**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| WESCO INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. <u>3:21-cv-00181</u> |
| | § | |
| MOODY NATIONAL BANK and | § | |
| MOODY BANCSHARES, INC., | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW Plaintiff Wesco Insurance Company ("Wesco"), by and through its undersigned attorneys, and brings this Complaint for Declaratory Judgment under 28 U.S.C. § 2201 against the above-named Defendants regarding Wesco's obligations to provide coverage under an insurance policy issued to Defendant Moody Bancshares, Inc. In support of its complaint, Wesco states as follows:

## NATURE OF THE ACTION

1.      This is an insurance coverage dispute regarding the appropriate limits of liability for an underlying lawsuit against Moody National Bank in the Probate Court of Galveston County under Cause No. PR 0075340-B (the "Fiduciary Duty Suit"). Wesco has agreed to reimburse defense expenses to the insured Bank under the July 2015 Policy in which the underlying plaintiff's claims were first made or anticipated, subject to that policy's $1,000,000 limit of liability. The Bank has demanded that Wesco instead provide

$3,000,000 in coverage under a July 2018 Policy that was sought after the underlying claims began or were expected.

2.      Wesco seeks a declaration that it has no obligation under the July 2018 Policy to pay any loss, including defense expenses, settlements, or judgments, incurred by the Defendants in connection with the Fiduciary Duty Suit.  In the alternative, Wesco seeks a declaration that its obligations for the Fiduciary Duty Suit under the July 2018 Policy and any other policy are limited to the payment of $1,000,000.

## PARTIES

3.      Plaintiff Wesco Insurance Company ("Wesco") is a corporation, incorporated under the laws of the State of Delaware.  Wesco has its principal place of business in New York, New York.

4.      Defendant Moody National Bank (the "Bank" or "MNB") is a nationally chartered bank domiciled in the State of Texas.  The Bank is headquartered in Galveston, Texas.

5.      Defendant Moody Bancshares, Inc. is a corporation formed under the laws of the State of Texas, and has its principal place of business in Galveston, Texas.  Moody Bancshares, Inc. is the holding company of the Bank and the named insured under the policy issued by Wesco.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter is between citizens of different states.

7.      This Court has the power to determine the parties' respective rights and legal obligations as requested herein pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.  The dispute between Wesco and Defendants, discussed below, creates an actual controversy for this Court to adjudicate.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because all Defendants reside and do business within this judicial district and a substantial part of the events giving rise to this suit occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.      The Bank's Administration of the Moody Estate and Trusts

9.      Moody National Bank is a full-service bank offering trust and fiduciary services, including services as a trustee and executor.

10.     In April 2014, the Bank was named and accepted appointment as trustee of the living trust and testamentary trusts of W.L. Moody IV ("Mr. Moody").

11.     In July 2014, Mr. Moody died from complications of dementia.

12.     In August 2014, the Bank was qualified and appointed as independent executor of Mr. Moody's estate (the "Estate").

13.     The Estate and trusts were overseen and administered by Bank trust officers John Smith and Toby Sessions.  Mr. Smith and Mr. Sessions are vice presidents and officers of the Bank.

14.     Following its appointment as executor, the Bank decided that certain property held by Mr. Moody (including his shares in Moody Ranches, Inc.) was community property.  As a result, the Bank took the position that the Estate and related testamentary

trusts were entitled to only one half of the designated property and that the other half of such property belonged to Mr. Moody's second wife, Deloris Darlene Moody ("Darlene").

15.     Upon information and belief, the Bank made this decision regarding the designation of community property on or before March 25, 2015, when Mr. Sessions communicated that Darlene was a 50% owner of Moody Ranches, Inc.   The Bank subsequently served an inventory of Estate assets in January 2016, signed by Mr. Smith, confirming the Bank's position that Moody Ranches, Inc. and other property held by Mr. Moody would be treated as community property.

16.     The effect of the Bank's decision was that more than $30,000,000 in assets were recognized as Darlene's separately-owned property, and not as the property of the Estate or testamentary trusts.  This included a 50% share of ownership in Moody Ranches, Inc., which was valued at $44,800,000 in the inventory.

17.     The Bank and Darlene thereafter decided to sell Moody Ranches, Inc. and its main underlying asset (the 46,000-acre Rancho Rio Grande).

18.     In making its designation of community property, the Bank relied on a Marital Property Agreement signed approximately three months before Mr. Moody's death.

19.     Upon information and belief, the Bank did not disclose the Marital Property Agreement to the other trust beneficiaries, including Mr. Moody's daughter, Linda Moody ("Linda"), until July 2016.

20.     After finding out about the Marital Property Agreement, Linda raised concerns about the agreement's validity and asked the Bank not to enforce it.

21.     Linda also objected to the Bank's plan to sell Moody Ranches, Inc. and the Rancho Rio Grande.

**B.     Linda's 2016 Demand Letters to the Bank**

22.     Over the course of 2016, Linda or her attorney sent no less than five letters to the Bank regarding the Bank's plan to sell Moody Ranches, Inc. and the Rancho Rio Grande.

