# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **WESCO INSURANCE COMPANY,** | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-CV-00181** |
| | § | |
| **MOODY NATIONAL BANK and** | § | |
| **MOODY BANCSHARES, INC.,** | § | |
| *Defendants/Counter-Plaintiffs.* | § | |

## DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR
## FINAL SUMMARY JUDGMENT

**WINSTEAD PC**

By: */s/ Yasmin Atasi*
    Yasmin Atasi, Attorney in Charge
    State Bar No. 10435150
    S.D. Tex. I.D. No. 13119
    yatasi@winstead.com
    600 Travis Street, Suite 5200
    Houston, Texas 77002
    Telephone: 713-650-8400
    Fax: 713-650-2400

**MILLS SHIRLEY L.L.P.**

Fred D. Raschke
State Bar No. 16551450
S.D. Tex. I.D. No. 7123
fraschke@millsshirley.com
P.O. Box 1943
Galveston, TX 77553-1943
Telephone: 409-761-4028
Fax: 409-763-2879

**ATTORNEYS FOR DEFENDANTS /
COUNTER-PLAINTIFFS MOODY
NATIONAL BANK AND MOODY
BANCSHARES, INC.**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.    INTRODUCTION AND BRIEF SUMMARY ...................................................... 1

II.   SUMMARY JUDGMENT EVIDENCE ............................................................... 3

III.  FACTUAL BACKGROUND .............................................................................. 3

    A.    The Wesco Policies ................................................................................. 3

            The 2015 Policy ................................................................................. 3

            The 2018 Policy ................................................................................. 4

    B.    Moody Family Background ...................................................................... 4

            Bill's Three-Part Estate Plan In April 2014 ...................................... 4

            Sale of Ranch in October 2016 ......................................................... 5

    C.    2016 Correspondence with Linda Moody ................................................ 5

    D.    November 2016 – The MPA Lawsuit and Notice to Wesco ....................... 7

    E.    February 2020 – The Fiduciary Lawsuit and Notice to Wesco .................. 8

    F.    February 2021 – Wesco's Coverage Denial ........................................... 10

    G.    July 2021 – This Coverage Lawsuit and Parties' Claims ......................... 11

IV.   ARGUMENT AND AUTHORITIES .................................................................. 11

    A.    Summary Judgment Legal Standards ..................................................... 11

    B.    The Law On Insurance Policy Construction ........................................... 12

    C.    Linda's 2016 Letters and the MPA Lawsuit Are Not "Claims" Under
           the Policies ........................................................................................... 14

            Linda's 2016 Letters .......................................................................... 16

            The MPA Lawsuit ............................................................................ 18

    D.    The Single Limit/Retention Provision Does Not Apply ........................... 19

    E.    The Notice of Potential Claims Provision Does Not Apply ...................... 22

    F.    The Prior Knowledge/Litigation Exclusion Does Not Apply ................... 24

    G.    The Known Loss Doctrine Does Not Apply ........................................... 28

    H.    Moody Is Entitled to Recover Its Attorneys' Fees and Expenses .............. 29

V.    CONCLUSION AND PRAYER ........................................................................ 29

CERTIFICATE OF SERVICE ........................................................................................ 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adi Worldlink, LLC v. RSUI Indem. Co.*,
  No. 4:16-CV-00665, 2017 WL 6403047 (E.D. Tex. Aug. 16, 2017).........................20

*Agilis Benefit Services, LLC v. Travelers Cas. And Surety Co. of Am.*,
  2010 WL 22595321 (E.D. Tex. Feb. 24, 2010), report and
  recommendation adopted, 2010 WL 8573372 (Apr. 30, 2010)...................................16

*Am. Int'l Spec. Lines Ins. Co. v. Rentech Steel LLC*,
  620 F.3d 558 (5th Cir. 2010) .......................................................................................13

*Avina v. JP Morgan Chase Bank, N.A.*,
  413 Fed.App'x. 764 (5th Cir. 2011) .............................................................................12

*Axis Surplus Ins. Co. v. Johnson*,
  No. 06-CV500-GKF-PJC, 2008 WL 4525409 (N.D. Okla. Oct. 3, 2008) .................21

*Burks v. XL Spec. Co.*,
  534 S.W.3d 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.),
  *judgment vacated but opinion not withdrawn at* 534 S.W.3d 470 (Tex.
  App.—Houston [14th Dist.] 2016, no pet.) (mem. op.)................................................20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).....................................................................................................12

*Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*,
  267 S.W.3d 20 (Tex. 2008)..........................................................................................13

*Fed. Ins. Co. v. CompUSA, Inc.*,
  239 F.Supp.2d 612 (N.D. Tex. 2002) ..........................................................................13

*Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*,
  538 F.3d 365 (5th Cir. 2008) .......................................................................................13

*Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*,
  174 F.3d 653 (5th Cir. 1999) .......................................................................................14

*Mayo v. Hartford Life Ins. Co.*,
  354 F.3d 400 (5th Cir. 2004) .......................................................................................13

*Moody v. Moody*,
613 S.W.3d 707 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) .......................... 8

*Oceans Healthcare, LLC v. Illinois Union Ins. Co.*,
379 F.Supp.3d 554 (E.D. Tex. 2019) ......................................................................... 16

*One Beacon Inc. Co. v. T. Wade Welch & Assocs.*,
841 F.3d 669 (5th Cir. 2016) ............................................................................... 26, 27

*Ragas v. Tenn. Gas Pipeline Co.*,
136 F.3d 455 (5th Cir. 1998) ..................................................................................... 12

*Reeves County v. Houston Cas. Co.*,
356 S.W.3d 664 (Tex. App.—El Paso, 2011) ............................................................ 20

*Regency Title Co., LLC v. Westchester Fire Ins.*,
5 F.Supp.3d 836 (E.D. Tex. 2013) ............................................................................ 13

*RLI Ins. Co. v. Maxxon Southwest, Inc.*,
108 Fed.App'x. 194 (5th Cir. 2004) .......................................................................... 28

*Sossamon v. Lone Star State of Tex.*,
560 F.3d 316 (5th Cir. 2009) ..................................................................................... 12

*In re Vantage Benefits Administrators, Inc.*,
No. 18-31351-SGJ7, 2021 WL 2954819 (N.D. Tex. July 14, 2021).......................... 28

*W.R. Starkey Mortgage, LLP v. Chartis Spec. Ins. Co.*,
No. 4:12-CV-219, 2013 WL 12138896 (E.D. Tex. June 27, 2013) ..................... 16, 17

*Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, LLP*,
267 F.Supp.2d 601 (E.D. Tex. 2003).................................................................... 14, 26

**Statutes and Rules**

FED. R. CIV. P. 56 ................................................................................................... 1, 12

TEX. CIV. PRAC. & REM. CODE § 38.001(8)................................................................. 29

Pursuant to Federal Rule of Civil Procedure 56, Defendants/Counter-Plaintiffs Moody National Bank ("MNB") and Moody Bancshares, Inc. ("Moody Bancshares") (collectively "Moody") file their Motion for Final Summary Judgment against Plaintiff/Counter-Defendant Wesco Insurance Company ("Wesco"). The Motion addresses Wesco's declaratory judgment action and MNB's breach of contract action, and if granted, would dispose of the entire matter.

