**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| WESCO INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. <u>3:21-cv-00181</u> |
| | § | |
| MOODY NATIONAL BANK and | § | |
| MOODY BANCSHARES, INC., | § | |
| | § | |
| Defendants. | § | |

<u>**PLAINTIFF WESCO INSURANCE COMPANY'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>
<u>**AND SUPPORTING MEMORANDUM**</u>

Pursuant to Fed. R. Civ. P. 56, Plaintiff / Counter-Defendant Wesco Insurance Company ("Wesco") hereby moves the Court for summary judgment in Wesco's favor. Specifically, Wesco asks the Court to grant judgment in favor of Wesco on one or more Counts of Wesco's Complaint and declare that Wesco has no duty to pay any loss under the July 2018 Policy in connection with the underlying Fiduciary Duty Suit against Defendant Moody National Bank. Alternatively, Wesco asks the Court to declare that, even if the July 2018 Policy applies, Wesco's payments in connection with the Fiduciary Duty Suit under any policy are limited to a maximum of $1,000,000. Wesco further asks the Court to grant judgment in Wesco's favor on Defendants' Counterclaim for breach of contract, and dismiss said Counterclaim with prejudice.

Wesco's motion is based on the following memorandum, the accompanying affidavit and exhibits, and all other records and pleadings on file with this Court.

1

## INTRODUCTION

Since at least the summer of 2016, underlying claimant Linda Moody ("Linda") has been complaining about Moody National Bank's (the "Bank") handling of the estate and trusts set up by her father, W.L. Moody IV.  In June and July of 2016, Linda's counsel sent two letters to the Bank, expressly demanding that the Bank cease moving forward with the sale of the estate's largest asset (Moody Ranches Inc.), and alleging that the proposed sale was for millions of dollars less than its fair market value, was "not in the best interest of the remainder beneficiaries," and was "a breach of the Bank's fiduciary duties."  Despite such objections, and despite acknowledging that the remainder beneficiaries "could litigate in the future for selling the ranch before the favorable tax status year," the Bank completed the sale of Moody Ranches Inc. on October 11, 2016, based on demands made by Mr. Moody's surviving spouse, Darlene Moody ("Darlene"), whom the Bank decided was the 50 percent owner of Moody Ranches under a Marital Property Agreement (the "MPA"). Less than a month later, Linda filed suit against Darlene and the Bank, seeking to invalidate the MPA and seeking to prevent the Bank from "unlawfully" distributing additional property pursuant to that agreement.  Linda also made accusations against the Bank throughout the MPA Suit, asserting that the Bank had failed to protect and defend the assets of the estate and had improperly sided with Darlene over Linda to gain a tactical advantage over Linda "in hopes to avoid a future lawsuit over its failures to protect the estate."

It comes as no surprise then that, after a jury invalidated the MPA in the first lawsuit, Linda filed a second lawsuit against the Bank for breach of fiduciary duty.  In the current Fiduciary Duty Suit, Linda alleges that the Bank sold the ranch for nearly $20,000,000 less

than its appraised value, and specifically recites her prior written objections to such sale. Linda also alleges that the Bank breached its fiduciary duties to her through its alignment with Darlene and its conduct in the MPA Suit, and cites to the Bank's pleadings, actions, depositions, and correspondence in that prior litigation as proof of such breaches.

Under the insurance policies issued by Wesco to the Bank, all of these related claims and allegations are treated as a single risk that is deemed to have been made during the policy period in which the first claim or first notice of potential claim was made.  Here, the first claim was made in summer 2016, when Linda alleged a breach by the Bank and made a written demand that the Bank not move forward with the sale of Moody Ranches.  (The Bank also provided notice of a potential claim in February 2017, after the MPA Suit was filed.)  Linda's current Fiduciary Duty Suit is thus deemed to have been "first made" during the July 2015 to July 2018 policy period (the "July 2015 Policy"), and it is undisputed that the July 2015 Policy is limited to $1,000,000 in coverage.

In its Counterclaim, the Bank argues that the July 2018 to July 2021 policy (the "July 2018 Policy") and its increased limits of $3,000,000 should apply instead.  But even if the Fiduciary Duty Claim is found to have been first made during the July 2018 Policy, the July 2018 Policy does not allow the Bank to learn of potential claims, triple its limits of liability, and then take advantage of those increased limits for claims that are related to facts or litigation already known to the Bank.  The July 2018 Policy instead contains a specific endorsement that restricts coverage to the limits of the prior policy if the current claim arises from, is based upon, or is attributable to: (a) any fact, circumstance, situation, or event known to an Executive prior to July 17, 2018 that is or reasonably would be

regarded as the basis for a Potential Claim; or (b) any prior or pending litigation initiated against any Insured, or the facts, circumstances, or situations underlying or alleged in such prior litigation.  As detailed below, either or both of these reasons apply here.  (Texas common law also independently precludes the Bank from obtaining coverage for matters known to it prior to the policy period.)  Coverage for the Fiduciary Duty Suit is therefore limited to a maximum of $1,000,000, even if the July 2018 Policy applies.

Accordingly, regardless of whether the July 2015 Policy or July 2018 Policy applies, the Court should order and declare that coverage for the Fiduciary Duty Suit is limited to a maximum of $1,000,000.  The Court should also dismiss the Bank's counterclaim for breach of contract and award Wesco its costs and disbursements herein.

## STATEMENT OF UNDISPUTED FACTS

As noted above, Wesco issued two policies to Defendants Moody National Bank and Moody Bancshares, Inc.  The first policy is Commercial Policy No. WML 1389494 00 (the "July 2015 Policy), which was issued for the policy period of July 17, 2015 to July 17, 2018 and includes coverage for Trust Services subject to a $1,000,000 single limit of liability and a $125,000 retention.  The second policy is Commercial Policy No. WDO 1389494 01 (the "July 2018 Policy"), which was issued for the policy period of July 17, 2018 to July 17, 2021.  That policy generally includes coverage for Trust Services subject to a $3,000,000 single limit of liability and a $125,000 retention, but is subject to an endorsement for "prior knowledge / litigation (for excess limit of liability)."  A certified copy of the July 2015 Policy is attached as Exhibit 34.  A certified copy of the July 2018 Policy is attached as Exhibit 35.

The current coverage dispute relates to several claims brought against the Bank based on its administration of the estate and trusts of W.L. Moody IV.  The Bank became successor trustee of the living trust immediately upon the death of Mr. Moody on July 14, 2014, and the Bank was appointed as executor of his estate shortly thereafter.  Smith Depo. (Exh. 31), p. 21.  Executive Vice President and Senior Trust Officer John Smith, the head of the Bank's trust department at that time, was the primary administrator and oversaw the administration of the estate and trusts.  Id., pp. 22-23.  The beneficiaries of the estate and trusts included Mr. Moody's surviving spouse, Darlene Moody ("Darlene"), and Mr. Moody's daughter, Linda Moody ("Linda").  Exh. 12, at MOODY 101.

