**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **WESCO INSURANCE COMPANY,** | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-CV-00181** |
| | § | |
| **MOODY NATIONAL BANK and** | § | |
| **MOODY BANCSHARES, INC.,** | § | |
| *Defendants/Counter-Plaintiffs.* | § | |

<u>**DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO
PLAINTIFF/COUNTER-DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

**WINSTEAD PC**

By: */s/ Yasmin Atasi*
　　Yasmin Atasi, Attorney in Charge
　　State Bar No. 10435150
　　S.D. Tex. I.D. No. 13119
　　yatasi@winstead.com
　　600 Travis Street, Suite 5200
　　Houston, Texas 77002
　　Telephone: 713-650-8400
　　Fax: 713-650-2400

**MILLS SHIRLEY L.L.P.**

Fred D. Raschke
State Bar No. 16551450
S.D. Tex. I.D. No. 7123
fraschke@millsshirley.com
P.O. Box 1943
Galveston, TX 77553-1943
Telephone: 409-761-4028
Fax: 409-763-2879

**ATTORNEYS FOR DEFENDANTS /
COUNTER-PLAINTIFFS MOODY
NATIONAL BANK AND MOODY
BANCSHARES, INC.**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION AND BRIEF SUMMARY OF RESPONSE ........................... 1

II.     RESPONSE SUMMARY JUDGMENT EVIDENCE ........................................... 3

III.    RESPONSE ARGUMENT ............................................................................... 3

        A.      Linda's 2016 Letters Are Not "Claims" Under the Policy ......................... 3

        B.      The Fiduciary Lawsuit Does Not Relate to Linda's 2016 Letters
                Under the Single Limit/Retention Provision ................................................ 8

        C.      The Fiduciary Lawsuit Is Not Deemed First Made on the Date of the
                MPA Notice ................................................................................................. 14

        D.      The Prior Litigation Exclusion Does Not Apply ........................................ 16

        E.      The Prior Knowledge Exclusion Does Not Apply ..................................... 19

        F.      The Known Loss Doctrine Does Not Apply ............................................... 25

IV.     CONCLUSION AND PRAYER ......................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADI Worldlink, LLC v. RSUI Indem. Co.*,
No. 416CV00665ALMCAN, 2017 WL 6403047 (E.D. Tex. Aug. 16,
2017), *report and recommendation adopted*, No. 4:16-CV-665, 2017
WL 4112112 (E.D. Tex. Sept. 18, 2017), *aff'd sub nom. ADI Worldlink,
L.L.C. v. RSUI Indem. Co.*, 932 F.3d 369 (5th Cir. 2019) ...................................... 9, 10

*Axis Surplus Ins. Co. v. Johnson*,
No. 06-CV-500-GKF-PJC, 2008 WL 4525409 (N.D. Okla. Oct. 3,
2008) .................................................................................................................. 14

*Burks v. XL Specialty Ins. Co.*,
534 S.W.3d 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.)............................ 12

*Clarendon Am. Ins. Co. v. Molpus Co.*,
No. A-04-CA-563-SS, 2005 WL 8155169 (W.D. Tex. Aug. 9, 2005)............ 11, 12, 13

*D&T Partners v Baymark Partners LP*,
No. 3:21-CV-1171-B, 2022 U.S. Dist. LEXIS 83140 (N.D. Tex. May 9,
2022) ..................................................................................................................... 2

*Drawbridge Energy US Ventures, LLC v. Fed. Ins. Co.*,
No. 4:20-CV-03570, 2022 WL 991989 (S.D. Tex. April 1, 2022)........................... 4, 5

*In re Fogarty*,
39 F.4th 62 (2nd Cir. 2022) ................................................................................ 18

*HR Acquisition I Corp. v. Twin City Fire Ins. Co.*,
547 F.3d 1309 (11th Cir. 2008) ............................................................................ 17

*Ironwood Capital Partners, LLC v. Jones*,
844 S.E.2d 245 (Ga. App. 2020)......................................................................... 18

*Luke v. Lincoln Nat'l Life Ins. Co.*,
No. 5:03-CV-256, 2005 U.S. Dist. LEXIS 42074 (E.D. Tex. Nov. 15,
2005) ..................................................................................................................... 2

*Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*,
208 F.Supp.2d 687 (S.D. Tex. 2001) .................................................................. 25

*Nobilis Health Corp. v. Great Am. Ins. Co.*,
   No. H-17-2386, 2018 WL 4810840 (S.D. Tex. Oct. 4, 2018) ....................... 10, 11, 13

*Oceans Healthcare, L.L.C. v. Illinois Union Ins. Co.*,
   379 F.Supp.3d 554 (E.D. Tex. 2019) ............................................................ 7

*Reeves Cnty v. Houston Cas. Co.*,
   356 S.W.3d 664 (Tex. App.—El Paso 2011, no pet.) ..................................... 11, 12, 13

*Simon v. Maryland Cas. Co.*,
   353 F.2d 608 (5th Cir. 1965) ....................................................................... 18

*Spec's Family Partners, Ltd. v. Hanover Ins. Co.*,
   739 Fed.Appx. 233 (2018) ........................................................................ 6, 7

*Turner v. Cincinnati Ins.*,
   9 F.4th 300 (5th Cir. 2021) ......................................................................... 13

*Uni-Pixel, Inc. v. XL Specialty Ins. Co.*,
   No. 14-18-00828-CV, 2020 WL 1528098 (Tex. App.—Houston [14th
   Dist.] March. 31, 2020, no pet.) ................................................................. 9

*Weaver v. Axis Surplus Ins. Co.*,
   No. 13-CV-7374, 2014 WL 5500667 (E.D.N.Y. Oct. 30, 2014) ................................. 7

*Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*,
   267 F.Supp.2d 601 (E. D. Texas 2003) ..................................... 19, 21, 23, 24

*Williams v. Bestcomp, Inc.*,
   333 So.3d 461 (La. App. 2021) .................................................................. 17