23.     On May 3, 2016, Linda sent a letter to Mr. Smith, stating she was "unconvinced that accepting the present offer [for sale of the ranch] would be in the best interests of any of the beneficiaries." Linda also "question[ed] the judgment behind limiting exposure of the property to the private market," and demanded that the trustee and its broker execute a full open market advertising plan and "fulfill the fiduciary obligation to stoke, not stifle, competition among qualified and interested buyers."

24.     On June 3, 2016, Linda's attorney wrote to counsel for the Bank, stating that Linda "is not willing to consent to the sale" of Moody Ranches, Inc., and asserting that the proposed sale price was millions of dollars less than the fair market value of the Rancho Rio Grande and other assets owned by the corporation. That letter "demands that the Ranch not be sold until January 2019 or later" in order to avoid a built-in gains tax. The letter also asserts that the Bank has a "fiduciary duty to the beneficiaries of the Estate and Trust to make the Ranch profitable," and demands that the ranch be made profitable until it is sold in January 2019 or later. A true and correct copy of this June 3, 2016 demand letter is attached as Exhibit 1 (Bates Labeled WIC 0001-0002).

25.     On July 25, 2016, Linda's attorney wrote to counsel for the Bank, stating that Linda "again demands that [the Bank] not sell Moody Ranches, Inc. (the "Corporation") or Rancho Rio Grande (the "Ranch") until January 2019 or later and, during the interim, make the Ranch productive by leasing the Ranch for hunting and grazing and leasing the 6,000 acre feet of Class A water rights." That letter further states: "**Selling the Ranch now for a price that is $9,267,727 less than current fair market value of the Ranch is not in the best interest of the remainder beneficiaries and is a breach of the Bank's fiduciary duty to the remainder beneficiaries.**" A true and correct copy of this July 25, 2016 demand letter is attached as Exhibit 2 (Bates Labeled WIC 0003-0005).

26.     On August 11, 2016, Linda's attorney wrote to counsel for the Bank, demanding that the Bank cease moving forward with the disposition of Moody Ranches, Inc., and reiterating Linda's position that "selling Moody Ranches, Inc. at a discounted price is not in the best interest of the income nor remainder beneficiaries." That letter also states that, as trustee, the Bank "has a duty to make the property productive," and urges the Bank to do so.

27.     On October 17, 2016, Linda wrote a letter to Mr. Smith, stating that it remains her position that the assets of Moody Ranches, Inc. should be sold in a manner and at such time that maximizes the value of the beneficiaries' interests, and that it is "clearly more advantageous for the trustee to wait until 2019 to sell the ranch assets." She also states that the underlying assets of Moody Ranches Inc. "can and should be put to work to earn a profit during the few short years until they can be sold at full, fair market value without incurring built-in-gains taxes or discounts," and she demands that the Bank provide

additional information regarding the contemplated sale and the Bank's analysis of options to make the ranch productive.

28.     Upon information and belief, Linda also made other demands or communications to the Bank in the period prior to July 17, 2018, alleging that the Bank made errors, breached fiduciary duties, or took other wrongful acts in its administration of the trusts or the Estate or in the sale of Moody Ranches, Inc. or the Rancho Rio Grande.

29.     The Bank closed the sale of Moody Ranches, Inc. on or about October 11, 2016 for a price of approximately $37,000,000.

30.     The Bank or one or more of its officers knew in October 2016 that Linda objected to this sale.

31.     The Bank or one or more of its officers knew in October 2016 that the sale of Moody Ranches, Inc. was for a price that Linda believed was $11,000,000 to $18,000,000 less than the appraised or fair market value of the ranch and other assets owned by the corporation.

32.     The Bank did not report any of the communications or demands described in paragraphs 21 through 26 to Wesco prior to completing the sale of Moody Ranches, Inc.

33.     The Bank did not report any of the communications or demands described in paragraphs 21 through 26 to Wesco prior to July 17, 2018, or within 90 days after that date.

34.     The Bank did not report any of the communications or demands described in paragraphs 21 through 26 to Wesco until March 2020 or later.

C. **Linda's 2016 Lawsuit against the Bank and Darlene**

35.     On November 9, 2016, Linda initiated suit against Darlene and the Bank in the Probate Court of Galveston County, Texas, under Cause No. PR 0075340-A (the "Probate Litigation").  A true and correct copy of Linda's petition in the Probate Litigation (excluding its exhibits) is attached as Exhibit 3 (Bates Labeled WIC 0006-0021).

36.     Moody National Bank, as Trustee of the W.L. Moody IV Living Trust and as Independent Executor of the Estate of W.L. Moody IV, is named as a defendant in the Probate Litigation.

37.     Linda's petition in the Probate Litigation sought a declaration that the Marital Property Agreement (relied upon by the Bank to decide certain property was community property belonging one half to Darlene) was void and unenforceable and that Mr. Moody lacked the requisite capacity to execute that agreement.  Linda's petition also sought an order restraining and prohibiting the Bank, in any capacity, from distributing, transferring, pledging, encumbering, gifting, or otherwise removing or disposing of any funds or other assets of the Estate to Darlene pursuant to the Marital Property Agreement.