## I.     INTRODUCTION AND BRIEF SUMMARY

1.      This insurance coverage dispute involves two consecutively issued claims-made policies, and a dispute as to which of the two policies affords coverage to MNB for an underlying breach of fiduciary lawsuit. MNB became the Successor Trustee of the W.L. "Bill" Moody, IV Living Trust following Bill's death in April 2014, and was also appointed as the Executor of Bill's Estate. Bill's daughter, Linda Moody ("Linda"), filed suit against MNB on February 27, 2020 alleging breaches of fiduciary duty and other claims relating to MNB's administration of the Trust (the "Fiduciary Lawsuit"). Wesco issued two consecutive claims-made commercial policies that afforded professional liability coverage for trust services to MNB in 2015 and 2018, each effective for three years. The Policies are nearly identical in coverages and language, except for their limits of liability. The 2015 Policy provides $1 million in coverage while the 2018 Policy provides $3 million.

2.      Coverage should be afforded under the 2018 Policy that was in effect when the Fiduciary Lawsuit was filed in February 2020. Wesco spuriously relies on "interrelatedness" provisions in the Policy to argue that retroactive coverage should only

be available under the 2015 Policy. In its futile effort to "shoehorn" coverage for a 2020 lawsuit into a 2015 earlier policy with lower limits, Wesco alleges that:

      a.    the Fiduciary Lawsuit relates to two letters between Linda and MNB dated June 3, 2016 and July 25, 2016, approximately *four years* before suit was filed, regarding the sale of a ranch following her father's death, which Wesco disingenuously describes as "demand letters" and therefore a "Claim" under the Policies;

      b.    the Fiduciary Lawsuit relates to a notice provided by MNB on February 8, 2017 to Wesco of a separate lawsuit filed by Linda against her stepmother, Darlene Moody ("Darlene"), in November 2016 in which Linda sought to annul a marital property agreement between Linda's father and stepmother; and

      c.    MNB knew in 2016 that Linda would file a breach of fiduciary suit against MNB in 2020, four years later!

    3.    By inconsistently positing that the Fiduciary Lawsuit "relates to" either the 2016 Letters or the 2017 Notice, Wesco is impermissibly seeking to convert the 2018 claims-made Policy (which is triggered upon the making of a "claim" against MNB for "wrongful trust services") into an occurrence-based policy. The law is clear that until a claim is actually made based on an alleged liability event, coverage is not triggered. Significantly and tellingly, Wesco's *own* claim notes for the Fiduciary Lawsuit expressly and unequivocally acknowledge that the Fiduciary Lawsuit and the MPA Lawsuit are *not* related, that the Fiduciary Lawsuit includes allegations of wrongdoing that post-date the

filing of the MPA Lawsuit, and that there is no interrelation to other claims. In a blatant about-face, after MNB paid approximately $115,000 in premiums for $3 million in coverage under the 2018 Policy, Wesco is now throwing the proverbial "kitchen sink" of policy provisions to "relate back" the Fiduciary Lawsuit to limit its liability.

4.      As more fully discussed below, none of the Policies' definitions, provisions or exclusions limit coverage. There is no genuine issue of material fact, and MNB is entitled to summary judgment (1) against Wesco on its request for a declaratory judgment that coverage is limited to $1 million, and (2) in favor of MNB on its breach of contract claim for Wesco's failure to provide $3 million in coverage under the 2018 Policy.

## II.      SUMMARY JUDGMENT EVIDENCE

5.      Moody's summary judgment evidence is included in an appendix that is filed contemporaneously with this Motion, and which is fully incorporated herein by reference.

## III.      FACTUAL BACKGROUND

### A.      The Wesco Policies

The 2015 Policy

6.      Wesco issued commercial policy no. WML1389494 00 to Moody Bancshares and MNB with effective dates from July 17, 2015 to July 17, 2018 (the "2015 Policy"). **Ex. A**.[1] The 2015 Policy includes a Professional Liability Coverage Part that provides Trust Services Coverage on a claims-made basis, subject to a $1 million limit of

---

[1]    Moody Bancshares is the first named insured in both Policies, and MNB is named in the Schedule of Subsidiaries covered by the Policies. **Ex. A at WIC 0805 and 0909** and **Ex. B at WIC 0707 and 0799**.

liability. _Id_. at WIC 0805 (Item 4 in Declarations Page) and WIC 0863 (Professional Liability Coverage Part).

The 2018 Policy

7.      Wesco subsequently issued commercial policy no. WDO1389494 01 to Moody Bancshares and MNB with effective dates from July 17, 2018 through July 17, 2021 (the "2018 Policy"), for which MNB paid $115,191 in premiums. **Ex. B**. at WIC 0707. Like the 2015 Policy, the 2018 Policy includes a Professional Liability Coverage Part that provides Trust Services Coverage on a claims-made basis, although coverage was increased to $3 million. _Id_. at WIC 0707 (Item 4 in Declarations Page) and WIC 0707 (Professional Liability Coverage Part). The 2015 Policy and 2018 Policy are collectively referred to as the "Policies."

**B.      Moody Family Background**

Bill's Three-Part Estate Plan In April 2014

8.      In April 2014, Bill executed a three-part estate plan consisting of a Will, a Trust Agreement, and a Marital Property Agreement (the "MPA").[2] Under the MPA, Bill and his wife of over 50 years,[3] Darlene, agreed to treat all property not specifically defined as separate property as community property. Under the Will, the Living Trust is the residuary beneficiary of the Estate, and Darlene was the beneficiary of the various trusts created under the Trust Agreement during her lifetime following Bill's death. Upon

---

[2]      Copies of the Trust Agreement, MPA and Will are attached as Exhibits A, B, and C, to the MPA Lawsuit (**Exhibit C**) and the Fiduciary Lawsuit (**Exhibit I**).

[3]      Bill and Darlene married in 1961. **Ex. C, ¶ 7**.