Mr. Moody's largest asset at his death was Moody Ranches Inc., which held ownership of the 46,000-acre family ranch, and accounted for $44.8 million of the estate's value.  Exh. 9, at WIC 104.  In March 2015, the Bank advised Linda and the other beneficiaries that Moody Ranches was owned 50 percent by the living trust and 50 percent by Darlene.  Exh. 10.  This same division of ownership was also reflected in the inventory signed by Smith in January 2016.  Exh. 9, at WIC 104.  In her role as a 50 percent owner, Darlene demanded that the ranch be sold.  Exh. 36, at WIC 111.  The Bank recognized such a sale could trigger a built-in gains tax of $13.7 million dollars.  Exh. 12, at MOODY 101.  Smith also advised the other members of the Bank's trust committee that there was a "risk or potential liability" that "the remainder beneficiaries . . . could litigate in the future for selling the ranch before the favorable tax status year and thus reducing the net sale proceeds."  Id.

On May 2, 2016, the Bank advised the beneficiaries of its intent to sell Moody Ranches.   Exh. 36.   Linda wrote back the very next day and stated that she was "unconvinced that accepting the present offer would be in the best interests of any of the beneficiaries."   Exh. 5.   She also asked for additional information about the sale and marketing of the ranch (a continuation of requests she had made dating back to October 2015 to have input into the marketing and decisions regarding the ranch.)   Exh. 5; *see also* Exh. 11.   The Bank subsequently asked that all of the beneficiaries consent to the sale. Exh. 24.   On June 3, 2016, Linda expressly refused to consent, and objected to the Bank moving forward with the sale.   Exh. 1.

In the June 3, 2016 letter, counsel for Linda Moody stated that the proposed sale price of $37,475,900 was $11,843,100 to $18,173,150 less than the fair market value of Moody Ranches, based on the last two appraisals.   Exh. 1.   He stated that Linda had not been provided with any information indicating the ranch cannot become a productive asset, and stated that "It is the Bank's fiduciary duty to the beneficiaries of the Estate and Trust to make the Ranch profitable."   Id. at WIC 0002.   He further stated that Linda is not willing to consent to the proposed sale and that she "demands that the Ranch not be sold until January 2019 or later and be made profitable in the meantime."   Id.

The Bank subsequently informed the beneficiaries that the consent requirement had been waived by the buyer and that the purchase had been renegotiated.   In response, counsel for Linda Moody wrote another letter, dated July 25, 2016.   Exh. 2.   That letter "again demands that the Bank not sell Moody Ranches Inc. or Rancho Rio Grande until January 2019 or later and, during the interim, make the Ranch productive."   Id.   Counsel noted that

the new sale price was still $9,267,727 less than the fair market value based upon the January 2016 appraisal, and $15,330,050 less than the fair market value based upon the July 2014 appraisal.  Id. at WIC 0004.  He stated that Darlene did not have the right to demand the ranch be sold, and did not have the right to demand the ranch be sold for less than its fair market value.  Id.  Counsel further stated: "**Selling the Ranch now for a price that is $9,267,727 less than current fair market value of the Ranch is not in the best interest of the remainder beneficiaries and is a breach of the Bank's fiduciary duty to the remainder beneficiaries.**"  Id. (bold in original).  Although addressed to the Bank's counsel, Joseph Cavanah, both letters were received by Bank trust officer John Smith within a week or two of being sent.  Smith Depo. (Exh. 31) pp. 41, 44.

Ultimately, the sale of Moody Ranches was concluded on October 11, 2016.  Exh. 25.  The Bank knew that it was completing the sale over Linda's objection.  On August 11, 2016, Linda's counsel wrote to the Bank repeating her request that the Bank cease moving forward with the sale.  Exh. 6.  Linda also personally wrote to Smith on October 17, 2016, reiterating her position that it is more advantageous for the Trustee to wait until 2019 to sell the Ranch assets . . . than to sell the S-corp itself at this time."  Exh. 7.  Linda again requested additional information and documents regarding the contemplated sale.  Id.  It was not until October 21, 2016 that she and the other beneficiaries were advised that the sale had already been completed.  Exh. 25.

Less than three weeks later, on November 9, 2016, Linda filed the first of two lawsuits in the Galveston County probate court.  Her first lawsuit named Darlene and the Bank as defendants and was assigned Cause No. PR 0075340-A (the "MPA Suit").  The

Bank agreed to accept service, in lieu of being formally served with process. Exh. 29. The Bank later served an answer and general denial to Linda's petition. Exh. 30. A certified copy of Linda's petition is attached as Exhibit 3 ("MPA Petition").

Linda's petition in the MPA Suit was brought "to clarify an on-going and continuing dispute as to the proper distribution of Decedent's Estate." MPA Petition (Exh. 3) ¶ 25. Linda's petition alleged that neither Darlene nor MNB disclosed the existence of the MPA to her until July 2016. Id. ¶ 17. However, according to Linda's petition, the Bank had taken the position that the MPA converted the entirety of separate property owned by Mr. Moody into community property. Id. ¶ 19. This included his stock ownership of Moody Ranches, half of which the Bank transferred to Darlene. Id. Linda's petition sought a declaration that the MPA was void and unenforceable. Id. ¶ 24. Her petition also sought an order restraining and prohibiting the Bank from distributing any further assets to Darlene, Id. ¶ 42, and alleged that such an injunction "will protect the assets rightfully belonging to the Estate as Decedent's separate property from being distributed, albeit unlawfully, pursuant to the Marital Agreement." Id. ¶ 33. The Bank agreed to cease further distributions of property, shortly after receiving Linda's petition. Exh. 27; Exh. 28.

The Bank notified Wesco of the MPA Suit in a letter dated February 8, 2017, and stated that it would advise Wesco if Linda amended her claim to allege liability. Exh. 37. The Bank also provided a copy of the MPA Petition to Wesco on February 13, 2017. Exh. 38.[1]

---

[1] The Bank did not and does not seek defense or indemnity for the MPA Suit. Exh. 33 - Req. for Admission No. 19-20; Interrogatory Resp. No. 10.

During the course of the MPA Suit, Linda and Linda's counsel made a number of additional allegations and accusations against the Bank. In her March 15, 2017 responses to interrogatories, Linda states that she "requests exemplary damages as a result of MNB's breach of fiduciary duty and/or negligent behavior in failing to fully investigate the legitimacy of the purported Marital Agreement prior to transferring certain separate property assets of W.L. Moody IV from the Estate to Mrs. Moody." Exh. 18, p. 7-8. In a September 2017 letter, Linda's counsel stated it was puzzling that the Bank was expending estate funds "to try to establish an agreement that is adverse to the ownership of Mr. Moody's separate property assets." Exh. 14. In her responses to requests for disclosures, dated February 2, 2018 and May 4, 2018, Linda then stated that "since Decedent's death, MNB has failed to comply with its duties to protect and defend the assets of the Estate." Exh. 23, p. 5; Exh. 19, p. 5.