**Statutes and Rules**

FED. R. CIV. P. 10(c) ....................................................................................... 2

Defendants/Counter-Plaintiffs Moody National Bank ("MNB") and Moody Bancshares, Inc. ("Moody Bancshares") (collectively "Moody") file their Response to Plaintiff/Counter-Defendant Wesco Insurance Company's ("Wesco") Motion for Summary Judgment ("Wesco's Motion") (Dkt. 26). Wesco's Motion does not establish any facts that would support summary judgment in its favor. Instead, Wesco resorts to misleading arguments based on distinguishable case law and documents taken completely out of context. The unrebutted evidence provided in support of Moody's Motion for Final Summary Judgment (Dkt. 24 and 25) establishes that summary judgment should be granted in favor of Moody as a matter of law and that coverage for the underlying Fiduciary Lawsuit should be afforded under the 2018 Policy.

## I.      INTRODUCTION AND BRIEF SUMMARY OF RESPONSE

1.      On September 30, 2022, Moody filed a Motion for Final Summary Judgment ("Moody's Motion") that details the factual background of this insurance coverage dispute, as well as the grounds for why summary judgment should be granted in Moody's favor (Dkt. 24).[1] The grounds urged in Wesco's Motion are the same grounds discussed in Moody's Motion. Specifically, Wesco improperly suggests in its Motion that the Fiduciary Lawsuit that was filed in February 2020 when the 2018 Policy was in effect, should be covered by the earlier 2015 Policy with lower limits because it "relates to" either (i) a "Claim" first made by Linda Moody ("Linda") in two letters dated June 3, 2016 and July 25, 2016, or (ii) a notice provided by MNB in February 2017 to Wesco of

---

[1]    The definitions used in this Response are the same definitions used in Moody's Motion.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                        1 of 2

a separate lawsuit filed by Linda against her stepmother Darlene Moody ("Darlene") in which she sought to annul a marital property agreement between Linda's deceased father and stepmother. Alternatively, Wesco contends that the Prior Knowledge / Litigation exclusion in the 2018 Policy limits coverage to $1 million.

2.     Rather than regurgitate its Motion for Final Summary Judgment in this Response, and to avoid burdening the Court with duplicative and unnecessary briefing, and in the interest of judicial economy, Moody adopts and incorporates herein by reference the Motion for Final Summary Judgment (Dkt. 24) and the evidence in support of its Motion (Dkt. 25) in responding to Wesco's Motion. *See D&T Partners v Baymark Partners LP,* No. 3:21-CV-1171-B, 2022 U.S. Dist. LEXIS 83140, at *10-11 (N.D. Tex. May 9, 2022) (allowing prior briefing to be incorporated by reference to serve judicial economy); *Luke v. Lincoln Nat'l Life Ins. Co.,* No. 5:03-CV-256, 2005 U.S. Dist. LEXIS 42074, at *5 (E.D. Tex. Nov. 15, 2005) (same); *see also* FED. R. CIV. P. 10(c).

3.     As more fully discussed in Moody's Motion and in this Response, Wesco's Motion should be denied for the following reasons:

- Linda's 2016 Letters are not "Claims" under the 2018 Policy, and the Single Limit/Retention provision in the Policy does not apply to relegate coverage for the Fiduciary Lawsuit to the earlier 2015 Policy.

- The 2017 Notice provided to Wesco of the MPA Lawsuit was not a "notice of a potential claim" against MNB, and accordingly the Fiduciary Lawsuit does not relate back to the MPA Notice.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                    2 of 3

- Wesco has failed to carry its burden under the Prior Litigation Exclusion because the MPA Lawsuit was not a claim "against" MNB, and Wesco admitted in its own claim notes that the Fiduciary Lawsuit was not related to the MPA Lawsuit.

- Wesco has failed to carry its burden under the Prior Knowledge Exclusion because the exclusion does not apply in cases involving allegations of wrongdoing that occur after the inception of coverage, as in this case, and there is no evidence to support the stringent subjective and objective knowledge standards required by the exclusion.

## II.    RESPONSE SUMMARY JUDGMENT EVIDENCE

4.    In addition to the evidence presented by Moody in support of its Motion (Dkt. 25), Moody relies on the following additional evidence:

Exhibit R        Probate court docket sheet for MPA Lawsuit

## III.    RESPONSE ARGUMENT

A.    **Linda's 2016 Letters Are Not "Claims" Under the Policy.**

5.    Wesco alleges that "one or both" of Linda's two letters dated June 3, 2016 and July 25, 2016 (the "2016 Letters") are "Claims" under the Policy, that the 2020 Fiduciary Lawsuit relates to the 2016 Letters, and accordingly, the Fiduciary Lawsuit is deemed made on either June 3, 2016 or July 25, 2016 under the Single Limit/Retention Provision of the Policy.[2] *See* Wesco's Motion, pp. 13-18 (Dkt. 26). As discussed in detail

---

[2]    The 2016 Letters are Exhibits N-8 and N-9 to Moody's Motion (Dkt. 25-22 and 25-23), and Exhibits 1 and 2 to Wesco's Motion (Dkt. 27-1 and 27-2). The Fiduciary Lawsuit Petition and

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                    3 of 4

in Moody's Motion, Linda's 2016 Letters are not "demands for non-monetary relief" and therefore not "Claims" under the Policy. Rather, the two letters are merely requests by Linda (couched in terms of a "demand") that MNB voluntarily cease from selling the Ranch and make it productive. The Letters were not accompanied by any demand for monetary relief, any threat of injunctive relief, any threat of litigation or any legal consequence if MNB did not abide by Linda's request that MNB not sell the Ranch, and accordingly do not qualify as "a written demand for non-monetary relief." *See* Moody's Motion, pp. 14-18 (Dkt. 24).