38.     Linda claims she was forced to commence the Probate Litigation and spend her personal funds to challenge the validity and enforceability of the Marital Property Agreement, because the Bank itself would not challenge the validity and enforceability of that agreement.

39.     During the course of the Probate Litigation, Linda objected to certain actions taken by the Bank to aid, assist, and align itself with Darlene and to oppose Linda's efforts to set aside the Marital Property Agreement and increase the assets of the Estate and trusts.

40.     On or about March 15, 2017, Linda alleged in her written discovery responses that the Bank had breached its fiduciary duties and that the Bank had failed to comply with its duty to protect and defend assets of the Estate.

41.     On or about February 13, 2018, Linda's attorney reminded the Bank of its fiduciary obligations to Linda and requested in writing that the Bank withdraw its motion for summary judgment against Linda.

42.     On or about May 4, 2018, Linda repeated her allegation in her written disclosures that the Bank had failed to comply with its duty to protect and defend assets of the Estate.

43.     Upon information and belief, Linda or her attorney also asked the Bank to refrain from opposing Linda's position, refrain from seeking an award of fees against Linda, or refrain from taking other actions adverse to Linda in the Probate Litigation.

44.     The Probate Litigation was tried to a jury in May 2018.  On May 31, 2018, the jury returned a unanimous verdict, finding that Mr. Moody lacked capacity to enter into the Marital Property Agreement and finding that the Marital Property Agreement was unenforceable.

45.     No later than July 16, 2018, the Bank or one or more of its officers knew that the jury believed the Bank incorrectly relied upon the Marital Property Agreement in determining the status of property held by Mr. Moody.

46.     No later than July 16, 2018, the Bank or one or more of its officers knew that Linda was likely to pursue another lawsuit or other claim against the Bank.

47.     Upon information and belief, Linda made a demand on or before July 16, 2018 that the Bank reclassify property held by Mr. Moody as property of the Estate or Trusts based on the jury verdict and seek to recover assets previously distributed to Darlene.

48.     Upon information and belief, Linda made a demand on or before July 16, 2018 that the Bank pay for her attorney fees in the Probate Litigation.

49.     Upon information and belief, Linda made other demands for monetary damages or non-monetary relief on or before July 16, 2018, based on or related to the jury verdict.

**D.     The Bank's 2017 Notice of Circumstances and Its 2018 Request for Higher Limits of Insurance from Wesco**

50.     Wesco has issued two claims made liability policies to the Bank (the "Policies").

51.     The first policy, Policy No. WML1389494 00, was for the policy period of July 17, 2015 to July 17, 2018 (the "July 2015 Policy").  The second policy, Policy No. WDO1389494 01, was for the policy period of July 17, 2018 to July 17, 2021 (the "July 2018 Policy").

52.     The Bank provided written notice of the Probate Litigation to Wesco on February 8, 2017.  On February 13, 2017, the Bank provided Wesco with a copy of Linda's November 9, 2016 petition in that proceeding.

53.     In its February 8, 2017 notice, the Bank stated that Linda does not allege that the Bank is liable.  The Bank also states: "Should the petitioner amend her claim to allege

liability, such that coverage arises, [the Bank] will update this notice accordingly."

54. The Bank thereafter confirmed that the notice had been provided as a notice of circumstances or notice of potential claim, and that there were no current allegations of wrongful conduct by the Bank.

55. Wesco asked the Bank to advise Wesco if the status of the matter changes or if there any allegations made against the Bank.

56. The Bank did not disclose or provide notice to Wesco of Linda's 2016 demand letters regarding the sale of Moody Ranches, Inc. or the Rancho Rio Grande at that time, or at any other time on or before July 17, 2018.

57. At no time on or before July 17, 2018 did the Bank disclose or provide notice to Wesco of Linda's allegations in her written discovery responses that the Bank had breached its fiduciary duties and failed to comply with its duty to protect and defend assets of the Estate.

58. At no time on or before July 17, 2018 did the Bank disclose or provide notice to Wesco of the May 31, 2018 jury verdict.

59. On or about June 25, 2018, the Bank signed and submitted an application for the second policy from Wesco (the July 2018 Policy), to take effect at the end of the July 2015 Policy.

60. In July 2018, the Bank requested that the second policy contain higher limits of liability for Professional Liability (including Trust Services Liability). The Bank asked that the limit of liability for Professional Liability be increased from $1,000,000 to $3,000,000.

61.     While applying for the second policy or requesting higher limits of coverage, the Bank did not disclose or provide notice to Wesco of Linda's 2016 demand letters, the May 31, 2018 jury verdict, or Linda's allegations that the Bank had breached its fiduciary duties and duty to protect and defend assets of the Estate.

62.     In its June 25, 2018 application, the Bank represented that the Bank and its officers did not have knowledge of any fact, circumstance or situation related to any coverage applied for which could reasonably be expected to give to a future claim.

63.     This representation was false.

64.     In its June 25, 2018 application, the Bank also represented that there had not been any lawsuits, civil or criminal proceedings, or written or oral demands for monetary damages or non-monetary relief involving the Bank or any officer during the past three years.