MOODY'S MOTION FOR FINAL SUMMARY JUDGMENT                    4 of 30

Darlene's death, the remaining assets would fund the Children's Trusts created under the Trust Agreement.[4]

9.     Bill died on July 14, 2014, survived by Darlene, three daughters from his first marriage (including Linda), a step-daughter, and a son with Darlene. Shortly thereafter, MNB was appointed to serve as Independent Executor of Bill's Estate. MNB also became the Successor Trustee of the Living Trust and all other trusts created under the Trust Agreement.[5] <u>Dkt. 1, ¶¶ 10-12</u>. John Smith, MNB's current Executive Vice President Senior Wealth Advisor, oversaw the administration of Bill's Estate and the Trusts. **<u>Ex. N, ¶ 3</u>**.

<u>Sale of Ranch in October 2016</u>

10.     While married to Darlene, Bill purchased Rancho Rio Grande (the "Ranch"), and subsequently conveyed it to Moody Ranches, Inc. ("MRI"). The Ranch was the primary asset of MRI. <u>Dkt. 1, ¶ 17</u>. On April 29, 2016, a little over two years after Bill's death, Darlene formally invoked her right under the Trust Agreement to demand that the Trustee sell MRI (and the Ranch, its primary asset), **<u>Ex. N-3</u>**. MRI (and the Ranch) were sold on October 11, 2016. **<u>Ex. N-15</u>**.

**C.     <u>2016 Correspondence with Linda Moody</u>**

11.     In light of Darlene's demand to sell the Ranch, MNB advised all of the beneficiaries of its plan to sell MRI in a letter dated May 2, 2016. **<u>Ex. N-4</u>**.

---

[4]     Darlene died on November 29, 2018.

[5]     Bill was the Trustee during his lifetime.

12.     Between May and October 2016, Linda corresponded with MNB in writing to (i) request marketing information and documents regarding the proposed sale [**Exs. N-2**, **N-5** and **N-6**], (ii) withhold consent to the sale, which was requested by the purchaser [**Exs. N-8** and **N-9**], (iii) complain of the proposed purchase price [**Exs. N-8** and **N-11**], and (iv) take the factually-unsupported position that the Ranch could be made productive and should not be sold until 2019 [**Exs. N-11** and **N-14**]. Linda *never* made any demand in any of her 2016 letters to MNB for monetary relief or threatened any legal consequence if MNB did not comply with her vague request to "make the Ranch productive" and postpone the sale of the Ranch until 2019.

13.     MNB dutifully responded to all of Linda's written communications, forwarding all requested documentation [**Ex. N-7**], providing support for its determination that the Ranch was financially unproductive [**Exs. N-4**, **N-7** and **N-5**], explaining Darlene's right to demand the sale under the Trust Agreement and its attempt to balance the interests of both the lifetime and remainder beneficiaries [**Exs. N-4**, **N-10** and **N-12**], and reiterating the tax benefit posed by selling MRI [**Exs. N-10** and **N-13**]. Ultimately, MNB advised all beneficiaries that the sale of MRI (and its largest asset, the Ranch) closed on October 11, 2016. [**Ex. N-15**].[6]

14.     In this lawsuit, Wesco suggests that *two* of the letters sent by Linda to MNB on June 3, 2016 [**Ex. N-8**] and July 25, 2016 [**Ex. N-9**] (hereinafter referred to as the "2016 Letters") are "written demands for non-monetary relief" and therefore

---

[6]   MNB has included copies of all of the 2016 correspondence with Linda and her counsel to provide context for the two letters that Wesco contends were "demand letters."

constitute a Claim under the Policies. <u>Dkt. 1, ¶¶ 110 and 111</u>. As more fully discussed below, the 2016 Letters are *not* demands for non-monetary relief under Texas law.

**D.**     **November 2016 – The MPA Lawsuit and Notice to Wesco**

15.     On November 9, 2016, during the policy period of the 2015 Policy, and one month after the sale of MRI, Linda filed the MPA Lawsuit in Galveston County Probate Court against her stepmother, Darlene.[7] **Ex. C**. Linda sought a declaratory judgment that the Marital Property Agreement between her stepmother and deceased father was void. Linda named MNB as a necessary party to the MPA Lawsuit in its capacity as Trustee and Executor, but did not assert any claims or causes of action against MNB.

16.     Out of an abundance of caution, MNB's counsel sent notice of the MPA Lawsuit to AmTrust—the third-party administrator for Wesco—on February 8, 2017 (the "MPA Notice"). **Ex. D**. In the Notice, MNB specifically stated that it had been named as a necessary party only, and that "should [Linda] amend her claim to allege liability [against MNB], such that coverage arises, Moody National will update this notice accordingly." Linda never amended her pleadings in the MPA Lawsuit to assert any allegations or causes of action against MNB or to seek any damages or relief from MNB.

17.     AmTrust opened a claim file for the MPA Lawsuit, noting in its claim notes that Linda "does not allege liability on the part of the Insured bank, she just alleges that a property agreement is invalid," "there are no allegations against the Insured," MNB has

---

[7]     *Linda Moody v. Deloris Darlene Moody and Moody National Bank, as Trustee of the W.L. Moody, IV Living Trust and as Independent Executor of the Estate of W.L. Moody, IV, Deceased*; Cause No. PR-0075340-A; in the Probate Court of Galveston County, Texas (the "MPA Lawsuit").

"provided [] notice out of an abundance of caution," and that the adjuster was closing her file. **Ex. E at p. 5**. Since no claims were asserted against MNB in the MPA Lawsuit, AmTrust never provided any coverage position to MNB.

18.     Following a jury trial, the probate court entered a final judgment in Linda's favor on November 19, 2018 declaring that Bill did not have capacity to execute the MPA and the MPA was unenforceable, awarding damages against Darlene, and awarding attorney's fees to be paid from the Trust to Linda and Darlene. **Ex. F**.[8] Since no claims were ever asserted against MNB in the MPA Lawsuit, the final judgment did not include any findings, damage awards, or any other relief as against MNB. Darlene died ten days later on November 29, 2018.

**E.      February 2020 – The Fiduciary Lawsuit and Notice to Wesco**

19.     Approximately a year and a half after entry of the final judgment in the MPA Lawsuit, and during the policy period of the 2018 Policy, Linda filed the Fiduciary Lawsuit against MNB in Galveston County Probate Court on February 27, 2020.[9] **Ex. I**. Linda asserts causes of action against MNB for breach of fiduciary duty, misappropriation of fiduciary property, negligence, and gross negligence based on the following events:

---

[8]     On November 10, 2020, the Houston Fourteenth Court of Appeals reversed the final judgment, finding that Linda lacked standing to challenge the MPA. *Moody v. Moody*, 613 S.W.3d 707, 718 (Tex. App.—Houston [14th Dist.] 2020, pet. filed). Linda's Petition for Review is currently pending before the Supreme Court of Texas, styled as *Linda Moody v. Deloris Darlene Moody, et al.*, Case No. 20-0990, in the Supreme Court of Texas.