When the Bank filed a motion for summary judgment against Linda, Linda's counsel suggested that the Bank withdraw the motion, "given [the Bank's] fiduciary obligations to my client." Exh. 17, at 3913. In response, the Bank offered to withdraw its motion for summary judgment if Linda confirmed that she would not seek relief against the Bank in the MPA Suit and removed her allegations of breach of fiduciary duty and failure to protect and defend assets of the estate. Exh. 16. Linda's counsel refused to do so. Exh. 17. Linda instead accused the Bank of trying to "extort a release" from Linda "for its improper actions as a fiduciary." Exh. 40, at 9773. Linda also filed a response and opposition to Bank's summary judgment motion, which alleged (among other things) that the Bank had filed its motion for summary judgment "to gain a tactical advantage" over

Linda, "in hopes to avoid a future lawsuit over its failure to protect the Estate." Id. at 9748. The Bank admits that trust officer John Smith received this summary judgment response, and each of the other discovery responses and communications described above. Exh. 33 – Req. for Admission No. 32. Smith was also aware of Linda's claims of an inadequate investigation into the MPA beginning in January 2018. Smith Depo. (Exh. 31) p. 86. On May 31, 2018, a jury returned a unanimous verdict finding the MPA to be unenforceable. Exh. 41, Answer No. 4.[2]

On February 27, 2020, Linda filed her second lawsuit against the Bank. Her second lawsuit was again filed in the Galveston County Probate Court and was assigned Cause No. PR 0075340-B (the "Fiduciary Duty Suit"). A certified copy of Linda's petition in the Fiduciary Duty Suit is attached as Exhibit 4 ("Petition").

In her petition, Linda alleges that, since the death of Mr. Moody on July 14, 2014, the Bank has taken a multitude of actions to Linda's detriment, which constitute breaches of the Bank's fiduciary duties. Petition (Exh. 4) ¶ 19. Among other things, Linda alleges that the Bank;

- Failed to voluntarily disclose the MPA to Linda prior to July 2016 (Id. ¶ 21);

- Failed to investigate the validity or invalidity of the MPA (Id. ¶ 30);

- Improperly categorized Moody Ranches as community property under the MPA and allowed Darlene to control the sale of Moody Ranches over the express objections of Linda (Id. ¶¶ 22-24);

---

[2] Darlene and the Bank both appealed that ruling, and the ruling remains on appeal, based on a challenge to Linda's standing to assert the claims in the MPA Suit.

- Sold Moody Ranches for nearly $20,000,000 less than the Company's previously appraised value (Id. ¶ 27); and

- Aligned itself with Darlene in the MPA Suit to defend the MPA that was detrimental to the Estate and Testamentary Trusts it took an oath to protect, resulting in a reduction of gross assets of the estate and trusts by millions of dollars (Id. ¶¶ 30, 33).

In her petition, Linda recites her prior written objections to the sale of the Moody Ranches, including the June 3, 2016 letter described above. Petition (Exh. 4) ¶¶ 25, 26, 28. Linda quotes from the deposition testimony, pleadings, and correspondence in the prior MPA Suit. Id. ¶¶ 31, 32, 38, 40, 41. Linda also claims that she was forced to file the prior MPA Suit to invalidate the MPA on her own, because the Bank failed to do so, and alleges that the Bank's appeal of the MPA verdict is a further breach of fiduciary duty. Id. ¶¶ 34, 46.

The Bank reported the Fiduciary Duty Suit to Wesco and requested coverage under the July 2015 and July 2018 policies. Wesco agreed to advance defense expenses for the Fiduciary Duty Suit, subject to a reservation of rights, and subject to a $1,000,000 limit of liability. Exh. 43, pp. 1, 20. The Bank contends it is instead entitled to up to $3,000,000 in coverage under the July 2018 Policy, and that Wesco has breached the policy by refusing to pay that amount. Counterclaim ¶ 40 [at Dkt. 11].

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment if the pleadings, affidavits, and other evidence show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if the evidence is such that a reasonable factfinder could render a verdict for the nonmoving party. *See Anderson v.*

11

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" only if proof of its existence or nonexistence would affect the outcome of the case.  *See id.*  Thus, the mere existence of *some* factual dispute between the parties will not defeat summary judgment, if that dispute is irrelevant or unnecessary to the outcome of the case.  *See id.* at 247-48. Here, this means that a factual dispute as to one of bases for limiting coverage will not be deemed material, and will not require a trial, if the Bank's claim for coverage would fail for some other reason.  Any one of the following reasons would be sufficient, by itself, to limit coverage to $1,000,000.

Cases involving the interpretation of an insurance policy, or its application to an undisputed set of facts, are particularly amenable to resolution by summary judgment.  *See Central Mut. Ins. Co. v. Davis*, 576 F.Supp.3d 493, 505 (S.D. Tex. 2021); *Fina, Inc. v. Travelers Indem. Co.*, 184 F.Supp.2d 547, 550 (N.D. Tex. 2002).  In construing the terms of the contract, the Court's primary concern is to give effect to the written expression of the parties' intent, reading all provisions of the contract as a whole and giving effect to each term.  *See Atain Specialty Ins. Co. v. Galvestonian Condo. Ass'n*, 2020 WL 1676378, at *4 (S.D. Tex. 2020).

## ARGUMENT

I.    **The Current Fiduciary Duty Suit Is Related to Linda's 2016 Demand Letters and Is Deemed to Be a Claim "First Made" Prior to the July 2018 Policy Period.**

In order to establish its right to coverage under the July 2018 Policy, the Bank bears the burden of showing that the claim was "first made" during the policy period of July 17, 2018 to July 17, 2021.  July 2018 Policy (Exh. 35), Prof. Liability § I.C at WIC 2722

(covering "Loss resulting from a Claim first made during the Policy Period"); *see also Reeves Cnty. v. Houston Cas. Co.*, 356 S.W.3d 664, 670 (Tex. App. El Paso 2011) (holding that the insured bears burden of proof on this issue).  In deciding when a Claim was "first made," the policy clearly states that all "Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim, and that single Claim shall be deemed to be first made on the date the earliest of such Claims was first made."  Id., Gen. Terms § III.C at WIC 2691.  Interrelated Wrongful Acts are defined, in turn, to mean "Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions."  Id., General Terms § II, at WIC 2689.  Similar policy provisions have been repeatedly enforced by Texas courts and applied to aggregate and combine multiple related claims under the policy in which the risk was first presented.  *See, e.g.*, *Drawbridge Energy US Ventures, LLC v. Federal Ins. Co.*, 2022 WL 991989, at *5–6 (S.D. Tex. 2022); *Uni-Pixel, Inc. v. XL Specialty Ins. Co.*, 2020 WL 1528098, at *5–6 (Tex.App. Hous. (14 Dist.) 2020); *Nobilis Health Corp. v. Great American Ins. Co*, 2018 WL 4810840, at *7–9 (S.D. Tex. 2018); *Adi Worldlink LLC v. RSUI Indem. Co.*, 2017 WL 6403047, at *13 (E.D. Tex. 2017); *Burks v. XL Specialty Ins. Co.*, 534 S.W.3d 458, 464–65 (Tex.App. Hous. (14 Dist.) 2015); *Reeves Cnty.*, 356 S.W.3d at 670; *Clarendon American Ins. Co. v. Molpus Company*, 2005 WL 8155169, at *5 (W.D. Tex. 2005).