6.     At p. 15 of its Motion, Wesco cites to two clearly distinguishable and inapposite cases to support its faulty argument that "[o]ne or both" of the 2016 Letters qualify as a "Claim." *Drawbridge Energy US Ventures, LLC v. Fed. Ins. Co.*, No. 4:20-CV-03570, 2022 WL 991989 (S.D. Tex. April 1, 2022) involved a lawsuit filed on July 10, 2018, and a letter sent to the insured two months earlier on May 17, 2018, prior to the inception of coverage. The underlying lawsuit related to an improper and void transaction pursuant to which a company that had violated the Australian Securities Exchange transferred its interest in a subsidiary – $21 million – to the insured. The plaintiff in the underlying lawsuit sought an injunction to prevent the expenditure of the $21 million, a declaration that the transaction was void, and asserted claims for unjust enrichment/money had and received. *Id.* at *3-5. At issue was whether a letter sent *two months* earlier to the insured constituted a notice of claim. The letter stated (i) the insured

_____

Supplement to Petition are attached as Exhibits I and J to Moody's Motion (Dkt. 25-9 and 25-10), and a copy of the Fiduciary Petition is attached as Exhibit 4 to Wesco's Motion (Dkt. 27-4).

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                          4 of 5

knew about the company's suspended status on the Australian Exchange before entering into the transaction, (ii) due to its knowledge, the insured is liable as an accessory, knowing recipient or party involved in contravention of Australia law, (iii) the property it received is held in trust for the true owners of the funds, and (iv) in light of this, requested an urgent written undertaking that the insured will not disperse any of the $21 million. *Id.* at *5-8. Key to the court's finding that the letter related to the underlying lawsuit was the letter's description of a "Wrongful Act" that the insured knowingly participated in a breach of fiduciary duty by accepting the funds in violation of Australian law, the contention that Australian law imposes liability on those who knowingly assist or receive property in a breach of fiduciary duty, the letter's request for "an urgent written undertaking" to not disperse the funds (which the court characterized as non-monetary relief), and the transaction referenced in the letter was the subject of the underlying lawsuit filed two months after the letter was sent. *Id.*

7.      Unlike the letter in *Drawbridge*, the 2016 Letters were sent approximately 4 years *before* the underlying lawsuit was filed and *before* the Ranch was sold in October 2016. The Letters do not accuse MNB of any "Wrongful Trust Services Act,"[3] do not include a demand for any "urgent written undertaking," do not contend that MNB violated any laws, and do not threaten any litigation, injunctive relief or legal consequence for moving forward with the sale. Rather, as discussed in Moody's Motion,

---

[3]   The Policies define "Wrongful Act" in the Professional Liability Coverage part as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or neglect by the Insured in the rendering or failure to render Trust Services…." (Dkt. 25-2 at p. 59).

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                          5 of 6

the letters simply request (couched in terms of "demand") that MNB not sell the Ranch until 2019 and make it productive in the interim. In the July 25, 2016 letter (Dkt. 25-23), Linda proposes unsupported and speculative scenarios to make the ranch productive ("*If the entire 48,670 acre Ranch was leased for hunting at $10 acre . . .,*" "water rights *could* be leased separately or in connection with the leasing of land on the Ranch," . . . "the water rights *could* also be sold separately from the Ranch."), which Wesco disingenuously argues are demands. Once again, Linda's vague and unsupported proposals and suggestions cannot be "demands" because they were not accompanied by any threat of litigation or consequence for MNB if it did not follow her proposals. As noted in Moody's Motion, Linda herself acknowledges in prior correspondence that any deference to her requests would be voluntary by MNB. *See* Moody's Motion at pp. 16-17 (Dkt. 24); Ex. N-1 to Moody's Motion (Dkt. 25-15).

8.      Equally unavailing is Wesco's reliance on *Spec's Family Partners, Ltd. v. Hanover Ins. Co*., 739 Fed.Appx. 233 (2018). The two demand letters that the insured had sent to the insurance company demanded the payment of significant funds ($7.6 million in one letter and $1.9 million in the other), accused the insured of non-compliance with required security standards that led to the hacking of the insured's credit card network, and demanded documentation and security compliance forms. *Id.* at 234-35, 239. While the court referred to the request for the completion and submission of security forms as "non-monetary relief", the court was *not* analyzing or discussing whether the demand letters that the insured sent to the carrier were "Claims" under the

policy. Rather, the court was assessing whether the letters contained at least one claim that potentially falls within the scope of the policy's coverage to trigger the carrier's duty to defend. The court concluded that the non-monetary relief requested – completion and submission of forms – implicated theories of negligence and general contract law that triggered the duty to defend, and that the district court had therefore erred in entering judgment on the pleadings. *Id.* at 239. The letters in *Spec's v Hanover* are a far cry from the requests in Linda's 2016 Letters that MNB not sell the Ranch until 2019 and make it productive.

9.      In footnote 3 at p. 14 of its Motion, Wesco summarily argues that Linda's "other letters" (which Wesco does not specifically identify) "*may* … qualify as implied demands for relief, including the production of documents and information to which she had a right as a beneficiary." Of course, the Policies do not cover, define or contemplate "implied demands for relief." What is more, the two cases cited by Wesco in the footnote are inapplicable. *Oceans Healthcare, L.L.C. v. Illinois Union Ins. Co.*, 379 F.Supp.3d 554, 562 (E.D. Tex. 2019) involved a demand for documents pursuant to a subpoena, with potential legal consequences, and *Weaver v. Axis Surplus Ins. Co.*, No. 13-CV-7374, 2014 WL 5500667, at *8-11 (E.D.N.Y. Oct. 30, 2014) involved a demand by the Attorney General for documents under a claim of legal right and threat of legal action for noncompliance.