65.     This representation was false.

66.     Upon information and belief, the Bank intentionally concealed and failed to disclose Linda's 2016 demand letters, the May 31, 2018 jury verdict, and Linda's allegations of breach of fiduciary duty or other wrongful acts by the Bank.

**E.     Linda's Related Fiduciary Duty Suit against the Bank**

67.     On February 27, 2020, Linda filed suit against the Bank in the Probate Court of Galveston County, Texas, under Cause No. PR 0075340-B (the "Fiduciary Duty Suit"). A true and correct copy of Linda's petition in the Fiduciary Duty Suit (excluding its exhibits) is attached as Exhibit 4 (Bates Labeled WIC 0022-0037).

68.     The Fiduciary Duty Suit arises from and is based upon the Bank's conduct in the prior Probate Litigation and the Bank's sale of Moody Ranches Inc. and the Rancho Rio Grande.

69.     In her petition in the Fiduciary Duty Suit, Linda recites provisions from and attaches copies of the same will and trust instruments that were quoted from and attached to her petition in the Probate Litigation.

70.     In her petition, Linda alleges that the Bank has failed and/or delayed to fund her individual trust.

71.     In her petition, Linda alleges that the Bank took the position that Moody Ranches, Inc. and other property held by Mr. Moody should be treated as community property (belonging one half to Darlene) pursuant to the Marital Property Agreement.

72.     Linda alleges that the Bank knew that the Marital Property Agreement purported to drastically reduce the assets of the Estate and trusts, and that the Bank knew Mr. Moody suffered from dementia during the time period that the agreement was signed. Linda also alleges that she immediately voiced her concerns regarding the validity of the Marital Property Agreement once it was disclosed to her.

73.     Linda alleges that the Bank effectively did nothing to investigate the validity or invalidity of the Marital Property Agreement.  Linda's petition also quotes the testimony of trust officer Smith from the Probate Litigation regarding the brevity of his investigation.

74.     Linda alleges that the Bank also aligned itself with Darlene and defended the Marital Property Agreement, to the detriment of Linda, the Estate, and trusts.

75.     Linda alleges that, as a result of the Bank's actions and inaction, she was forced to file the Probate Litigation on her own and spend hundreds of thousands of dollars of her personal funds to do what the Bank was required to do – protect the assets of the Estate and trusts.

76.     Linda alleges that, during the Probate Litigation, the Bank continued its favoritism toward Darlene and actively opposed Linda's claim to invalidate the Marital Property Agreement, despite the fact that Linda's claims would serve to enlarge the assets of the Estate and trusts by approximately $25,000,000.

77.     Linda alleges that the Bank aided, assisted, and aligned itself with Darlene for the entirety of the Probate Litigation by (among other things): filing a motion for summary judgment against Linda in February 2018 that mimicked the grounds asserted by Darlene and that asked for fees to be assessed against Linda; asking Linda in February 2018 to withdraw her discovery responses alleging a breach of duty by the Bank; and intentionally violating the motion in limine during opening and closing arguments at the trial in May 2018.

78.     Linda alleges that the Bank then continued to breach its fiduciary duties by refusing to pay Linda the attorney fees that were awarded in the Probate Litigation and by filing post-trial motions and an appeal, which sought to reverse the jury verdict that benefited the Estate and trusts.  Linda further alleges that the Bank has refused to dismiss the appeal of the Probate Litigation and refused to pay the fees awarded in the Probate Litigation, even after written request by all trust beneficiaries.

79.     Linda's petition in the Fiduciary Duty Suit also alleges that the Bank breached its duties of care and competence in connection with the sale of Moody Ranches, Inc. and the Rancho Rio Grande.

80.     Linda alleges that the Bank executed a contract in September 2016 to sell Moody Ranches, Inc. for nearly $20,000,000 less than the company's previously appraised value.

81.     Linda claims that this caused millions of dollars in injury to Linda and the other beneficiaries of the trusts and deprived each of them use and enjoyment of the ranch.

82.     Linda also alleges that the Bank completed the sale of the company over Linda's written objections.  In her petition, Linda expressly refers to three examples of such objections: the June 3, 2016 demand letter, August 11, 2016 demand letter, and October 17, 2016 demand letter sent to the Bank or the Bank's counsel.

### F.     The Bank's Request for Coverage and the Parties' Coverage Dispute

83.     The Bank provided notice to Wesco of the Fiduciary Duty Suit on March 11, 2020, and invoked its alleged right to coverage under the July 2015 Policy and the July 2018 Policy.

84.     The July 2015 Policy and the July 2018 Policy are both "claims made" policies.

85.     Under both Policies, a Claim is defined to include "a written demand for monetary damages or non-monetary relief" and "a civil proceeding commenced by the service of a complaint or similar pleading."

86.     Under both Policies, a Claim must be "first made" during the policy period in order to trigger coverage under the insuring agreement for Trust Services Liability.

87.     Under both Policies, all Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts are considered a single Claim that is deemed to have been "first made" on the date the earliest of such Claims was first made.

88.     Under both Policies, if the Insured becomes aware of facts or circumstances that may reasonably give rise to a potential claim and gives written notice to the Insurer of such facts or circumstances, any Claim subsequently made shall be deemed to have been "first made" during the policy year in which that written notice was given to the Insurer.