[9]     *Linda Moody v. Moody National Bank*, Cause No. PR0075340-B in the Probate Court of Galveston County, Texas (the "Fiduciary Lawsuit").

- The sale of MRI in 2016, whose primary asset was the Ranch [**Ex. I at pp. 6-7**];

- MNB's retention of the law firm Greer, Herz & Adams, L.L.P. ("GHA"), whose named partner Irwin Herz is an Advisory Director on MNB's Board of Directors, to represent MNB in the MPA Lawsuit [*Id.* at p. 9];

- Allegations that MNB had aligned itself with Darlene in the MPA Lawsuit [*Id.*];

- Allegations that MNB had delayed funding the Children's Trusts (including Linda's trusts) after Darlene's death in November 2018[10] [**Ex. J at p. 3**]; and

- Allegations that MNB refused to pay Linda's attorneys' fees awarded to her in the MPA Lawsuit judgment. [*Id.* at pp. 1-2]

20.   MNB promptly gave AmTrust notice of the Fiduciary Lawsuit on March 19, 2020 [**Ex. K**] and AmTrust opened a claim file for the Fiduciary Lawsuit [**Ex. L**.]. In response to an inquiry about whether the Fiduciary Lawsuit should be handled under the 2017 claim opened for the MPA Lawsuit, the AmTrust adjuster stated on May 28, 2020:

> This suit is related to the prior claim number, in that it deals with the same trusts and trust clients. However, the prior claim was primarily a claim by Linda Moody against her step mother for a declaration of related to the trusts and for certain injunctions that would prevent her from taking certain actions. The bank was named as a necessary party because they are the trustee and needed to be bound by the court's rulings, but did not have an interest in the matter.
>
> This suit instead alleges wrongful acts related to their administration of certain trusts to which Linda Moody was a direct or indirect beneficiary. There is some overlap of subject matter between the suits, but it does not appear to be a claim is related to the notice of circumstance as much of the claimed wrongful acts here post date the filing of the prior suit and claim.
>
> This matter should not be handled under the prior claim number.

---

[10]   Under the Trust Agreement, any remaining assets held for the benefit of Darlene during her lifetime would pass to the Children's Trusts following Darlene's death.

**Ex. L** at p. 8 (WIC 12156). After receiving voluminous requested documents from MNB as part of Wesco's investigation, the same adjuster confirmed in a claim note dated August 3, 2020 that there was "No inter-relationship to other claims." *Id.* at p. 7 (WIC 12155).

**F.    February 2021 – Wesco's Coverage Denial**

21.    Wesco did not send any coverage position letter to MNB until February 23, 2021, almost a year after MNB notified Wesco of the Fiduciary Lawsuit. **Ex. M**. Wesco advised that it would advance defense costs up to a $1,000,000 limit of liability (the limit of the 2015 Policy) "regardless of which of the two Policies applies." *Id* at p. 13.

22.    Wesco's coverage letter focused exclusively on linking the 2016 MPA Lawsuit and five (5) letters from Linda in 2016 (**Exs. N-5**, **N-8**, **N-9**, **N-11** and **N-14**) (hereinafter referred to as the "2016 Correspondence") to the Fiduciary Lawsuit, thereby directly contradicting the AmTrust adjuster's determination that the Fiduciary Lawsuit was unrelated to the MPA Lawsuit or any other claim. *See* **Ex. L** at pp. 7-8.

23.    Wesco's coverage letter admittedly made *no* mention of the other claims against MNB in the Fiduciary Lawsuit (e.g., alleged conflict of interest in hiring GHA, alleged delay in funding Children's Trusts, alleged refusal to pay Linda's attorneys' fees in the MPA Lawsuit . . . etc.), and Wesco's complaint in this case is similarly silent about these claims.[11] In an evasive and disingenuous effort to explain away Wesco's admitted

---

[11]    Wesco's corporate representative conceded that Linda's 2016 correspondence did not contain any "reference about alleged delays in funding Linda Moody's personal trusts," did not "reference any alleged self-dealing by hiring . . . the law firm of [GHA]," and did not

failure to address these new claims, Crystal Ivy stated Linda generally "continues to raise continuous conduct, and these would serve as related wrongful acts that would relate back to the original policy period and the original file that we opened for the [MPA Lawsuit]." **Ex. O** at 149:21-150:11.

**G.     July 2021 – This Coverage Lawsuit and Parties' Claims**

24.     Wesco filed this Coverage action against Moody on July 13, 2021, seeking a declaration (1) that Wesco has no obligation to pay any loss under the 2018 Policy, or (2) alternatively, that Wesco's coverage obligation under the 2018 Policy is limited to $1 million. *See* Dkt. 1 at p. 30.

25.     Moody timely answered and filed a Counterclaim for breach of contract based on Wesco's denial of coverage for the Fiduciary Lawsuit up to the $3 million limit of liability in the 2018 Policy. Dkt. 11 at pp. 32-33.

26.     To date Wesco has only paid $997,894.13 towards MNB's ongoing Defense Expenses, and has refused to pay any further Defense Expenses submitted by MNB above $1 million. Defense Expenses are included within the $3 million coverage under the 2018 Policy.

## IV.     ARGUMENT AND AUTHORITIES

**A.     Summary Judgment Legal Standards**

27.     A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

---

reference any allegation of aiding, assisting, and aligning with Darlene" in the MPA Lawsuit. **Ex. O** at 110:4-111:3; 112:12-20; 113:2-8, 23; 114:24-25; 115:2, 5-8, 21-25; 116:1-6, 18-21.

law. Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). "Once a movant who does not have the burden of proof at trial makes a properly supported motion" for summary judgment, "the burden shifts to the nonmovant to show that [the motion] should not be granted." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The movant may satisfy the initial burden of showing that there is no genuine fact issue by pointing out the absence of evidence supporting the nonmovant's case. *Celotex*, 477 U.S. at 322-23. The nonmovant, however, cannot preclude summary judgment by raising "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence." *Avina v. JP Morgan Chase Bank, N.A.*, 413 Fed.App'x. 764, 767 (5th Cir. 2011).