Here, there is no dispute that the Fiduciary Duty Lawsuit is a "civil proceeding" and thus a "Claim" within the meaning of the Policies.  July 2018 Policy (Exh. 35), Prof. Liability § II, at WIC 2722.  However, there are at least two additional Claims made by

13

Linda before the current Fiduciary Duty Suit: the demand letters sent by Linda's counsel on June 3, 2016 and July 25, 2016 in response to the sale of Moody Ranches negotiated by the Bank.[3]  The first of these letters refuses to consent to the proposed sale; asserts that the proposed sale price is between $11.8 million and $18.1 million less than the fair market value of the corporation; and asserts that each beneficiary would enjoy a significantly lower amount if the ranch is sold now instead of waiting until 2019 (after the built-in gains tax expires).  Exh. 1.  The June 3, 2016 letter also contests the Bank's claim that the ranch is unproductive, states that the information provided by the Bank shows the ranch *can* be made profitable, and asserts that the Bank has a "fiduciary duty to the beneficiaries" to do so.  Id.  The letter concludes by expressly "demand[ing] that the Ranch not be sold until January 2019 or later and be made profitable in the meantime."  Id.

The second letter, dated July 25, 2016, is even more explicit.  In that letter, Linda "again demands" that the Bank not sell Moody Ranches or the ranch until January 2019 or later and make the ranch productive in the interim.  Exh. 2.  The letter insists that the ranch can be made productive if the Bank works at it, and details specific actions that Linda demands the Bank take, including leasing the ranch and its water rights, which could

---

[3]  The other letters sent by Linda may likewise qualify as implied demands for relief, including the production of documents and information to which she had a right as a beneficiary.  *See, e.g.*, *Oceans Healthcare v. Illinois Union Ins. Co.*, 379 F.Supp.3d 554, 562 (E.D. Tex. 2019) (holding that demand for production of documents qualifies as a demand for non-monetary relief); *Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *8 (E.D.N.Y. 2014) (holding that a document need not use the word demand to be a written demand under the policy).  While the foregoing discussion focuses on the June 3, 2016 and July 25, 2016 letters, the same conclusion would also apply to these other letters and implicit demands.

increase cash flow by hundreds of thousands of dollars.  Id.  The letter further asserts that the new sales price is still between $9.2 million and $15.3 million less than the fair market value of the ranch, and contests the Bank's claim that Darlene has the right to demand that the ranch be sold.  Id.  The letter also states, in bold font, that: "**Selling the Ranch now for a price that is $9,267,727 less than current fair market value of the Ranch is not in the best interest of the remainder beneficiaries and is a breach of the Bank's fiduciary duty to the remainder beneficiaries.**"  Id.

Each of these letters is a "written demand for . . . non-monetary relief" and thus a "Claim" within the meaning of the Policy.  July 2018 Policy (Exh. 35) Prof. Liability § II, at WIC 2722 (defining Claim).  Both letters from Linda were clearly "written," and were sent to the Bank's counsel via mail, email, and fax.  Both letters make a clear "demand" upon the Bank, and, in fact, use that word expressly.  *See* Exh. 1; Exh. 2.  Both letters also seek "non-monetary relief" from the Bank.  Specifically, the letters demand that the Bank cease moving forward with the negotiated sale of Moody Ranches, which is alleged to be a breach of the fiduciary duties owed to Linda by the Bank.  The letters also demand that the Bank fulfill its fiduciary duty of making the ranch productive, and outline specific actions that Linda demands the Bank take in order to do so.  One or both of these 2016 demand letters therefore qualify as a "Claim" under the Policy.  *See Drawbridge Energy US Ventures*, 2022 WL 991989, at *5–6 (holding that a demand for a written undertaking not to disperse property was a demand for non-monetary relief); *Spec's Family Partners v. Hanover Ins. Co.*, 739 Fed.Appx. 233, 239 (5th Cir. 2018) (allegations of noncompliance, coupled with a demand to complete and submit forms, is demand for non-monetary relief).

The current Fiduciary Duty Suit is based on the same or interrelated wrongful acts as those prior claims.  The claim made in those letters – that the Bank negotiated a sale of Moody Ranches for millions of dollars less than its fair market value – is expressly repeated in Linda's petition in the Fiduciary Duty Suit.  Petition (Exh. 4) ¶¶ 27-28 ("On September 28, 2016, MNB, as Trustee, executed a contract to sell the Company for $37,032,170.10 – nearly **$20,000,000** less than the Company's previously appraised value. . . . This caused millions of dollars in injury to the Plaintiff, and to all other beneficiaries").  Linda's prior written objections to the sale, including her June 3, 2016 demand letter, are also expressly referenced.  Id. ¶ 25 (citing June 3 written objection); *see also* Id. ¶¶ 24, 26-28 (reciting other written objections and the Bank's sale over such objections).  Linda's prior assertion that the Bank was incorrectly allowing Darlene to demand the sale of the ranch is also reiterated.  Id. ¶ 24 ("MNB took the position that Darlene was a 50% owner of the Company and that Darlene's interests were superior to any other beneficiary of the Estate and/or Testamentary Trusts.  Under this theory, MNB allowed Darlene to control the sale of the Company and facilitated same at Darlene's demand and over the express objection of Plaintiff.").

In addition, the current and prior claims also "arise from" or "are attributable to" the same or interrelated wrongful acts.  Among other things, both the demand letters and Fiduciary Duty Suit arise from or are attributable to the Bank's actions of: deciding Darlene was a 50 percent shareholder of Moody Ranches under the MPA; determining that Darlene had the power to force a sale of Moody Ranches over another beneficiary's objections; selling the ranch in 2016 instead of waiting until 2019; and selling the ranch for millions

of dollars less than its appraised value.  These actions and the resulting claims made by Linda also share a clear nexus of common facts, circumstances, situations, events, and transactions.  *See* July 2018 Policy (Exh. 35) Gen. Terms § II, at WIC 2689 (defining Interrelated Wrongful Acts).  As the Bank's trust officer admits, all of these claims involve the Bank's role and actions as executor and trustee of that estate.  *See* Smith Depo. (Exh. 31) pp. 104-107.  All of these claims also share and arise from the creation of Mr. Moody's estate and trusts; his ownership of Moody Ranches; the Bank's transfer of 50 percent ownership of Moody Ranches to Darlene under the MPA; the subsequent sale of Moody Ranches; and Linda's status and demands as a beneficiary of the estate and trusts.