10.      In sum, Linda's 2016 Letters (or any unidentified "other letters") are not "Claims" under the Policy.

**B.**     **The Fiduciary Lawsuit Does Not Relate to Linda's 2016 Letters Under the Single Limit/Retention Provision.**

11.     Wesco next argues that the 2016 Letters – the alleged "Claims" – and the Fiduciary Litigation – another Claim – are "based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts**," and the Fiduciary Lawsuit is accordingly deemed made on either June 3, 2016 or July 25, 2016 (the dates of the 2016 Letters) under the Single Limit/Retention Provision in the Policy. *See* Wesco's Motion, pp. 16-18 (Dkt. 26). As discussed above and in Moody's Motion, (i) the 2016 Letters are not "Claims" and the Single Limit/Retention provision is therefore not implicated to begin with, (ii) the case law addressing interrelatedness provisions such as the one in question here, typically involve multiple lawsuits or legal proceedings, *not* letters requesting voluntary action and a lawsuit approximately 4 years later, and (iii) the 2016 Letters and the Fiduciary Lawsuit are not "based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts." *See* Moody's Motion at pp. 19-21 (Dkt. 24).

12.     Wesco cites to several cases at p. 13 of its Motion to support its argument that the Court should aggregate and combine the 2016 Letters and Fiduciary Lawsuit under the Single Limit/Retention provision. However, if anything, these cases confirm that aggregation and combination is not appropriate in this case because the cases either involved multiple lawsuits or arbitrations with the same claims *or*, in one case, a monetary demand coupled with accusations of wrongdoing, none of which exist here:

- *Uni-Pixel, Inc. v. XL Specialty Ins. Co.,* No. 14-18-00828-CV, 2020 WL 1528098 (Tex. App.—Houston [14th Dist.] March. 31, 2020, no pet.) involved *multiple actions*: a shareholder class action, an SEC subpoena, a derivative action (all of which predated coverage under the policy), and a later notice from the SEC recommending an action against the insured ("SEC Notice"), and subsequent SEC enforcement action (both of which occurred during the policy period). *All* of the actions and subpoena related solely to misstatements, misrepresentations and omissions by the insured about a new product it was developing, which resulted in a significant decline in the insured's stock price. The insured sought coverage for the later SEC Notice and SEC Enforcement Action, but the court concluded that the SEC Notice and SEC Enforcement Action arose from the same series of related facts in the class action and derivative action, namely the insured's statements and representations regarding the product. *Id.* at *6-7. Accordingly, the SEC enforcement action, SEC Notice, class action and derivative action constituted a single claim that arose before the commencement of coverage under the policy. *Id.*

- *ADI Worldlink, LLC v. RSUI Indem. Co.,* No. 416CV00665ALMCAN, 2017 WL 6403047 (E.D. Tex. Aug. 16, 2017), *report and recommendation adopted*, No. 4:16-CV-665, 2017 WL 4112112 (E.D. Tex. Sept. 18, 2017), *aff'd sub nom. ADI Worldlink, L.L.C. v. RSUI Indem. Co.*, 932 F.3d 369 (5th Cir. 2019) involved *multiple arbitration proceedings and lawsuits* against the insured by

several engineers, *all* of which were rooted in the insured's alleged failure to categorize engineers as non-exempt employees and failure to pay them overtime pay, and *all* of which involved claims under the Fair Labor Standards Act and related state statutes. The insurance company argued that the insured did not timely provide notice of the first arbitration proceeding, and since all of the subsequent arbitrations and lawsuits arose out of the same course of conduct in the first arbitration, they constitute a single claim. Since there was no coverage for the first arbitration, there should also be no coverage for the later arbitrations and lawsuits. Relative to the interrelatedness argument, the court agreed because *all* of the arbitrations and lawsuits involved claims arising out of the insured's decision to categorize the engineers as exempt under the FLSA to avoid paying those employees overtime, and they were generally "identical (almost verbatim)." *Id*. at *11-13.

- *Nobilis Health Corp. v. Great Am. Ins. Co.,* No. H-17-2386, 2018 WL 4810840 (S.D. Tex. Oct. 4, 2018) involved an insurance company arguing that *three shareholder class action lawsuits* were *not* deemed to be a single claim to avoid coverage; the insurance company had agreed to provide coverage for the first class action, but denied coverage for the subsequent class actions that were filed after coverage had terminated under the policy. The court disagreed and found that allegations in the later lawsuits were related to the same wrongful acts alleged in the first lawsuit: all three lawsuits alleged that the

insured inflated its stock price and its financial statements were misstated, false, misleading and/or inaccurate. Accordingly, there was coverage for the subsequent lawsuits. *Id*. at *7-9.

- *Clarendon Am. Ins. Co. v. Molpus Co.*, No. A-04-CA-563-SS, 2005 WL 8155169 (W.D. Tex. Aug. 9, 2005) involved a *monetary demand letter* accusing the insured of multiple violations and breaches of a timber management services contract and demanding payment for the value of missing timber, and reimbursement of lost interest. The letter further stated that if the insured did not take corrective action and pay the amounts demanded, the plaintiff would pursue all remedies under the agreement and at law. *Id.* at *5-7. The court concluded that the letter was a demand for *monetary relief* and thus a "Claim" under the policy. *Id.* at *8. The court further held that the subsequent lawsuit related to the *monetary* demand letter because the allegations in the lawsuit related to the same timber management services contract at issue in the monetary demand letter and involved faulty timber forecasts under the agreement. *Id.* at *10-11.

- *Reeves Cnty v. Houston Cas. Co.,* 356 S.W.3d 664 (Tex. App.—El Paso 2011, no pet.) involved *two lawsuits* filed against the insured, *both* of which were based on allegations of retaliatory conduct by the insured that interfered with the plaintiffs' ability to operate as a bail bondsman. The court held that the *two*

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                      11 of 12

*lawsuits* involved the same wrongful actions – retaliation – and were accordingly deemed a single claim. *Id.* at 674-675.

- *Burks v. XL Specialty Ins. Co.,* 534 S.W.3d 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.) involved a *bankruptcy complaint and two derivative actions*, and an insured seeking to exclude coverage on summary judgment by arguing that the bankruptcy complaint did *not* relate to two earlier derivative actions against the insured. The court disagreed and found that all of the actions revolved around compensation, bonuses and benefits paid to the insured and disgorgement of same. *Id.* at 465.