89.     The July 2015 Policy was issued for the policy period of July 17, 2015 to July 17, 2018 and provides Trust Services Liability coverage subject to a $1,000,000 limit of liability.

90.     The July 2018 Policy was issued for the policy period of July 17, 2018 to July 17, 2021, and provides Trust Services Liability coverage subject to a $3,000,000 limit.

91.     The July 2018 Policy also includes an endorsement addressing the impact of Prior Knowledge or Litigation on the excess or increased limits of liability.

92.     That endorsement provides that "the Insurer shall not be liable to pay any Loss or Defense Expenses in excess of $1,000,000 in connection with any Claim made against any Insured arising from, based upon, or attributable to any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a Potential Claim about which any Executive had knowledge prior to 7/17/2018" (the "Prior Knowledge Exclusion").

93.     The endorsement to the July 2018 Policy also provides that "the Insurer shall not be liable to pay any Loss or Defense Expenses in excess of $1,000,000 in connection with any Claim made against any Insured arising from, based upon, or attributable to any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any Insured prior to 7/17/2018, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or Wrongful Act underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding" (the "Prior or Pending Litigation Exclusion").

94.     As part of its investigation and review of the Bank's request for coverage, Wesco received for the first time a copy of the correspondence the Bank had exchanged with Linda prior to the initiation of the Probate Litigation and a copy of the May 31, 2018 jury verdict.

95.     Wesco then determined that the Fiduciary Duty Suit was related to Linda's 2016 demand letters to the Bank, and that the combined Claim was deemed to have been first made in 2016.

96.     Wesco also determined that the Fiduciary Duty Suit involved the same facts or circumstances that were the subject of the Bank's February 2017 notice of circumstances.

97.     As a result, Wesco advised the Bank that the Fiduciary Duty Suit was a Claim that was deemed to have been "first made" within the policy period of the July 2015 Policy, and that any coverage was subject to the $1,000,000 limit of liability applicable to the July 2015 Policy.

98.     Wesco also advised the Bank that, even if the Fiduciary Duty Suit was found to have been first made during the policy period of the July 2018 Policy (instead of the July 2015 Policy), coverage for the Fiduciary Duty Suit would still be limited to a maximum of $1,000,000, based on the Prior Knowledge Exclusion and/or Prior and Pending Litigation Exclusion that were added to the July 2018 Policy by endorsement.

99.     Accordingly, Wesco advised the Bank that Wesco would agree to reimburse the Bank's defense expenses for the Fiduciary Duty Suit, subject to a reservation of rights and subject to a $1,000,000 limit of liability.  Wesco also reserved its rights on a number of other bases and continues to do so, regardless of whether such additional bases are listed in the current Complaint.

100.     The Bank now disputes Wesco's coverage determination.

101.     The Bank takes the position that the July 2018 Policy, and not the July 2015 Policy, applies to the Fiduciary Duty Suit.

102.     The Bank also argues that it is entitled to up to $3,000,000, not $1,000,000, in coverage for the Fiduciary Duty Suit.

103.     The damages demanded by the claimant and the defense expenses incurred to date demonstrate that there is a real and actual controversy to adjudicate regarding the dispute over the applicable limit of liability.

104.     Wesco therefore brings this declaratory judgment action to resolve the parties' ongoing dispute, and to seek a declaration that the Bank is not entitled to $3,000,000 in coverage under the July 2018 Policy for one or more of the reasons described below.

## COUNT ONE: Declaratory Judgment - Claim Not First Made
## During July 2018 Policy Period

105.     Wesco hereby incorporates by reference the allegations contained in paragraphs 1-104 of this Complaint, as if set forth fully herein.

106.     In order to trigger coverage under the July 2018 Policy, the Bank must establish that the Claim for which it seeks coverage was "first made" within the policy period of July 17, 2018 to July 17, 2021.

107.     Under Section III.C of the Wesco Policies' General Terms and Conditions, Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim, and that single Claim shall be deemed to be first made on the date the earliest of such Claims was first made, regardless of whether such date is before or during the policy period.

108.     The Wesco Policies defines Interrelated Wrongful Acts to mean "Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions."

109.     The Fiduciary Duty Suit is a civil proceeding that constitutes a Claim within the meaning of the Wesco policies.

110.     Linda's June 3, 2016 demand letter is a written demand for non-monetary relief and constitutes a Claim within the meaning of the Wesco policies.

111.     Linda's July 25, 2016 demand letter is a written demand for non-monetary relief and constitutes a Claim within the meaning of the Wesco policies.

112.    One or more of Linda's other demand letters or other written communications to the Bank prior to July 17, 2018 constitute a "Claim" within the meaning of the Wesco policies.  These communications and Linda's June 3, 2016 and July 25, 2016 letters are collectively referred to as "Linda's Demand Letters."

113.    The Fiduciary Duty Suit and one or more of Linda's Demand Letters are based upon or arise out of one or more of the same Wrongful Acts.