**B.**     **The Law On Insurance Policy Construction**

28.     Under Texas law,[12] "insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance

---

[12]  The Wesco policies do not contain choice-of-law provisions. Since (1) the policies are issued to first named insured Moody Bancshares, a Texas corporation, at its Texas address, and

policy is a question of law for a court to determine." *Am. Int'l Spec. Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010). "No one phrase, sentence, or section [of the policy] should be isolated from its setting and considered apart from other provisions." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008). A policy's terms should be given their plain meaning, without inserting additional provisions in the contract. *Id*. While the insured bears the initial burden to establish the underlying lawsuit is potentially within the policy's scope of coverage, "it is the insurer that carries the burden of establishing that 'the plain language of a policy exclusion or limitation allows the insurer to avoid coverage." *Regency Title Co., LLC v. Westchester Fire Ins.*, 5 F.Supp.3d 836, 842 (E.D. Tex. 2013). Additionally, "[e]xclusions are narrowly construed, and all reasonable inferences must be drawn in the insured's favor." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008).

29.     The 2015 Policy and the 2018 Policy are claims-made policies. *See* Declaration Pages of both policies (**Exs. A** and **B**). A claims-made policy "covers occurrences which may give rise to a claim that comes to the attention of the insured and is made known to the insurer during the policy period." *Fed. Ins. Co. v. CompUSA, Inc.*, 239 F.Supp.2d 612, 617 (N.D. Tex. 2002). In contrast, an occurrence-based policy covers all claims based on an *event* occurring during the policy period, regardless of whether the

---

(2) the coverage dispute concerns the availability of coverage for the Fiduciary Lawsuit pending against MNB in a Texas court involving Texas parties, Texas law applies to the construction of the policies. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004) (applying Texas' most significant relationship test).

claim itself is brought to the attention of the insured or made known to the insurer during the policy period. *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 658-59 (5th Cir. 1999) (applying Texas law). Consequently, in a claims-made policy, such as the Policies at issue here, the date of the occurrence of the wrongful act on which the claim is said to be based matters less than the date on which the claimant actually makes a claim against the insured for the allegedly wrongful conduct. *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, LLP*, 267 F.Supp.2d 601, 609 (E.D. Tex. 2003).

**C.   Linda's 2016 Letters and the MPA Lawsuit Are Not "Claims" Under the Policies**

30.    In its futile effort to deny and/or limit coverage under the 2018 Policy, Wesco relies on several provisions and an exclusion (all of which are separately discussed below), including the following:

  a.    Single Limit/Retention in Section III – Limit of Liability and Retention, Subsection C (**Ex. B** at WIC 0726);

  b.    Notice of Potential Claims in Section V – Notice of Claims and Potential Claims, Subsection B (*Id.* at WIC 0727); and

  c.    Prior Knowledge/Litigation Exclusion, endorsement to the 2018 Policy (*Id.* at WIC 0796).

31.    At the crux of each of these provisions is the definition of the term "Claim." In order to implicate these provisions, Wesco argues that (i) the 2016 Letters – the two letters from Linda in June and July 2016 – constitute a "Claim" related to the

2020 Fiduciary Lawsuit (<u>Dkt. 1 at p. 19, ¶¶ 110-112</u>), and (ii) MNB's 2017 MPA Notice to Wesco of the MPA Lawsuit was a notice of a "Potential Claim," namely the 2020 Fiduciary Lawsuit. (<u>*Id*.</u>, ¶¶ 123-125.) Wesco's argument fails because the 2016 Letters do not qualify as a "Claim," as defined in the Policies and under Texas law, and the MPA Notice was not a "notice of a Potential *Claim*," as defined in the Policies.

32.     The 2018 Policy's Professional Liability Coverage Part that provides coverage for Trust Services Liability provides as follows in the insuring agreement:

C.     **TRUST SERVICES LIABILITY** – The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from a **Claim** first made during the **Policy Period** or the Extended Reporting Period (if exercised), for a **Wrongful Trust Services Act**.

**Ex. B** at WIC 0757.

33.     The Professional Liability Coverage Part defines "Claim" as follows:

**Claim** means:

1.  a written demand for monetary damages or non-monetary relief;

2.  a civil proceeding commenced by the service of a complaint or similar pleading;

3.  a criminal proceeding commenced by a filing of charges or return of an indictment;

4.  a formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order, service of summons, or similar document;

5.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld; or

6.  a written request to toll or waive a statute of limitations relating to

> a potential civil or administrative proceeding,
>
> against an **Insured** for a **Wrongful Act** including any appeal from such proceeding.
>
> **Ex. B** at WIC 0757.

Linda's 2016 Letters

34.     It is undisputed that Linda's 2016 Letters do not constitute civil, criminal, administrative, regulatory, or alternative dispute resolution proceedings. It is also undisputed that Linda's 2016 Letters do not constitute written demands for monetary damages. Relying on Linda's "demands" that the Ranch not be sold until January 2019 or later and that it be made profitable in the meantime (*see* **Ex. N-8 at bottom of p. 2**, and **Ex. N-9 at p. I**), Wesco alleges that the letters are "written demand[s] for non-monetary relief" under section 1 of the definition of "Claim." Wesco's argument is misplaced.

35.     Courts applying the phrase "non-monetary relief" in a liability policy's definition of "claim" consider the phrase to include injunctive or declaratory relief, a subpoena, or a search warrant as part of a grand jury investigation—all circumstances where the insured is exposed to some sort of liability for failing to comply.[13] A naked demand "for something due" (the dictionary definition of "relief") without any threat of liability is merely a request that the insured take some action voluntarily. *W.R. Starkey*

---

[13]  *See, e.g., Agilis Benefit Services, LLC v. Travelers Cas. And Surety Co. of Am.*, 2010 WL 22595321, at *8-9 (E.D. Tex. Feb. 24, 2010), report and recommendation adopted, 2010 WL 8573372 (Apr. 30, 2010) (subpoena and search warrants were "demands for non-monetary relief"); *Oceans Healthcare, LLC v. Illinois Union Ins. Co.*, 379 F.Supp.3d 554 (E.D. Tex. 2019) (subpoena issued to insured as part of federal government's investigation of insured's possible False Claims Act violations was a "demand for non-monetary relief" because a failure to produce documents could expose insured to civil liability).