Under the clear language of the Policy, Linda's 2016 demand letters and her later Fiduciary Duty Suit are therefore treated as a single Claim that is deemed first made at the time of the earliest claim.  As made clear by Texas courts, the claims need not be identical in order to be treated as a single claim.  *Clarendon American Ins. Co. v. Molpus Co.*, 2005 WL 8155169, at *10 (W.D. Tex. 2005); *Reeves Cnty.*, 356 S.W.3d at 670.  The claims need only satisfy the broad standard of being connected by "any common fact, circumstance, or situation" in order to be related under the policy.  *See Nobilis Health Corp. v. Great American Ins. Co.,* 2018 WL 4810840, at *8 (S.D. Tex. 2018) ("The fact that the complaints contain *some* of the same Wrongful Acts is enough to trigger coverage."); *Turner v. Cincinnati Ins. Co.*, 9 F.4th 300, 317 (5th Cir. 2021) ("The Plaintiffs' arguments as to how the two lawsuits were different does not overcome the clear similarities between them both. . . . The ATI entities' role in creating and maintaining this "high pressure sales culture," however small that role might have been, is a fact common to both lawsuits and

17

integral to the claims presented in both. As a result, we conclude that the *Bartlett* lawsuit and the *Nelson* lawsuit are based on at least one common "wrongful act" or "interrelated wrongful act" and therefore constitute a single claim under the insurance policy."). The claims here meet that broad standard. Linda's 2016 demand letters and current Fiduciary Duty Suit must therefore be treated as a single claim first made during the July 2015 policy period.[4] As a result, the Bank is limited to the $1,000,000 limit of liability provided by the July 2015 Policy, and is not entitled to any further coverage.

---

[4] In addition to being related to Linda's 2016 demand letters, the Fiduciary Duty Suit is also deemed to be "first made" during the July 2015 Policy, based on the Bank's submission of a notice of potential claim and a copy of the MPA Petition in February 2017. See Exh. 8. Pursuant to Section V.B of the Policy, if an Executive "becomes aware of facts or circumstances which may reasonably give rise to a Potential Claim and gives written notice to the Insurer of the reasons for anticipating such Potential Claim, then any Claim subsequently made shall be deemed to have been first made during the Policy Year in which notice was first given to the Insurer. *See* July 2018 Policy (Exh. 35) Gen. Terms § V.B, at WIC 2692.

Here, Executive Vice President John Smith was aware of facts and circumstances which could reasonably give rise to a Potential Claim. (Without limitation, Smith knew of the filing of the MPA Suit at the time of the Bank's notice. Smith also knew of Linda's prior demand letters, the Bank's sale of the ranch over her objections, and the possibility of future litigation by the beneficiaries as a result of the sale.) The notice submitted by the Bank specifically contemplated and advised Wesco of the possibility that Linda could amend her claim to allege liability in the future and promised to update Wesco if Linda did so. Exh. 37. The notice given by the Bank also provided sufficient details about why a future claim or later assertion of liability could be anticipated. The notice indicated that there was a dispute about how the trust should be administered and whether the MPA relied upon by the Bank was valid. Id. The petition provided by the Bank also alleged that the Bank had failed to disclose the MPA to Linda and that distribution of assets pursuant to the MPA was "unlawful." MPA Petition (Exh. 3) ¶¶ 17, 33. Accordingly, when Linda later filed the Fiduciary Duty Suit based on these same underlying facts and circumstances (the Bank's actions in administering the estate and trusts, its distribution of Moody Ranches and other assets under the MPA, and its conduct in the MPA Suit itself), that suit was deemed to be first made at the time of the Bank's February 2017 notice to Wesco. The Fiduciary Duty Suit is thus deemed to have been first made during the July 2015 Policy.

**II.     The Fiduciary Duty Suit Is Based Upon, Arises From, or Is Attributable to Prior or Pending Litigation, Precluding Any Higher Limit of Liability**

Alternatively, even if the Court finds that the Fiduciary Duty Suit was first made during the July 2018 policy period instead of during the July 2015 Policy, the Bank is still limited to a maximum of $1,000,000 in coverage for the Fiduciary Duty Suit, and not the increased limits of $3,000,000 that the Bank requested in July 2018.  This is because the July 2018 Policy includes an endorsement, which caps coverage at the prior limits of liability ($1,000,000) for any claim that relates to other litigation that was initiated before the July 2018 Policy began.  That endorsement provides, in relevant part:

> The **Insurer** shall not be liable to pay any **Loss** or **Defense Expenses** in excess of $1,000,000 in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> 2.     any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to 7/17/2018, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

July 2018 Policy (Exh. 35), Endorsement, at WIC 2761.

Here, the Bank admits that the prior MPA Suit commenced by Linda was a "civil proceeding."  Exh. 32 – Req. for Admission No. 9.  The Bank also admits that Linda initiated the MPA Suit on or about November 9, 2016, and before the operative date of July 17, 2018.  Answer [Dkt. 11] ¶ 140.  As shown below, the prior MPA Suit was also "against any Insured" and gave rise to or was otherwise related to the current Fiduciary Duty Suit.

The petition filed in the MPA Suit clearly demonstrates that this prior litigation was "against" the Bank.  The Bank is named as a defendant in the suit.  MPA Petition (Exh. 3)

p. 1.  The petition seeks to declare the rights, status, and other legal relations of all of the "parties" and clarify the proper distribution of Mr. Moody's estate, which the Bank was in charge of administering.  Id. ¶¶ 23-25.  The petition further seeks to enjoin and prohibit the Bank from distributing or transferring any further funds or assets from the Estate to Darlene.  Id. ¶ 41.  Finally, the caption also shows the suit was brought by Linda Moody *versus* Darlene Moody and Moody National Bank.  Id., p. 1.  The term "versus" means "against."  *See* Black's Law Dictionary 1556 (7th ed. 1999) (defining versus as "Against. – Abbr. v.; vs."); American Heritage Dictionary of the English Language 1985 (3rd ed. 1992) (defining versus as "*Abbr.* v., vs.. 1. Against: *the plaintiff versus the defendant . . .*"); Online Etymology Dictionary, available at https://www.etymonline.com/word/versus ("mid-15c., in legal case names, denoting action of one party against another").  Numerous courts have also held that a suit naming an insured as a defendant is litigation "against" that insured.  *See, e.g.*, *HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309, 1317 (11th Cir. 2008) ("We believe that a person of ordinary intelligence would reasonably consider a lawsuit "against" a person or entity to be pending or to exist when it names that person or entity as a defendant and is properly filed with a court, and thus docketed and given a case number."); *Williams v. Bestcomp, Inc.*, 333 So.3d 461, 464 (La. App. 2021) (finding there was no prior or pending litigation against the insured until the insured "was named a defendant" in the proceedings); *see also In re Fogarty*, 39 F.4th 62, 72 (2nd Cir. 2022) (holding that an action "against the debtor . . . must encompass actions in which the debtor is a named defendant"); *Ironwood Capital Partners, LLC v. Jones*, 844 S.E.2d 245, 250 (Ga. App. 2020) (holding claim for declaratory relief was an "action or proceeding

against the debtor").  The analysis need not be, and should not be, any more complicated than that.