13.    *None* of these cases involve any letters like Linda's 2016 Letters; they either involved multiple lawsuits with same or similar claims, or in the one case (*Clarendon*), a written demand for monetary relief coupled with accusations of breaches of contract. Linda's 2016 Letters, which are not "Claims" to begin with, are not interrelated to the Fiduciary Lawsuit, and the Single Limit/Retention Provision does not apply.

14.    Wesco's basic argument that the 2016 Letters and the Fiduciary Lawsuit are related is premised on the Bank's role and actions as executor and trustee of the same trusts and estate at issue in the 2016 Letters and the Fiduciary Lawsuit. *See* Wesco's Motion at p. 17 (Dkt. 26). Wesco's argument defies logic and seeks to expand the notion of interrelatedness to cover any and all claims that may possibly arise as a result of a relationship – here, MNB's role as executor and trustee. Significantly, Wesco's argument

is belied by its own claim notes that acknowledged the involvement of "the same trusts and trust clients" and "some overlap of subject matter," but then went on to detail how the claims are not otherwise related and should be handled separately. (Dkt. 25-12 at pp. 3 and 4.)

15.     Apparently recognizing the significant differences and big divide between the 2016 Letters and the Fiduciary Lawsuit, which includes many allegations of wrongdoing that do not remotely relate to the substance of the 2016 Letters, Wesco suggests at p. 17 of its Motion that the claims need not be identical in order to be treated as a single claim. However, the cases cited by Wesco do not remotely support such a conclusion in this case. *See Clarendon v. Molpus* (*monetary demand letter* coupled with accusations of breach of contract and a threat of litigation, followed by a lawsuit that included breaches of the *same* contract); *Reeves Cnty v Houston Cas.* (*two lawsuits* involving the *same* retaliatory conduct by the insured); *Nobilis v. Great American* (*three shareholder class actions* involving *same* allegations of inflated stock price and misleading and false financial statements); *Turner v. Cincinnati Ins.,* 9 F.4th 300, 316 (5th Cir. 2021) (*two lawsuits* that are "indeed, virtually *identical* to each other" and contain the *same* allegations of a corrosive, high pressure environment).

16.     Linda's 2016 Letters are limited to the proposed sale of the Ranch. The Fiduciary Lawsuit alleges facts far beyond anything contemplated in the 2016 Letters: the actual sale of MRI in October 2016, the alleged conflict in retaining GHA, allegations that MNB wrongfully aligned itself with Darlene in the MPA lawsuit, MNB's alleged

refusal to pay Linda's fees in the MPA Suit, and MNB's alleged failure to timely fund the Children's Trusts after Darlene's death in November 2018. There can be no interrelation, no "common nexus of facts," between the 2016 Letters and the Fiduciary Lawsuit where the Fiduciary Lawsuit includes allegations of wrongdoing that had not yet even occurred. *See Axis Surplus Ins. Co. v. Johnson*, No. 06-CV-500-GKF-PJC, 2008 WL 4525409, at *8-10 (N.D. Okla. Oct. 3, 2008) (applying Oklahoma law) (granting summary judgment that similar interrelated provisions did not apply because although claims of breach of fiduciary duty were made against insured directors in two lawsuits, the claims in the first suit were solely related to the directors' failure to pay off loans they improperly approved on behalf of company, whereas the second suit alleged breaches of fiduciary duty from company's inception through bankruptcy). In sum, the Single Limit/Retention provision does not apply here.

## C. The Fiduciary Lawsuit Is Not Deemed First Made on the Date of the MPA Notice.

17. In another telling 'footnote argument,' Wesco alleges that the February 8, 2017 Notice (the "MPA Notice"), in which MNB notified Wesco of the filing of the MPA Lawsuit, was a "Notice of a Potential Claim" under the Policy, and accordingly the Fiduciary Lawsuit is deemed made on February 8, 2017. *See* Wesco's Motion, footnote 4 at p. 18 (Dkt. 26). As discussed in Moody's Motion, the 2016 MPA Notice was notice of a lawsuit between Linda and her stepmother to annul a marital property agreement in which MNB was only named as a necessary party and in which no claims or causes of action were alleged against MNB. The MPA Notice was not a notice of a "potential

claim" against MNB, but simply a notice of a lawsuit filed by Linda against her stepmother. The MPA notice did not provide any notice of a Wrongful Act that may subsequently give rise to a claim against MNB. And lastly, the MPA Notice does not meet the Policy criteria to qualify as a notice of a Potential Claim (notice must include names, dates, persons involved, identity of potential plaintiffs and causes of action to be asserted). *See* Moody's Motion, pp. 22-23 (Dkt. 24).

18.     Without citing any supporting authority, Wesco cobbles together a disjointed argument that because (i) MNB knew about the MPA Lawsuit (which *was* after all the subject of the Notice!), the 2016 Letters and the subsequent sale of the Ranch, and (ii) MNB's counsel attached a copy of the MPA Lawsuit to the MPA Notice, the MPA Notice somehow qualifies as a 'Notice of a Potential Claim.' Of course, Wesco does not explain how MNB's alleged knowledge of the MPA lawsuit, the 2016 Letters and sale of the Ranch is a "Wrongful Act that may subsequently give rise to a Claim" (the definition of a Potential Claim), nor does Wesco address the complete absence in the MPA Notice of the specificity required under the Policy for a 'Notice of a Potential Claim.' In a desperate attempt to fabricate a 'Notice of a Potential Claim' out of thin air, Wesco has parlayed Moody's statement at the end of the MPA Notice that "[s]hould petitioner amend her claim to allege liability, such that coverage arises, Moody National will update this notice accordingly" to mean that MNB "specifically contemplated and advised Wesco of the possibility that Linda could amend her claim to allege liability in the future and promised to update Wesco if Linda did so." The weakness and absurdity of

this entire argument is perhaps best evidenced by the fact that it has been relegated to a footnote argument!