114.    Without limitation, the Fiduciary Duty Suit and one or more of Linda's Demand Letters arise out of or are based upon one or more of the following: the Bank's determination that Moody Ranches, Inc. should be treated as community property; the Bank's determination that Darlene was a 50% shareholder of Moody Ranches, Inc.; the Bank's determination that Darlene had the power to force a sale of Moody Ranches, Inc.; the Bank's decision to sell the Rancho Rio Grande (owned by Moody Ranches, Inc.) in 2016 instead of waiting until 2019; the Bank's completion of the sale of Moody Ranches, Inc. over Linda's objection; and the Bank's sale of Moody Ranches, Inc. or the Rancho Rio Grande for less than its appraised or fair market value.

115.    Alternatively, or in addition, the Fiduciary Duty Suit and one or more of Linda's Demand Letters are based upon or arise out of one or more Interrelated Wrongful Acts.

116.    Without limitation, the Fiduciary Duty Suit and one or more of Linda's Demand Letters have as a common nexus one or of the following facts, circumstances, situations, events, or transactions: Mr. Moody's death; Mr. Moody's creation of the trusts; Linda's status as a beneficiary of the trusts; Mr. Moody's execution of the Marital Property

Agreement; the Bank's application or enforcement of the Marital Property Agreement; the Bank's determination regarding the ownership of Moody Ranches, Inc.; the Bank's transfer of 50 percent ownership of Moody Ranches, Inc. to Darlene; and the sale of Moody Ranches, Inc. and the Rancho Rio Grande.

117.    For one or more of the reasons alleged above, the Fiduciary Duty Suit is considered to be part of a single Claim with one or more of Linda's Demand Letters, and that Claim is deemed to have been first made at the time of the earliest of the Demand Letters to which the Fiduciary Duty Suit is related.

118.    The Fiduciary Duty Suit is deemed to have been first made prior to July 17, 2018.

119.    The Fiduciary Duty Suit is not a claim that was first made during the policy period of the July 2018 Policy.

120.    The Bank is not entitled to coverage for the Fiduciary Duty Suit under the July 2018 Policy.

### COUNT TWO: Declaratory Judgment – Claim Related to a Prior Notice of Circumstances

121.    Wesco hereby incorporates by reference the allegations contained in paragraphs 1-120 of this Complaint, as if set forth fully herein.

122.    In order to trigger coverage under the July 2018 Policy, the Bank must establish that the Claim for which it seeks coverage was "first made" within the policy period of July 17, 2018 to July 17, 2021.

123.    Under Section V.B of the Wesco Policies' General Terms and Conditions, if the Insured becomes aware of facts or circumstances that may reasonably give rise to a potential claim and gives written notice to the Insurer of such facts or circumstances, any Claim subsequently made shall be deemed to have been "first made" during the policy year in which that written notice was given to the Insurer.

124.    On February 8, 2017, the Bank gave written notice to Wesco that the Bank had been named as a party in the Probate Litigation and that Linda alleged the Marital Property Agreement was invalid.

125.    On February 13, 2017, the Bank provided Wesco with a written copy of Linda's complete petition in the Probate Litigation.

126.    Linda's petition in the Probate Litigation notes that the Bank has been appointed as the independent executor of Mr. Moody's Estate and as trustee of the related trusts.

127.    Linda's petition in the Probate Litigation states that the Bank has taken the position that the Marital Property Agreement converted certain property held by Mr. Moody, including his stock ownership in Moody Ranches, Inc., into community property.  Linda's petition also asserts that the Bank transferred shares of Moody Ranches, Inc. from the Estate to Darlene.

128.    Linda's petition alleges that the Bank did not disclose the Marital Property Agreement to Linda until July 2016.

129.    Linda's petition seeks an injunction to protect the assets rightfully belonging to the Estate from being unlawfully distributed, and asks the court to enjoin the Bank from distributing any Estate funds to Darlene pursuant to the Marital Property Agreement.

130.    The Fiduciary Duty Suit is based upon or arises out of one or more of the facts or circumstances that the Bank gave Wesco notice of in 2017.

131.    Without limitation, the Fiduciary Duty Suit is based upon or arises out of one or more of the following facts or circumstances: the Bank's service as independent executor of Mr. Moody's Estate; the Bank's determination that the Marital Property Agreement was valid; the Bank's distribution of property to Darlene; the Bank's transfer of shares in Moody Ranches, Inc. from the Estate to Darlene; Linda's challenge to the validity of the Marital Property Agreement; the Bank's failure to disclose the Marital Property Agreement to Linda until July 2016; and the Bank's conduct as a party in the Probate Litigation.

132.    The Fiduciary Duty Suit is deemed to be a Claim that was first made in the policy year in which the Bank first gave Wesco written notice of the facts and circumstances alleged in the Probate Litigation or related to Linda's challenge to the Marital Property Agreement.

133.    The Fiduciary Duty Suit is deemed to be a Claim that was first made in the policy year of July 17, 2016 to July 17, 2017.

134.    The Fiduciary Duty Suit is not a claim that was first made during the policy period of the July 2018 Policy.

135.    The Bank is not entitled to coverage for the Fiduciary Duty Suit under the July 2018 Policy.

## COUNT THREE: Declaratory Judgment – Excess Limits Precluded by
## Prior and Pending Litigation Exclusion

136.    Wesco hereby incorporates by reference the allegations contained in paragraphs 1-135 of this Complaint, as if set forth fully herein.