*Mortgage, LLP v. Chartis Spec. Ins. Co.*, No. 4:12-CV-219, 2013 WL 12138896 at *1-2 (E.D. Tex. June 27, 2013). As noted by the United States District Court for the Eastern District of Texas, a request for information—unaccompanied by a subpoena or any other liability for noncompliance—is not sufficient to constitute a "written demand for non-monetary relief." *Id.*

36.    In her 2016 Letters, Linda "demanded" that MNB make the Ranch productive and refrain from selling the Ranch until 2019. However, not a single letter from Linda in 2016 was accompanied by any threat of injunctive relief, civil liability, or any proposed legal consequence for failing to meet such "demands." *See* **Exs. N-1**, **N-2**, **N-5**, **N-6**, **N-8**, **N-9**, **N-11** and **N-14**. Despite being represented by counsel, Linda never threatened any legal action if MNB continued with the proposed sale and did not file suit against MNB to enjoin the sale, which took nearly six months to close. In fact, Linda specifically acknowledged in her correspondence that any deference to her requests would be voluntary by MNB. **Ex. N-1** ("Ms. Moody *would like to be updated* as to these plans and her *input be considered . . . .* Ms. Moody further *requests* that she be given the *opportunity* to have input . . . . We *hope* that MNB will strongly consider Ms. Linda Moody's requests") (emphasis added). Indeed, Linda herself framed her letters as "objections" and *not* as "demands" in her Original Petition in the Fiduciary Lawsuit. *See* **Ex. I** at pp. 6-7. Accordingly, Linda's 2016 letters, which merely request a voluntary course of action by MNB without the threat of any consequence, are not a "demand for non-monetary relief" and cannot constitute a "Claim" as defined by the Policies.

37.     To accept Wesco's argument would lead to absurd results: according to Wesco, anytime an insured receives a letter from a trust beneficiary expressing an opinion and advocating for a particular course of action (which is not unusual in the trust world), the insured would need to notify its carrier even though there is no claim or demand made. This would include any letter that references the term "demand," "breach of fiduciary duty," "request," "insist," "require," or similar language. Of course, no carrier would ever provide any coverage for such a letter, which then begs the question, why would the insured need to notify its carrier in the first place!

<u>The MPA Lawsuit</u>

38.     Likewise, the MPA Lawsuit is not a "Claim" under the Policies because, although it is a civil proceeding commenced by service of a complaint, it is not made "against an **Insured** for a **Wrongful Act**." The Policies' Trust Services Liability coverage part defines "Wrongful Act" as any "actual or alleged Wrongful Trust Services Act," which in turn is defined as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by the **Insured** in the rendering of, or failure to render, **Trust Services**…" **Ex. B** <u>at WIC 0760</u>. Linda joined MNB in the MPA Lawsuit in name only; there were no allegations or causes of action against MNB for a Wrongful Act, and the MPA Lawsuit is accordingly not a "Claim" against MNB.

**D.**     **The Single Limit/Retention Provision Does Not Apply**

39.     Wesco next argues that the Fiduciary Lawsuit relates to Linda's 2016

Letters and is accordingly a "Claim" "first made" in 2016 (during the 2015 Policy period)

under the Single Limit/Retention Provision:[14]

---

SECTION III – LIMIT OF LIABILITY AND RETENTION

. . .

C. **SINGLE LIMIT/RETENTION** – **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one Retention and Limit of Liability shall apply. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

**Ex. B** at WIC 0726.

. . .

**Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

*Id.* at WIC 0724.

---

40.     As discussed above, the 2016 Letters are not "demands for non-monetary

relief," and are accordingly not "Claims" under the Policies. On that ground alone, the

Single Limit/Retention provision is not implicated since it applies only to "**Claims** based

upon or arising out of the same **Wrongful Act or Interrelated Wrongful Acts . . .**," and

retroactively deems the second Claim to be made on the date the earlier Claim was first

made. Here, the 2016 Letters are not Claims, and accordingly, the Fiduciary Suit cannot

relate back to 2016.

---

[14]     Dkt. 1, ¶¶ 107-112.

41.    Additionally and importantly here, cases analyzing substantially similar interrelatedness provisions involve multiple "claims" against the insured in the form of multiple *lawsuits or legal proceedings* against the insured—not mere letters between the insured and a third party. *See, e.g., Burks v. XL Spec. Co.*, 534 S.W.3d 458, 464 (Tex. App.—Houston [14th Dist.] 2015, no pet.), *judgment vacated but opinion not withdrawn at* 534 S.W.3d 470 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (mem. op.) (relating bankruptcy adversary proceeding against executive with shareholders' prior derivative actions based on same allegedly-fraudulent conduct by executive); *Adi Worldlink, LLC v. RSUI Indem. Co.*, No. 4:16-CV-00665, 2017 WL 6403047, at *12 (E.D. Tex. Aug. 16, 2017) (relating employee's 2014 arbitration with other employees' 2015 arbitrations based on same alleged wrongful employment classification practices); *Reeves County v. Houston Cas. Co.*, 356 S.W.3d 664, 675 (Tex. App.—El Paso, 2011) (relating bail bondsman's 2001 lawsuit against sheriff with bondman's 2007 lawsuit against sheriff for the same alleged civil rights violations).

42.    Even assuming, *arguendo*, that the 2016 Letters are a "Claim" (which they are not), and that the 2016 Letters and a lawsuit could be considered under an interrelatedness provision (which they cannot), the provision still does not apply because the 2016 Letters and the Fiduciary Lawsuit are not "based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts." Linda's 2016 Letters are factually limited to the proposed sale of the Ranch and Linda's request to make the Ranch a productive asset. On the other hand, Linda's Fiduciary Lawsuit alleges facts far beyond anything contemplated in the 2016 Letters: the actual sale of MRI in October 2016, the alleged

conflict in retaining GHA in the MPA Lawsuit in November 2016, allegations that MNB wrongfully aligned itself with Darlene in the MPA lawsuit, MNB's alleged refusal to pay Linda's fees in the MPA Suit, and MNB's alleged failure to timely fund the Children's Trusts after Darlene's death in November 2018. None of these events had even occurred at the time of *Linda's 2016 Letters*. There can be no "common nexus of facts" between the 2016 Letters and the Fiduciary Lawsuit where the Fiduciary Lawsuit includes allegations of wrongdoing that had not yet even occurred. *See Axis Surplus Ins. Co. v. Johnson*, No. 06-CV500-GKF-PJC, 2008 WL 4525409, at *8-10 (N.D. Okla. Oct. 3, 2008) (applying Oklahoma law) (granting summary judgment that similar interrelated provisions did not apply because although claims of breach of fiduciary duty were made against insured directors in two lawsuits, the claims in the first suit were solely related to the directors' failure to pay off loans they improperly approved on behalf of company, whereas the second suit alleged breaches of fiduciary duty from company's inception through bankruptcy).

43. Wesco's sweeping interpretation of "Interrelated Wrongful Acts" stretches the definition past the breaking point. "If [Wesco's] logic were to prevail, then any prior [correspondence or] lawsuit . . . that contained the words 'breach of fiduciary duty' would suffice as a basis for relation-back of [Linda's] claim. This interpretation abrogates the intent of claims-made policy . . ." *Id*. at *10. In sum, the Single Limit/Retention provision does not apply and the Fiduciary Lawsuit should not be deemed made on the date of Linda's 2016 Letters.