The subsequent litigation of the MPA Suit, however, further demonstrates that the litigation was "against" the Bank.  After filing the petition, Linda asked whether the Bank would agree to accept service or if a citation should be issued.  Exh. 26.  The Bank's counsel agreed to accept service on behalf of the Bank and to timely file an answer.  Exh. 29.  The Bank then responded to the petition by serving a general denial that denied the allegations of the petition, demanded strict proof of said allegations, and prayed that Linda's petition be dismissed with prejudice and that Linda bear all costs incurred.  Exh. 30.  The Bank subsequently filed a motion for summary judgment, asking the Court to deny Linda's claims that the MPA is unenforceable, and asking that fees and costs be assessed against Linda.  Exh. 39, pp. 2, 19.  In short, Linda and the Bank took opposing and contrary positions to each other in the litigation.  *See* American Heritage Dictionary of the English Language 32 (3rd ed. 1992) (defining "against" to mean "in a direction or course opposite to . . . contrary to; opposed to").  And in its filings to the Texas court of appeals, provided to Wesco, the Bank and Bank's counsel have repeatedly referred to that MPA Suit as being litigation "against" the Bank.  *See* Exh. 42 p. 1 (stating that "Linda filed a lawsuit against Darlene and MNB seeking to set aside the MPA"); Id. p. 39 (arguing that "MNB's good faith advocacy in [the MPA] litigation filed against it by Linda did not breach any fiduciary duty the Trustee may owe Linda"); Id. p. 60 (arguing that Linda named MNB as a defendant in the MPA Suit, and that "MNB was empowered by the Trust Agreement to . . . defend any claim or controversy by or against the Trust.").

Finally, the current Fiduciary Duty Suit also bears the required connection with the prior MPA Suit.  The current Fiduciary Duty Suit directly arises from and is expressly based upon and attributable to the prior MPA Suit.  In her current petition, Linda alleges that she was forced to file the prior MPA Suit on her own and expend her own personal funds because the Bank failed to do what it was supposed to – protect the estate and trusts. Petition (Exh. 4) ¶ 34.  Linda alleges the Bank failed to make an adequate investigation into the MPA that was the subject of the prior MPA Suit, and cites the Bank's deposition testimony from the MPA Suit as part of her current petition.  Id. ¶¶ 30-32.  Linda also asserts that the position taken by the Bank in the prior MPA Suit (that the MPA was valid) was contrary to the interests of the estate and trusts, and would reduce rather than enlarge the assets of the estate and trusts.  Id. ¶¶ 30, 33, 34.  Linda's petition in the Fiduciary Duty Suit further identifies specific actions taken by the Bank during the course of the prior MPA Suit that Linda contends are a breach of the Bank's fiduciary duties, including the Bank's acts of: filing a motion for summary judgment and seeking an award of fees against Linda (Id. ¶ 38); attempting to extort a release from Linda in exchange for withdrawing the motion for summary judgment (Id. ¶ 41); violating the motions in limine entered in the MPA Suit (Id. ¶ 43); and filing post-trial motions and an appeal seeking to reverse the jury verdict that would expand the assets of the estate (Id. ¶ 46).  In making these claims, Linda expressly cites to pleadings, communications, transcripts, and other documents exchanged or filed in the prior MPA Suit.  She also complains that the Bank still has not paid her the attorney fees awarded in that prior litigation.  Id. ¶ 45.  In short, the connection between the current Fiduciary Duty Suit and the prior MPA Suit could not be any clearer.  The

current Fiduciary Duty Suit arises from, is based upon, or is attributable to the prior MPA Suit against the Bank, and the prior litigation endorsement applies in this case.

Alternatively, or in addition, the current Fiduciary Duty Suit also arises out of or "in any way involves" the same or substantially same facts, circumstances, or situations underlying or alleged in the prior MPA Suit. *See Burks v. XL Specialty Ins. Co.*, 534 S.W.3d 458, 451 (Tex. App. Hous. (14 Dist.) 2015) (describing a similar standard of connection as "incredibly broad"). Both suits arise out of the estate and trust plans set up by Mr. Moody, and both suits describe those plans in similar detail. *Compare* Petition (Exh. 4) ¶¶ 9-18 *with* MPA Petition (Exh. 3) ¶¶ 8-16 (each describing the estate plan, trusts, terms, and beneficiaries in detail). Both suits involve the Bank's service and actions as executor and trustee of the estate and trusts. *See* Smith Depo. 104-107. Both suits arise from, involve, and specifically allege the Bank's determination that Moody Ranches, Inc. was community property under the MPA. *Compare* Petition ¶ 22 *with* MPA Petition ¶ 19. Both suits also specifically allege that the Bank failed to disclose the MPA to Linda until July 2016. *Compare* Petition ¶ 29 *with* MPA Petition ¶ 17.

Based on the above, it is clear that the current Fiduciary Duty Suit arises from, is based upon, or is attributable to a prior civil proceeding against the Bank (the MPA Suit), or at least "in any way involves" the facts, circumstances, or situations alleged in that prior proceeding. The Policy's endorsement for prior litigation therefore applies, and precludes any responsibility or obligation by Wesco to provide coverage in excess of $1,000,000 for the Fiduciary Duty Suit.

**IV.     The Fiduciary Duty Suit Is Based Upon, Arises From, or Is Attributable to Facts or Circumstances Known to an Executive Prior to the Policy Period, Precluding Any Higher Limit of Liability**

In addition, any potential coverage under the July 2018 Policy is also limited by the Policy's prior knowledge endorsement.  That endorsement again caps coverage at the prior limits of liability ($1,000,000) for claims arising from facts and circumstances known to an Executive prior to the inception date of July 17, 2018.  Specifically, the endorsement states:

> The **Insurer** shall not be liable to pay any **Loss** or **Defense Expenses** in excess of $1,000,000 in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> 1.     any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a Potential Claim about which an Executive had knowledge prior to 7/17/2018.

July 2018 Policy (Exh. 35), Endorsement, at WIC 2761.  A Potential Claim is defined, in turn, to mean "any Wrongful Act [that is, "any actual or alleged act, error, omission . . . or breach of duty" in the rendering of Trust Services] that may subsequently give rise to a Claim."  Id., Gen. Terms § II, at WIC 2690 (defining "Potential Claim"); *see also* Id., Prof. Liability § II, at WIC 2725 (defining "Wrongful Act").

As interpreted by Texas courts, this provision will limit coverage if there is either a subjective or objective basis for believing there are acts that may subsequently give rise to a Claim.  First, if there is a fact or circumstance that subjectively "is" regarded as the basis for a Potential Claim, this limitation will apply.  This is true any time an Executive subjectively recognizes facts that may subsequently give rise to a Claim, regardless of whether the Executive believes a future claim would be unwarranted or the wrongs alleged

would be "wholly imaginary." *See Westport Ins. Corp. v. Cotton Schmidt, LLP*, 605 F.Supp.2d 796, 804-06 (N.D. Tex. 2009). Second, the limitation will also apply if there is a fact or circumstance known to an Executive that objectively or "reasonably would be" regarded as the basis for a Potential Claim. In this prong, the Court looks at the facts known to the Executive and determines whether a reasonable person would believe those facts may give rise to a future Claim. *See id.* at 806. The Court will not allow the insured to engage in willful blindness or allow their subjective hopes or beliefs to trump the policy's limitation if the insured had constructive knowledge of the basis for a Potential Claim. *See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka*, 267 F.Supp.2d 601, 608 n.5 (E.D. Tex. 2003).