19.     In sum, the 2017 MPA Notice is not a notice of a "Potential Claim", and the Fiduciary Suit cannot be deemed to have been made on February 8, 2017.

**D.     The Prior Litigation Exclusion Does Not Apply.**

20.     Wesco next argues that if the Fiduciary Lawsuit is covered under the 2018 Policy, then coverage should be limited to $1 million under the Prior Litigation Exclusion because the Fiduciary Lawsuit "arises from, is based upon, or attributable to the 2016 MPA Lawsuit." *See* Wesco's Motion at pp. 19-23 (Dkt. 26). As more fully discussed in Moody's Motion, the MPA Lawsuit only named MNB as a necessary party, related strictly to Linda's attempt to invalidate a marital property agreement between Linda's deceased father and her stepmother, and did not assert any claims or causes of action against MNB, or seek damages from MNB. *See* Moody's Motion at pp. 7-8 (Dkt. 24). Significantly also, Wesco's own claim notes specifically acknowledge and admit that the Fiduciary Lawsuit did not relate to the MPA Notice because "while there is some overlap of subject matter between the suits, MNB was only named as a necessary party, and much of the claimed wrongful acts in the Fiduciary Lawsuit post-date the filing of the MPA Suit and the MPA Notice." (Dkt. 25-12 at pp. 3-4).

21.     First, Wesco attempts to establish the foundational "fact" that the MPA suit was "against" MNB because MNB was named in the lawsuit, accepted service of the lawsuit, and responded to, and participated in the lawsuit. Of course, Wesco conveniently ignores the fact that the core allegations and causes of action in the case involved Linda's

stepmother and the marital property agreement and asserted zero causes of action *against* MNB, which was only named as a necessary party. Wesco further refers to the Original Petition's request for a temporary injunction mandating Darlene to return to the Estate all assets she received under the marital property agreement and seeking to prohibit MNB from making any further distributions to Darlene. Of course, Wesco conveniently ignores and fails to mention the fact that Linda never pursued this requested relief and the court never issued any injunction against MNB. *See* MPA Lawsuit Docket Sheet attached as Exhibit R to this Response.

22.     Additionally, the cases from other jurisdictions cited by Wesco do not support the notion that the MPA Lawsuit is an *action against* MNB because, unlike the MPA Suit, all of the cases actually involved lawsuits in which claims and causes of action *were* asserted against the insured. *See HR Acquisition I Corp. v. Twin City Fire Ins. Co.,* 547 F.3d 1309, 1316-17 (11th Cir. 2008) (in analyzing "prior litigation" exclusion and two lawsuits naming the same insured and *asserting causes of action and the same type of wrongdoing against the insured c*oncerning the purchase and lease-back of real estate at artificially high prices, court disagreed with insured's argument that because insured had not been served or appeared in the lawsuit, the case was not an "action pending against" him); *Williams v. Bestcomp, Inc*., 333 So.3d 461, 475 (La. App. 2021) (in denying insurance company's motion for summary judgment based on the pending or prior litigation exclusion, court ruled that a claim did not exist until insured "was named a defendant" in a suit *alleging claims against the insured* for violations of

PPO notice requirements); *In re Fogarty*, 39 F.4th 62, 72 (2nd Cir. 2022) (in analyzing the application of the bankruptcy automatic stay, court held that the foreclosure action naming the debtor as a defendant was an "action against the debtor" for purposes of the automatic stay); *Ironwood Capital Partners, LLC v. Jones*, 844 S.E.2d 245, 250 (Ga. App. 2020) (also involving bankruptcy automatic stay and court finding that a declaratory judgment against the debtor was a "judicial…action or proceeding against the debtor" subject to the automatic stay).

23.    Here, the MPA Suit naming MNB did *not* assert any claims, causes of action liability, or such damages against MNB, and is accordingly not a "prior proceeding initiated against MNB." As aptly stated by the Fifth Circuit in *Simon v. Maryland Cas. Co.*, 353 F.2d 608, 612 (5th Cir. 1965):

> A suit is against an assured when, in a judicial proceeding to which he is a party (or deemed by the law to be a party), a definable claim or contention is asserted that the assured has a legal liability for damage or injury to person or property.

24.    Second,  Wesco alleges that the Fiduciary Suit "directly arises from and is attributable to the MPA Suit," and "alternatively, or in addition, … involves the same or substantially same facts, circumstances, or situations underlying or alleged in the MPA Suit." Wesco's Motion at p. 22. Wesco advances the same arguments it did in its Single Limit/Retention interrelatedness argument (e.g. both suits involve the same trusts and the Bank's role as executor and trustee), and further focuses on the fact that the Fiduciary Suit briefly references the MPA suit and discusses positions and actions taken by MNB in the MPA Suit that Linda *now* alleges are a breach of fiduciary duty in the Fiduciary Suit.

Wesco's argument of course flies in the face of its own admission and acknowledgment in its claim notes that although the two lawsuits involve the same trusts and trust clients, the lawsuits are *not* related and the Fiduciary Lawsuit involves different claims and allegations of wrongdoing that post-date the MPA Suit. (Dkt. 25-12 at pp. 3-4). Importantly also, the Prior Litigation Exclusion requires that the "Wrongful Act" must underly or be alleged in the prior proceeding ("arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** *underlying or alleged* in such prior … proceeding" (emphasis added)). (Dkt. 25-2 at p. 95). *None* of these alleged positions or actions in the MPA suit *were* the subject of the MPA Suit, i.e. they were not "underlying or alleged" in the MPA Suit; rather, Linda *now* alleges them as breaches of fiduciary duty in the Fiduciary Suit. Accordingly, Wesco's "interrelatedness" argument in the context of the Prior Litigation Exclusion fails.