137.    In the event coverage is triggered under the July 2018 Policy, it is subject to the other terms, conditions, limitations, and exclusions of that policy.

138.    The July 2018 Policy includes an endorsement titled "Exclusion – Prior Knowledge / Litigation (for Excess Limit of Liability)."

139.    The endorsement includes the Prior and Pending Litigation Exclusion, which states that "the Insurer shall not be liable to pay any Loss or Defense Expenses in excess of $1,000,000 in connection with any Claim made against any Insured arising from, based upon, or attributable to any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any Insured prior to 7/17/2018, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or Wrongful Act underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding."

140.    Linda initiated the Probate Litigation on or about November 9, 2016 and before July 17, 2018.

141.    The Bank was named as a defendant in the Probate Litigation.

142.    In the Probate Litigation, the Bank sought to enjoin and prohibit the Bank from making any further distributions of property out of the Estate or trusts.

143.    The Fiduciary Duty Suit arises from, is based upon, or is attributable to the Probate Litigation.

144.    Without limitation, the Fiduciary Duty Suit arises from, is based upon, or is attributable to one or more of the following: Linda's allegation that she was forced to file the Probate Litigation due to the Bank's actions or inaction; the Bank's alignment with Darlene during the Probate Litigation; the Bank's filing of a motion for summary judgment against Linda in the Probate Litigation; the Bank's failure to pay attorney fees awarded to Linda in the Probate Litigation; the Bank's payment of unreasonable or unnecessary attorney fees and expenses in the Probate Litigation; the Bank's filing of post-trial motions in the Probate Litigation; the Bank's appeal of the jury's verdict in the Probate Litigation; and the Bank's refusal to dismiss its appeal in the Probate Litigation.

145.    Alternatively, or in addition, the Fiduciary Duty Suit arises from, is based upon, or is attributable to one or more of the same facts, circumstances, situations, or Wrongful Acts underlying or alleged in the Probate Litigation.

146.    Without limitation, the Fiduciary Duty Suit arises from, is based upon, or is attributable to one or more of the following facts, circumstances, situations, or Wrongful Acts: the Bank's service as independent executor of Mr. Moody's Estate; the Bank's determination that Moody Ranches, Inc. was community property; the Bank's transfer of shares in Moody Ranches, Inc. from the Estate to Darlene; the Bank's distribution of other property to Darlene; the Bank's position that the Marital Property Agreement was valid; the Bank's failure to adequately investigate the Marital Property Agreement; the Bank's failure to disclose the Marital Property Agreement to Linda prior to July 2016; the Bank's opposition to Linda's

challenge to the Marital Property Agreement; and the Bank's failure to protect and defend the assets of the Estate.

147.    In its prior communications with Linda's counsel, the Bank has taken the position that Linda's allegations in the Fiduciary Duty Suit "are intertwined with" the Probate Litigation.

148.    For one or more of the reasons alleged above, the Prior and Pending Litigation Exclusion applies to the Fiduciary Duty Suit.

149.    Thus, if coverage is triggered under the July 2018 Policy instead of the July 2015 Policy, Wesco has no obligation to pay for any Loss or Defense Expenses in excess of $1,000,000 in connection with the Fiduciary Duty Suit.

## COUNT FOUR: Declaratory Judgment – Excess Limits Precluded by the Prior Knowledge Exclusion

150.    Wesco hereby incorporates by reference the allegations contained in paragraphs 1-149 of this Complaint, as if set forth fully herein.

151.    In the event coverage is triggered under the July 2018 Policy, it is subject to the other terms, conditions, limitations, and exclusions of that policy.

152.    The July 2018 Policy includes an endorsement titled "Exclusion – Prior Knowledge / Litigation (for Excess Limit of Liability)."

153.    The endorsement includes the Prior Knowledge Exclusion, which states that "the Insurer shall not be liable to pay any Loss or Defense Expenses in excess of $1,000,000 in connection with any Claim made against any Insured arising from, based upon, or attributable to any fact, circumstance, situation, or event that is or reasonably would be

regarded as the basis for a Potential Claim about which any Executive had knowledge prior to 7/17/2018."

154.    John Smith is an executive vice president and officer of the Bank.

155.    Prior to July 17, 2018, John Smith had knowledge of one or more facts, circumstances, situations, or events that was or reasonably would have been regarded as the basis for a potential claim.

156.    Without limitation, John Smith had knowledge of one or more of the following facts, circumstances, situations, or events prior to July 17, 2018: Linda's Demand Letters; Linda's claim that the sale of Moody Ranches Inc. and the Rancho Rio Grande was not in the best interests of the trust beneficiaries; the Bank's completion of the sale of Moody Ranches, Inc. over Linda's objection; Linda's claim that Moody Ranches, Inc. and the Rancho Rio Grande had been sold for millions of dollars less than their appraised or fair market value; Linda's allegation that the Bank had failed to disclose the Marital Property Agreement to her until July 2016; Linda's allegation that the Bank had breached its fiduciary duty or engaged in negligent behavior in failing to fully investigate the legitimacy of the Marital Property Agreement before transferring assets from the Estate to Darlene; Linda's allegation that the Bank's failure to fully investigate the Marital Property Agreement could serve as the basis for an award of exemplary damages against the Bank; the jury's unanimous verdict finding the Marital Property Agreement void and unenforceable; Linda's allegation that the Bank had incurred unreasonable and unnecessary fees in the Probate Litigation; and Linda's allegations that the Bank had failed to comply with its duties to protect and defend the assets of the Estate.