### E.    The Notice of Potential Claims Provision Does Not Apply

44.    After positing that the Fiduciary Lawsuit should be deemed made in June 2016 (when Linda sent her letter dated June 3, 2016), Wesco next (and inconsistently) posits that the Fiduciary Lawsuit relates to the MPA Notice that MNB sent to Wesco on February 8, 2017 (**Ex. D**), and should therefore be deemed made on February 8, 2017 under the "Notice of Potential Claims" provision:[15]

---

SECTION V – NOTICE OF CLAIMS AND POTENTIAL CLAIMS
. . .

B. **NOTICE OF POTENTIAL CLAIMS** – If during the **Policy Period** the **Insured**, through an **Executive**, first becomes aware of facts or circumstances which may reasonably give rise to a **Potential Claim** and gives written notice to the **Insurer** of the reasons for anticipating such **Potential Claim**, then any **Claim** subsequently made shall be deemed to have been first made during the **Policy Year** in which notice was first given to the **Insurer**.

As a condition precedent to any coverage hereunder for such **Potential Claims**, such notice must be specific and contain full particulars as to the names, dates, and persons involved in the underlying facts potentially giving rise to the **Potential Claim**, as well as the identity of the potential plaintiffs and the causes of action to be asserted.

**Ex. B** at WIC 0727.

. . .

**Potential Claim** means any **Wrongful Act** that may subsequently give rise to a **Claim**.

_Id._ at WIC 0725.

---

Wesco's argument that MNB's cautionary notice of the MPA Lawsuit in 2017 [**Ex. D**] is a notice of a "Potential Claim" (i.e. the Fiduciary Lawsuit) is untenable. First and

---

[15]  Dkt. 1, ¶¶ 121-135.

foremost, the 2017 Notice does not state that it is a notice of a "Potential Claim," and Wesco's corporate representative conceded that the term "Potential Claim" does not appear anywhere in the MPA Notice. *See* **Ex. O** at 82:18-83:25, 84:19-22.

45.     Second, the 2018 Policy defines "Potential Claim" as "any **Wrongful Act** that may subsequently give rise to a **Claim**." **Ex. B** at WIC 0725. It is undisputed that the MPA Petition did not include any allegation of a "Wrongful Act" by MNB, defined as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by the **Insured** in the rendering of, or failure to render **Trust Services**." *Id.* at WIC 0760. Indeed, the MPA Petition did not involve any allegation about MNB's conduct at all, as acknowledged by AmTrust's own claim notes for that suit. **Ex. C**, **Ex. E** at p. 5.

46.     Third, the MPA Notice does not include the condition precedent set forth in the provision to qualify as a notice of a 'Potential Claim': it is not "specific and [does not] contain full particulars as to names, dates, and person involved in the underlying facts, potentially giving rise to the **Potential Claim** as well as the identity of the potential plaintiffs and the causes of action to be asserted." **Ex. B** at WIC 0727. On the contrary, the Notice specifically says that *no* claims have been asserted against MNB [**Ex. D**].

47.     In sum, the 2017 MPA Notice is not a notice of a 'Potential Claim', and the Fiduciary Suit cannot be deemed to have been made on February 8, 2017.

**F.**     **The Prior Knowledge/Litigation Exclusion Does Not Apply**

48.     Wesco next argues that *if* coverage is available under the 2018 Policy, then it is limited to $1 million under the Prior Knowledge/Litigation exclusion that provides as follows:[16]

---

EXCLUSION – PRIOR KNOWLEDGE/LITIGATION
(FOR EXCESS LIMIT OF LIABILITY)
. . .

The **Insurer** shall not be liable to pay any **Loss** or **Defense Expenses** in excess of $1,000,000 in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive** had knowledge prior to 7/17/2018; or

2.  any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to 7/17/2018, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

**Ex. B** at WIC 0796.

---

49.     As to the first prong of the exclusion, there is simply no evidence that any Executive of MNB had knowledge before the 2018 Policy incepted on July 17, 2018 of "any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a **Potential Claim**." The Policy's definition of "Potential Claim" necessarily implicates some "Wrongful Trust Services Act." John Smith repeatedly testified that MNB had no knowledge of any event that could be the basis for any alleged wrongful trust services act by MNB. **Ex. P** at 64:7-15; 83:1-85:4.

---

[16]  Dkt. 1, ¶¶ 150-162.

50.     Nor would any reasonable trust department in MNB's shoes have expected any "Potential Claim" by Linda before the inception of the 2018 Policy on February 17, 2018. Linda never filed any injunctive action to stop the sale of the Ranch in 2016, never threatened MNB with any legal action for refusing to heed her bare requests relating to the sale of the Ranch, never asserted any claims or causes of action against MNB in the MPA Lawsuit, which was filed in 2016 immediately following the sale of the Ranch and Linda's 2016 Correspondence with the Bank.

51.     In fact, when MNB's representative was under the misimpression that Linda had asserted claims against MNB in the MPA Lawsuit, Linda's counsel assured MNB on the record during John Smith's February 2018 deposition that "[w]e've repeatedly told your counsel that we have not asserted in this litigation a claim of breach of fiduciary duty." **Ex. Q** at 133:5-7. [17]

52.     It was not until Linda's favorable judgment in the MPA Lawsuit risked reversal in the Court of Appeals, more than two years after the 2018 Policy incepted, that Linda made the strategic decision to file a Fiduciary Lawsuit against MNB in February 2020. Based on all of these circumstances, MNB did not have any knowledge about any fact, circumstance, situation or event that is or reasonably would be regarded as the basis

---

[17]  John Smith's confusion about whether Linda had asserted claims against MNB stemmed from Linda's erroneous interrogatory response that she was seeking exemplary damages from MNB due to MNB's alleged failure to investigate the MPA, which Linda subsequently amended to withdraw. *See* Linda's Responses to MNB's First Set of Interrogatories, at pp. 7-8 (Interrogatory No. 10) [**Ex. G**], and Linda's Amended Responses to MNB's First Set of Interrogatories (Interrogatory No. 10) [**Ex. H**]. This, coupled with counsel's assurances during the deposition, reassured MNB that it was not a target of any lawsuit and MNB did not have *any* reason to suspect that Linda would file suit in February 2020.

for a "Potential Claim" for "Wrongful Trust Services" prior to July 17, 2018. *See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F.Supp.2d 601, 610 (S.D. Tex. 2013) (denying insurer's summary judgment and holding that, under subjective-knowledge component of prior knowledge exclusion in professional malpractice policy precluding coverage for claims against insured law firm which arose before policy period, all that matters is that attorney *subjectively knew*, prior to policy period, that his client intended to bring claim). In sum, MNB did not have any subjective knowledge that Linda intended to bring a claim prior to the inception of the 2018 Policy, nor would MNB have had any reason to foresee that any Wrongful Trust Services Act had occurred and that it would likely be the basis of a claim against MNB in February 2020.