Here, it is clear that an Executive of the Bank (John Smith)[5] knew of acts that he subjectively knew could give rise to a later Claim. In February 2016, Smith prepared a written analysis of issues relating to the sale of Moody Ranches that he sent to the CEO and board members sitting on the trust committee. Exh. 12; Smith Depo. (Exh. 31) p. 50. In that analysis, Smith explained that approximately $13.7 million in capital gain taxes would be incurred if the ranch was sold prior to 2019. Exh. 12, at MOODY 101. Smith said that this had been explained to Darlene, but that Darlene did not want to wait. Id.

---

[5] The Policy defines an Executive to mean any natural person who was, is, or shall be a duly elected or appointed director, officer, or member of the board of managers, or the head of any Trust Department. July 2018 Policy (Exh. 35) Prof. Liability § II, at WIC 2723. Smith meets either or both of these categories. Smith testified that he is an Executive Vice President of the Bank, that his position was board approved, and that he was appointed to the executive team. Smith Depo. (Exh. 31) pp. 12-13. He also testified that he was the head of the trust department at Moody National Bank from 2014 to 2019. Id. pp. 13-14.

Smith also explained the risks of potential litigation if the Bank went forward with the sale:

> The risk or potential liability – The Remainder beneficiaries, the three daughters of Bill Moody, who get a life interest in the income in the Trust after Darlene's death . . . could litigate in the future for selling the Ranch before the favorable tax status year and thus reducing the net sale proceeds.

Id.  Smith testified that he believed Linda would be unhappy if the ranch was sold in 2016.

Smith Depo. (Exh. 31) p. 58.  Smith also testified that he did "think there could be a possibility of litigation, yes." Id. p. 59.  Smith could not recall any other time when he had affirmatively told the other members of the trust committee that someone could litigate in the future. Id. p. 68.  Stated differently, Smith subjectively knew that there was a possibility of litigation if the ranch was sold.  He also knew that it was still Linda's position that the ranch should not be sold in October 2016, Id. p. 49, the month the sale was ultimately completed. Exh. 25.  That is enough to trigger the language of the Policy: that Smith knew prior to July 17, 2018 of actions that "may subsequently give rise to a Claim."

Smith also was aware of a number of other facts and circumstances prior to July 17, 2018 that would objectively and reasonably be regarded as the basis for a Potential Claim. In advance of July 17, 2018, Smith knew the facts described above: that the remainder beneficiaries could litigate if the ranch was sold before the favorable tax status year; that Linda would be unhappy if the ranch was sold in 2016; and that the ranch was, in fact, sold. In addition to those facts, Smith also knew of the following further allegations related to the Bank's sale of the ranch and its conduct in the MPA Suit:

- Smith knew that Linda's counsel had sent a letter, dated June 3, 2016, stating that Linda was not willing to consent to the sale of Moody Ranches and stating that the sales price is approximately $11 million to $18 million less than the fair market value of the ranch and other assets of the corporation. Exh. 1.  Although the letter

was addressed to the Bank's attorney, Smith testified that he had seen this letter, and that he had received it within a week or two of June 3, 2016.  <u>Smith Depo. (Exh. 31)</u> p. 41.

- Smith knew that Linda's counsel had sent a letter, dated July 25, 2016, reiterating her objection to the Bank's sale of Moody Ranches and asserting the proposed sale price was $9.2 million to $15.3 million less than the fair market value of the ranch.  <u>Exh. 2</u>.  That letter further stated that the sale negotiated by the Bank "**is not in the best interest of the remainder beneficiaries and is a breach of the bank's fiduciary duty.**"  <u>Id.</u>  Smith testified that he received this letter within a week of it being sent.  <u>Smith Depo. (Exh. 31)</u> p. 44.  He could not recall receiving any other letters during his time at Moody National Bank claiming that an action taken by the bank is a breach of fiduciary duty.  <u>Id.</u> p. 46.

- Smith knew that Linda had complained that the Bank did not disclose the MPA to her.  Linda made that assertion in her first lawsuit against the Bank, filed in November 2016, <u>MPA Petition (Exh. 3)</u> ¶ 17, and Smith testified that he became aware of that complaint within a month of the filing.  <u>Smith Depo. (Exh. 31)</u> p. 88.

- Smith knew that Linda thought the Bank should be supporting her in questioning the validity of the MPA, and not expending estate funds to uphold an agreement that is adverse to the assets of the estate.  <u>Exh. 14</u>.  The Bank admits that John Smith received the letter from Linda's counsel setting forth that position in October 2017.  <u>Exh. 33</u> – Req. for Admission No. 27.

- Smith knew that Linda thought the Bank did an inadequate investigation into the marital property agreement.  Smith states that he first became aware of that allegation during his deposition in the MPA Suit, which occurred in January 2018.  <u>Smith Depo. (Exh. 31)</u> p. 86.

- Smith knew that the Bank had asked Linda in February 2018 to confirm that she would not seek relief against the Bank.  <u>Exh. 16</u>; <u>Smith Depo. (Exh. 31)</u> p. 81.  Smith does not recall the Bank ever sending a similar letter in any of the trusts he has been involved with.  <u>Smith Depo. (Exh. 31)</u> p. 82.

- Smith knew that Linda then filed a summary judgment response that accused the Bank of attempting to extort a release from Linda for its improper actions as a fiduciary.  <u>Exh. 40</u> ¶87.  That same response also alleged that the Bank had interests that are antagonistic to the Estate, that the Bank had taken a position that served to reduce the gross assets of the Estate, and that the Bank had failed to properly investigate the validity of the MPA.  <u>Id.</u> ¶84, ¶86, ¶89.  Linda alleged this "brings into question whether or not MNB is complying with its own fiduciary obligations."

Id. ¶86.  Linda also alleged that the Bank had filed a motion for summary judgment in support of Darlene "to gain a tactical advantage over its other beneficiary, Linda Moody, in hopes to avoid a future lawsuit over its failures to protect the Estate." Exh. 40, p. 2.  The Bank admits that John Smith received a copy of that pleading in March 2018.  Exh. 33 – Req. for Admission No. 32.

- Smith knew that Linda continued to allege that the Bank failed to protect and defend the assets of the estate, even after the Bank's counsel asked her to withdraw that allegation.  Exh. 19, p. 5.  Linda continued to assert this allegation in her amended disclosures, which the Bank admits Smith received in May 2018.  Exh. 33 – Req. for Admission No. 31.