25.    In sum, Wesco has failed to carry its burden on the Prior Litigation Exclusion, and the exclusion does not limit coverage to $1 million.

**E.      The Prior Knowledge Exclusion Does Not Apply.**

26.    Next Wesco argues that if the 2018 Policy applies, then coverage should also be limited under the Prior Knowledge Exclusion because the Fiduciary Suit is based on "acts" that John Smith ("Smith"), a Bank executive, *subjectively* "knew could give rise to a later Claim" prior to July 17, 2018. *See* Wesco's Motion at p. 25-26 (Dkt. 26). As noted by the court in *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.,* 267 F.Supp.2d 601, 608 (E. D. Texas 2003), a case cited by Wesco, in connection with the subjective knowledge component of the Prior Knowledge Exclusion, "[a]ll that

matters is that the [insured] subjectively knew, prior to the policy period, that his client *intended to bring a claim*, whether the wrongs alleged were wholly imaginary, were based on a breach of which the attorney was unaware, or were based on breaches of which the attorney was aware." (emphasis added.)

27.     In support of its subjective knowledge argument, Wesco cites to an e-mail authored by Smith dated February 26, 2016, in which Smith was seeking approval from the Bank's Trust Committee for the sale of MRI (Dkt. 27-11). The e-mail details the background of the matter (Bill Moody's death, the multiple appraisals of the Ranch, offer to purchase the Ranch) and the issues involved (losses sustained by the Ranch, Darlene's right to demand the sale of the Ranch pursuant to the Marital Trust, the tax implications of the sale, and the "risk or potential liability" as to the remainder beneficiaries – Bill Moody's three daughters.)  Wesco points to Smith's statement in the e-mail to the Trust Committee that "The Remainder beneficiaries … *could litigate in the future* for selling the Ranch before the favorable tax status year and thus reducing the net sale proceeds." The e-mail goes on to state "[w]e think we have *mitigated this risk* by [getting the Demand Letter to sell from Darlene, getting updated appraisals, documenting the weakening economy and marketing efforts]."  Wesco seizes on this potential liability statement to posit that "Smith knew prior to July 17, 2018 of actions that "*may subsequently* give rise to a Claim." *See* Wesco's Motion at p. 26.

28.     The problem with Wesco's argument is that the prior knowledge subjective standard requires a showing that Smith *knew that Linda Moody intended to bring a claim*

against the Bank. *Westport v. Atchley*, 267 F.Supp. at 608. Smith's statement that the remainder beneficiaries (the statement does not mention Linda specifically) "could litigate in the future," and his deposition testimony that "there could be a possibility of litigation," are not by any stretch of the imagination knowledge that Linda *intended to bring a claim*.

29.    Next, Wesco argues that under the *objective standard* of the Prior Knowledge Exclusion, Smith was aware of facts and circumstances that would reasonably be regarded as a basis for a Potential Claim. *See* Wesco's Motion at p. 26 (Dkt. 26). As noted by the court in *Westport*, under the objective prong there must a showing that either (1) the facts subjectively known to the insured would lead a reasonable insured to conclude that a *grossly flagrant or glaring breach of duty occurred*, or (2) the facts subjectively known to the insured would lead a reasonable insured to conclude that at least *some breach of duty occurred and* the client is dissatisfied to a point that would lead a reasonable insured to conclude that the client likely would file a claim. *Id.* at 611. Thus, at the core of the objective knowledge component is a conclusion and knowledge that a breach of duty occurred. This is consistent with the actual language of the Prior Knowledge Exclusion that requires a showing of facts or circumstances that "reasonably would be regarded as the basis for a **Potential Claim**." Potential Claim is defined to mean a **Wrongful Act** that may subsequently give rise to a **Claim** (Dkt. 25-2 at p. 24).

30.     To support the "objective standard", Wesco cites to (i) the two 2016 Letters, (ii) a statement in Linda's MPA Suit that she did not become aware of the MPA until the Bank sent it to her in connection with an inquiry about her father's death tax return, (iii) Linda's alleged "thoughts" that the Bank should not remain neutral in the MPA Suit, but should support her, (iv) Linda's counsel's questioning of Smith at his deposition in the MPA Suit about his investigation of the MPA, (v) correspondence in the MPA Suit relating to mistaken discovery responses by Linda indicating she sought punitive damages from the Bank, which were later withdrawn, and seeking assurances that Linda is not seeking relief against the Bank *in the MPA Suit* (which she was not and did not),[4] (vi) selective paragraphs in summary judgment pleadings in the MPA Suit in which Linda alleges that MNB's interests were allegedly adverse to the Estate and Living Trust, in order to support her standing under the Texas Family Code to contest the marital property agreement, which was challenged,[5] (vii) vague and non-specific allegations in Linda's MPA disclosure responses that the Bank "failed to comply with its duties to protect and defend the assets of the Estate", and (viii) Smith's awareness of the jury verdict annulling the MPA. *See* Wesco's Motion at pp. 26-28 (Dkt. 26).

31.     Wesco's kitchen-sink approach is to no avail for the simple reasons that (i) Linda's counsel assured Smith during his deposition in the MPA Lawsuit that Linda was not asserting a breach of fiduciary duty claim against the Bank (Dkt. 25-32 at p. 3),

---

[4]   *See* Moody's Motion at p. 25, footnote 17 discussing Linda's withdrawn interrogatory response regarding punitive damages.

[5]   The Fourteenth Court of Appeals reversed the MPA Lawsuit judgment because Linda lacked standing to challenge the MPA.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                      22 of 23

(ii) MNB was actually named as a defendant in the MPA Suit, and had Linda wanted to assert claims and causes of action against the Bank she certainly could have done so in the MPA Suit, but deliberately chose not to, (iii) Linda never asserted any claims relating to the sale of the Ranch in the MPA Suit (remember, her 2016 Letters pre-dated the MPA Suit), and never sought to enjoin the sale of MRI following her 2016 Letters, and (iv) Linda did not file her Fiduciary Lawsuit until February 2020, approximately 4 years *after* the 2016 Letters and the filing of the MPA Suit. *See Westport*, 267 F.Supp.2d at 610 (lapse of time in filing suit indicative of client's intent not to file suit).