157.    Knowledge of the above-listed facts, circumstances, situations, or events was regarded by John Smith or another executive of the Bank as the basis for a potential claim by Linda.

158.    Alternatively, or in addition, knowledge of the above-listed facts, circumstances, situations, or events reasonably would have been regarded by John Smith or another executive of the Bank as the basis for a potential claim.

159.    The Fiduciary Duty Suit arises from, is based upon, or is attributable to one or more of the facts, circumstances, situations, or events known to John Smith or another executive of the Bank.

160.    Without limitation, the Fiduciary Duty Suit arises from, is based upon, or is attributable to one or more of the facts, circumstances, situations, or events listed in paragraph 153.

161.    For one or more of the reasons alleged above, the Prior Knowledge Exclusion applies to the Fiduciary Duty Suit.

162.    Thus, if coverage is triggered under the July 2018 Policy instead of the July 2015 Policy, Wesco has no obligation to pay for any Loss or Defense Expenses in excess of $1,000,000 in connection with the Fiduciary Duty Suit.

## COUNT FIVE: Declaratory Judgment – Coverage Precluded by the Known Loss Doctrine

163.    Wesco hereby incorporates by reference the allegations contained in paragraphs 1-162 of this Complaint, as if set forth fully herein.

164.    Texas law prohibits insurance coverage for a matter where the insured is or should be aware of a known loss or loss in progress at the time the policy is purchased.

165.    The Bank or one or more of its officers knew or should have known prior to July 17, 2018 that it had engaged or was in engaging in activities which might reasonably be expected to expose the Bank to future claims of liability.

166.    Without limitation, the Bank or one or more of its officers knew prior to July 17, 2018 that the Bank had transferred 50 percent of the shares in Moody Ranches, Inc. to Darlene; had sold Moody Ranches, Inc. over Linda's objection; had sold Moody Ranches, Inc. for an amount that Linda alleged was millions of dollars less than its appraised or fair market value; had determined that the Marital Property Agreement was valid and enforceable; had failed to disclose the Marital Property Agreement to Linda prior to July 2016; had argued in the Probate Litigation that the Marital Property Agreement should be upheld; and had received the May 31, 2018 jury verdict that rejected the Bank's position and unanimously found that the Marital Property Agreement was unenforceable.

167.    The Bank or one or more of its officers knew prior to July 17, 2018 that Linda had alleged the Bank had or was breaching its fiduciary duties; that the Bank had failed to comply with its duties to protect and defend the assets of the Estate; and that the Bank had incurred unreasonable and unnecessary fees.

168.    For one or more of the reasons alleged above, the Known Loss Doctrine precludes the Bank for receiving coverage for the Fiduciary Duty Suit under the July 2018 Policy.

169.    Wesco is entitled to a declaration that it has no duty to pay any Loss or Defense Expenses for the Fiduciary Duty Suit under the July 2018 Policy.

## **PRAYER**

**WHEREFORE**, Wesco respectfully requests that the Court enter judgment in its favor for the following relief:

1.    An Order declaring that Wesco has no obligation under Wesco Policy No. WDO1389494 01 (the July 2018 Policy) to pay any loss, including defense expenses, settlements, or judgments, incurred by the Defendants in connection with the Fiduciary Duty Suit;

2.    In the alternative to Request No. 1, above, an Order declaring that Wesco's obligations under Wesco Policy No. WDO1389494 01 (the July 2018 Policy) and any other policy are limited to the payment of $1,000,000 in loss, including defense expenses, settlements, or judgments, incurred by the Defendants in connection with the Fiduciary Duty Suit;

3.    An Order awarding Wesco its costs and disbursements herein; and

4.    Such further relief, at law or in equity, as this Court deems just and proper.

Respectfully submitted,

Dated:  July 13, 2021                    By:  */s/ Alissa K. Christopher*
                                                         Alissa K. Christopher, Esq.
                                                         State Bar No. 11531020
                                                         COZEN O'CONNOR
                                                         1717 Main Street, Suite 3100
                                                         Dallas, TX 75201
                                                         Phone: (214) 462-3036
                                                         Fax: (214) 462-3299
                                                         akchristopher@cozen.com

In association with:

Daniel A. Ellerbrock, Esq.
MN Bar No. 0392039
(to be admitted *pro hac vice*)
GREGERSON, ROSOW, JOHNSON & NILAN
100 Washington Square, Suite 1550
Minneapolis, MN 55401
Phone: (612) 338-0755
Fax: (612) 349-6718
dellerbrock@grjn.com

***Attorneys for Wesco Insurance Company***