53.     Likewise, the Prior Litigation prong of the Exclusion is not implicated because the 2020 Fiduciary Lawsuit is not related to any proceeding initiated against MNB prior to July 17, 2018 nor does it "[arise] out of or in any way [involve] the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior. . . proceeding." The MPA Lawsuit and the subsequent jury verdict and judgment were limited to the validity and enforceability of the MPA and did *not* involve any "Wrongful Trust Services Act" by MNB.

54.     Application of the Prior Knowledge/Litigation exclusion here fails for another reason. In a case involving a similar exclusion in a claims-made malpractice claim, the Fifth Circuit concluded that applying the overbroad prior knowledge provision would be "facially absurd" and "render the cover illusory." *One Beacon Inc. Co. v. T.*

*Wade Welch & Assocs.*, 841 F.3d 669, 677 (5th Cir. 2016) (applying Texas law). The exclusion in *One Beacon* defined a "wrongful act" as "any actual or alleged act, error, omission or breach of duty arising out of the rendering or the failure to render professional legal services. *Id*. at 673. This is the identical definition of "Wrongful Act" in the 2018 Policy. *See* **Ex. B**, at WIC 0760 (defining "Wrongful Act" to mean "Wrongful Trust Services Act," which in turn is defined as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by the **Insured** in the rendering of, or failure to render **Trust Services**"). As noted by the Fifth Circuit:

> [O]n its face, this covers every single thing an attorney does or does not do, wrongful or not. As written, then, the exclusion renders coverage illusory and is facially absurd.

*Id.* at 677.

55.     As in *One Beacon*, the Prior Knowledge/Litigation exclusion in the 2018 Policy is incredibly broad and covers every single thing MNB does or does not do, wrongful or not. Thus, its application renders coverage under the 2018 claims-made Policy illusory. MNB purchased and paid for $3 million in coverage for Trust Services. The overly broad Prior Knowledge/Litigation exclusion effectively negates that coverage and relegates coverage to the $1 million afforded under the 2015 Policy, which renders the 2018 coverage illusory. In sum, the overly broad Prior Knowledge/Litigation exclusion should not, and does not, apply to limit the $3 million coverage MNB purchased to $1 million.

**G.     The Known Loss Doctrine Does Not Apply**

56.     Wesco next alleges that MNB should not have *any* coverage under the 2018 Policy under the common law Known Loss Doctrine. The Known Loss Doctrine precludes insurance coverage for known losses or losses in progress. The key inquiry is "not whether the insureds actually knew of the underlying loss or potential liability, but rather whether they knew, at the inception of coverage that they were 'engaging in activities' which might reasonably be expected to expose them to or result in liability." *RLI Ins. Co. v. Maxxon Southwest, Inc.*, 108 Fed.App'x. 194, 199 (5th Cir. 2004) (applying Texas law). Courts use an objective test to determine the insured's knowledge of a known loss or loss in progress. *In re Vantage Benefits Administrators, Inc.*, No. 18-31351-SGJ7, 2021 WL 2954819, at \*6 (N.D. Tex. July 14, 2021).

57.     The Known Loss common law doctrine is very similar to the Prior Knowledge/Litigation exclusion in the 2018 Policy. As fully discussed above, there is no evidence to support the unsubstantiated allegation that MNB had any subjective knowledge prior to inception of the 2018 Policy that it had engaged or was engaging in activities which would reasonably be expected to expose it to future claims of liability. There is likewise no evidence to suggest that MNB should have known about any alleged wrongful activities which might reasonably be expected to expose it to liability. *See* discussion *supra* at pp. 24-30. The Known Loss Doctrine, just like the Prior Knowledge/Litigation exclusion, does not apply.

**H.** **Moody Is Entitled to Recover Its Attorneys' Fees and Expenses**

58.    In denying Moody coverage for the Fiduciary Lawsuit up to the $3 million under the 2018 Policy, Wesco breached the insurance contract. Moody was therefore forced to engage the law firms of Winstead P.C. and Mills Shirley L.L.P. to prosecute this action and protect its rights under the 2018 Policy. Moody is entitled to its reasonable and necessary attorneys' fees and expenses incurred through the disposition of this motion pursuant to Section 38.001(8) of the Texas Civil Practice and Remedies Code for Wesco's blatant breach of contract. Due to the ongoing proceedings and attorneys' fees and expenses, Moody requests that it be allowed to present evidence of its final attorneys' fees and expenses when the Court grants this Motion.

## V.    CONCLUSION AND PRAYER

59.    Moody has carried its burden of showing that the Fiduciary Lawsuit is within the 2018 Policy's $3 million scope of coverage, and Wesco has failed to carry its burden of showing that the Single Limit/Retention provision, the Notice of Potential Claim provision, and the Prior Knowledge/Litigation exclusion limit Wesco's coverage obligation to $1 million. There are no genuine issues of material fact, and Defendants/Counter-Plaintiffs Moody National Bank and Moody Bancshares, Inc. move the Court to:

    1)    grant summary judgment in Moody's favor on its breach of contract cause of action against Wesco and award Moody its expenses and reasonable and necessary attorneys' fees and expenses;

    2)    grant summary judgment against Wesco on all counts in its Original Complaint for Declaratory Judgment; and

3)   enter an Order declaring that coverage for MNB's Defense Costs and Losses in the underlying Fiduciary Lawsuit exists under the 2018 Policy up to the Policy's $3 million Limit of Liability.

Respectfully submitted,

**WINSTEAD PC**

By:   */s/ Yasmin Atasi*
      Yasmin Atasi, Attorney in Charge
      State Bar No. 10435150
      S.D. Tex. I.D. No. 13119
      yatasi@winstead.com
      600 Travis Street, Suite 5200
      Houston, Texas 77002
      Telephone: 713-650-8400
      Fax: 713-650-2400

**MILLS SHIRLEY L.L.P.**

Fred D. Raschke
State Bar No. 16551450
S.D. Tex. I.D. No. 7123
fraschke@millsshirley.com
P.O. Box 1943
Galveston, TX 77553-1943
Telephone: 409-761-4028
Fax: 409-763-2879

**ATTORNEYS FOR DEFENDANTS / COUNTER-PLAINTIFFS MOODY NATIONAL BANK AND MOODY BANCSHARES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of September, 2022, a copy of the foregoing

Motion for Summary Judgment, was served on all counsel of record via the Court's ECF

system.

*/s/ Yasmin Atasi*
Yasmin Atasi

MOODY'S MOTION FOR FINAL SUMMARY JUDGMENT