- Smith also knew that the MPA, which the Bank had relied upon to transfer property to Darlene, was found to be unenforceable by a unanimous jury.  Exh. 41, Answer 4.  The Bank admits an Executive of the Bank had knowledge of the jury verdict on May 31, 2018, Exh. 32 – Req. for Admission No. 11, and Smith testified that he was aware of the verdict on May 31, 2018 or the day after.  Smith Depo. (Exh. 31) p. 96.

All of these facts were known or received by Smith prior to July 17, 2018.

Regardless of whether Smith himself viewed these facts as something that may give rise to a future claim, a reasonable person in his position would have.  Smith knew that Linda had repeatedly opposed the sale of Moody Ranches, that she would not be happy if the ranch was sold in 2016, that she believed the sale was a breach of the Bank's fiduciary duties, and that she believed the sale price was millions of dollars less than the company's fair market value.  Smith also knew, prior to July 17, 2018, that Linda had alleged that the Bank had failed to protect and defend the assets of the estate, that Linda had alleged the Bank failed to adequately investigate the MPA, that Linda had alleged the Bank failed to disclose the MPA, and that the MPA upon which the Bank had relied in distributing more than $20,000,000 in assets to Darlene had been found unenforceable by a unanimous jury verdict.  Any reasonable person would believe that these facts at least "*may* subsequently give rise to a Claim."

28

The Fiduciary Duty Suit that was subsequently filed also repeats and relies upon many of these same facts that were previously known to the Bank's Executive.   In her current petition, Linda alleges that the Bank facilitated the sale of Moody Ranches over her express objections, and that the sale price was nearly $20,000,000 less than the Company's appraised value.   Petition (Exh. 4) ¶¶ 24, 27.   Linda alleges that the Bank never voluntarily disclosed the MPA to her, and that the Bank did nothing to investigate its validity.   Id. ¶¶ 21, 30.   She also alleges that the position taken by the Bank in the prior litigation (aligning with Darlene to defend the MPA) was detrimental to the estate and trusts the Bank took an oath to protect, and that the Bank's position would have deprive the estate and trusts of millions of dollars in assets.   Id. ¶¶ 30, 33.   The current Fiduciary Duty Suit clearly arises from, is based upon, or attributable to the facts, circumstances, situations, or events that were known by an Executive of the Bank prior to July 17, 2018.   The July 2018 Policy's endorsement for prior knowledge therefore applies to this matter, and limits coverage for the Fiduciary Duty Suit to a maximum of $1,000,000.[6]

---

[6] Coverage for the current Fiduciary Duty Suit is also precluded or limited by the common law "known loss" or "loss in progress" doctrine.   Under Texas law, fortuity is a requirement of *all* insurance policies.   *See Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 767 (Tex. App. Forth Worth 2006).   The doctrine precludes shifting liability to an insurer where there is an ongoing progressive loss that the insured is, or should be, aware of at the time the policy is purchased.   *See Wesco Ins. Co. v. Layton*, 725 Fed.Appx. 289, 293 (5th Cir. 2018).   In the context of a liability policy, "the key inquiry is not whether the insureds actually knew of the underlying loss or potential liability, but rather whether they knew, at the inception of coverage that they were engaging in activities which might reasonably be expected to expose them to or result in liability." *Id.*   "A party, therefore, may not voluntarily engage in an activity that gives rise to an accusation of wrongdoing and potential legal liability, and then purchase insurance so that it may shift financial responsibility for its conduct." *RLI Ins. Co. v. Maxxon Southwest, Inc.*, 265 F.Supp.2d 727, 730 (N.D. Tex. 2003); *accord Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 208

## **CONCLUSION**

For the reasons stated more fully above, the Court should find and declare that the current Fiduciary Duty Suit is a Claim that was "first made" during the July 2015 Policy and is therefore subject to the $1,000,000 limit of liability applicable to that policy. Alternatively, if the Court determines that the Fiduciary Duty Suit was first made during the July 2018 Policy, the Court should find and declare that coverage for the Fiduciary Duty Suit is still limited to a maximum of $1,000,000 based on the July 2018 Policy's Prior Knowledge / Litigation endorsement or the known loss doctrine. Because the Bank is not entitled to any coverage in excess of $1,000,000, the Court should also dismiss the Bank's Counterclaim against Wesco for breach of contract, and should award Wesco its costs and disbursements herein.

---

F.Supp.2d 687, 691 (S.D. Tex. 2001) (finding coverage barred by known loss doctrine where insureds began the activities for which they claim coverage before entering the policy, received a demand letter warning them of their potential liability, and then purchased the insurance at issue).

Here, the Bank first determined that Darlene was entitled to 50 percent of Moody Ranches by January 2016 at the latest, when it listed the Company as community property. Petition (Exh. 4) ¶ 22; *see also* Smith Depo. (Exh. 31) p. 30. The Bank then allowed Darlene to facilitate and control the sale of Moody Ranches in October 2016, over Linda's known objections, Petition (Exh. 4) ¶¶ 24-28, and despite her demand letters stating she believed the sale was a breach of the Bank's fiduciary duties. Exh. 2. In the subsequent MPA Suit, the Bank then made the decision to defend the MPA and take other actions adverse to the position of Linda, despite Linda's warnings that such actions were inconsistent with the Bank's fiduciary duties and its duties to protect and defend the assets of the estate. Petition (Exh. 4) ¶¶ 33, 40; *see also* Exh. 14; Exh. 40 ¶ 86 (questioning whether Bank's actions were consistent with its duties to the beneficiaries). Because all of these actions and all of these warnings were known to the Bank prior to its application for the July 2018 Policy, the fortuity doctrine precludes the Bank from recovering under that policy for the subsequent Fiduciary Duty Suit based on such actions.

Respectfully submitted,

Dated:  September 30, 2022        By:  _/s/ Daniel A. Ellerbrock_____
                                     Daniel A. Ellerbrock, Esq. attorney-in-charge
                                     MN Bar No. 0392039 (admitted *pro hac vice*)
                                     GREGERSON, ROSOW, JOHNSON & NILAN
                                     100 Washington Square, Suite 1550
                                     Minneapolis, MN 55401
                                     Phone: (612) 338-0755
                                     Fax: (612) 349-6718
                                     dellerbrock@grjn.com

                In association with:

                                     Alissa K. Christopher, Esq. Counsel
                                     State Bar No. 11531020
                                     Southern District of Texas Bar No. 16201
                                     COZEN O'CONNOR
                                     1717 Main Street, Suite 3100
                                     Dallas, TX 75201
                                     Phone: (214) 462-3036
                                     Fax: (214) 462-3299
                                     akchristopher@cozen.com

                                     *Attorneys for Wesco Insurance Company*

## **CERTIFICATE OF SERVICE**

This certifies that, on September 30, 2022, a true copy of the foregoing was served

on all counsel of record who are registered ECF users pursuant to the Federal Rules of Civil

Procedure.

/s/ *Daniel A. Ellerbrock*
Daniel A. Ellerbrock