32.     Importantly also, none of these "facts" cited by Wesco are indicative of either (i) the occurrence of a blatantly flagrant or glaring breach of duty, or (ii) that some breach of duty occurred and Linda likely would file a claim. Indeed, Wesco does not argue that any of these facts indicate the occurrence of any kind of breach of duty. Rather, Wesco simply catapults to a conclusion that any reasonable person would believe that these facts at least "*may* subsequently give rise to a Claim," which is not the test for the objective standard. *See* Wesco's Motion at p. 28 (Dkt. 26).

33.     Wesco next argues that the Fiduciary Lawsuit includes the same facts Wesco recites and relies upon for its failed objective knowledge argument, and summarily concludes that the Fiduciary Lawsuit is based upon, attributable to facts and circumstances known to the Bank prior to July 17, 2018. *Id.* at p. 29. For the same reasons that Wesco has failed to establish that any Bank Executive had knowledge of facts regarded as the basis for a Potential Claim, this argument fails as well.

34.     The Prior Knowledge Exclusion also does not apply in this case for the simple reason that the case involves numerous allegations of wrongdoing and alleged breaches of fiduciary duty that were never alleged or asserted until *after* July 17, 2018 (date of inception of 2018 Policy): (i) MNB allegedly delayed funding the Children's Trusts (including Linda's trusts) after Darlene died in November 2018, (ii) MNB allegedly refused to pay Linda's attorneys fees awarded to her in the MPA Lawsuit judgment dated November 19, 2018 (Dkt. 25-6), and (iii) MNB's retention of Greer Herz and Adams was an alleged conflict of interest. Throughout this coverage dispute, Wesco has completely and deliberately ignored these later made allegations of wrongdoing, opting instead to focus myopically on the Ranch and MPA in its quest to deny coverage to its insured.

35.     The court in *Westport Ins. Corp. v Atchley* denied the insurance company's summary judgment motion on the prior knowledge argument precisely because the underlying lawsuit included allegations of wrongful acts after the inception of the policy:

> Moreover, the Keaton Family alleges that the firm engaged in distinct and separate wrongful acts during 2001. Thus, they allege the acts occurred both *before* and *after* the inception of the policy here in issue. *This allegation alone, if true, would avoid the exclusion in the policy.* This is because the policy exclusion applies only to acts that occurred before the policy period, which began in January 2001.

267 F.Supp.2d at 624 (emphasis in original). Thus, the Prior Knowledge Exclusion is inapplicable.

36.     Additionally, as more fully discussed in Moody's Motion, the application of the Prior Knowledge Exclusion fails because the exclusion is overbroad and its

application is facially absurd and renders the coverage under the 2018 Policy illusory. *See*

Moody's Motion at pp. 26-27 (Dkt. 24).

37.     In sum, the Prior Knowledge Exclusion does not remotely apply in this

case.

**F.     The Known Loss Doctrine Does Not Apply.**

38.     In yet another telling footnote argument, Wesco cites to the common law

"known loss" or "loss in progress" doctrine to preclude or limit coverage under the 2018

Policy. *See* Wesco's Motion at footnote 6 at pp. 29-30 (Dkt. 26). Wesco relies on the

same factors urged in its Prior Knowledge Exclusion argument to support this common

law theory. As discussed in Moody's Motion, this doctrine is similar to the Prior

Knowledge Exclusion, and for the same reasons that the Exclusion does not apply, the

Known Loss Doctrine also does not apply.[6]

## IV.     CONCLUSION AND PRAYER

Wesco has failed to carry its burden of showing that the Fiduciary Lawsuit is not

covered under the 2018 Policy by virtue of (i) the Single Limit/Retention provision,

(ii) the Notice of Potential Claim provision, (iii) the Prior Knowledge/Litigation

Exclusion, or (iv) the Known Loss common law doctrine. Accordingly, the Court should:

1)     deny Wesco's Motion for Summary Judgment on all counts in its
       Original Complaint for Declaratory Judgment;

2)     grant Moody's Motion for Final Summary Judgment;

---

[6]   Wesco cites to the case of *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 208 F.Supp.2d 687,
      691 (S.D. Tex. 2001), which is completely distinguishable and not applicable (insureds who received
      demand letter warning them of potential misappropriation liability for selling watches over a Website,
      purchased insurance coverage without disclosing demand letter or underlying activities).

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                                              25 of 26

3)     award Moody its reasonable and necessary attorneys' fees and expenses; and

4)     award any further relief to which Moody is justly entitled.

Respectfully submitted,

**WINSTEAD PC**

By:     _/s/ Yasmin Atasi_
        Yasmin Atasi, Attorney in Charge
        State Bar No. 10435150
        S.D. Tex. I.D. No. 13119
        yatasi@winstead.com
        600 Travis Street, Suite 5200
        Houston, Texas 77002
        Telephone: 713-650-8400
        Fax: 713-650-2400

**MILLS SHIRLEY L.L.P.**

        Fred D. Raschke
        State Bar No. 16551450
        S.D. Tex. I.D. No. 7123
        fraschke@millsshirley.com
        P.O. Box 1943
        Galveston, TX 77553-1943
        Telephone: 409-761-4028
        Fax: 409-763-2879

**ATTORNEYS FOR DEFENDANTS /
COUNTER-PLAINTIFFS MOODY
NATIONAL BANK AND MOODY
BANCSHARES, INC.**

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                    26 of 26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 28th day of October, 2022, a copy of the foregoing Response to Wesco's Motion for Summary Judgment was served on all counsel of record via the Court's ECF system.

*/s/ Yasmin Atasi*

Yasmin Atasi

DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT                          Certificate of Service