### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| WESCO INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-00181 |
| | § | |
| MOODY NATIONAL BANK and | § | |
| MOODY BANCSHARES, INC., | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF WESCO INSURANCE COMPANY'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As described in Wesco's motion for summary judgment, the underlying dispute between claimant Linda Moody and Moody National Bank ("the Bank") first manifested itself back in 2016, when the Bank knew that its sale of estate property (Moody Ranches) could trigger future litigation, and then went through with that sale over Linda's demand not to do so and despite Linda's allegations that such a sale was a breach of the Bank's fiduciary duty.  Over the next two years, Linda proceeded to file litigation to challenge the Bank's ongoing distribution of estate assets under a Marital Property Agreement ("MPA").  Linda also continued to make additional allegations against the Bank, including allegations of attempted "extortion" and failure to protect the assets of the estate.  For a number of reasons, Linda's current Fiduciary Duty Suit must therefore be handled under the Bank's July 2015 Policy, during which this dispute first arose.  The Bank is not, and should not be, allowed to take advantage of the higher limits of liability under its July 2018 Policy, which the Bank sought out after all of the above facts were already known.

1

The Bank's cross-motion for summary judgment, seeking the higher limits of the July 2018 Policy, is an exercise in creative recharacterization.  In an effort to avoid the various policy provisions that would limit the Bank to the coverage of its first policy, the Bank now contends that Linda's express "demands" were really "requests" for voluntary action.  The Bank contends that Linda's prior litigation, naming the Bank as a defendant to her claim for declaratory judgment and claim to enjoin further distributions, did not assert any causes of action against the Bank.  The Bank contends that its prior notice of that litigation was not a notice of potential claim, but was given to Wesco for no substantive purpose at all.  The Bank also contends that it did not have "any reason" to suspect that Linda might later file a second lawsuit, despite having previously flagged the possibility of litigation over the sale of the ranch, and despite having received additional allegations of breach after that time.  As explained herein, the Bank also seeks at multiple points to recharacterize and add new requirements to the language of the Policy itself.

Fortunately, the material facts, communications, and pleadings in this matter are written documents that are undisputed by the parties.  The language of the Wesco Policy is also clear and unambiguous.  The Court therefore need not consider any of the Bank's post-hoc characterizations of such documents.  (Nor for that matter does the Court need to consider the internal claim notes or characterizations of Wesco's adjuster.)  The Court should instead apply the Policy's unambiguous language to the undisputed facts of this case and determine coverage as a matter of law.  Doing so, the Court will find, and should hold, that coverage for Linda's Fiduciary Duty Suit against the Bank is limited to a maximum of $1,000,000 under one or more of the Policy provisions discussed herein.

2

## ARGUMENT

Coverage for this matter is limited for any one of the five reasons that follow. In its motion for summary judgment [Dkt. 24] ("Bank MSJ"), the Bank argues the term "Claim" is at the crux of all of these coverage provisions. Bank MSJ ¶ 31. But to be clear, Wesco has established five alternative defenses to coverage, only one of which requires a prior "Claim." The other defenses are triggered by something different – the *notice of a potential claim*, the existence of *prior litigation*, the *prior knowledge of facts* that may give rise to a claim, or a risk of loss of which the insured *should have known*. Each of these defenses represents a distinct basis for limiting coverage, and the Court should reject the Bank's attempt to blur these defenses together or add the requirements of one defense onto another. The Court must instead separately evaluate each of the defenses described below and give each of them independent meaning and effect. If any one or more of those defenses applies (and they do), the Court should hold that coverage is limited to a maximum of $1,000,000.

## I.   The Related Claim Provision Applies

The "claims made" policies issued by Wesco aggregate risks together and treat all related claims as being "first made" during the policy period in which the first claim was asserted. *See* Policy (Exh. 35), Gen. Terms § III.C at WIC 2691. Here, that means Linda's 2016 demand letters (alleging the Bank was breaching its fiduciary duties by selling Moody Ranches for millions of dollars less than its fair market value) and Linda's later Fiduciary Duty Suit (repeating that exact same allegation) are deemed to be a single Claim that was "first made" during the policy period of the July 2015 Policy. And the Bank itself agrees that the July 2015 Policy is subject to a $1,000,000 limit of liability. *See* Bank MSJ ¶ 6.

Despite these overlapping allegations, the Bank contends the policy's related claim provision does not apply.  In its motion for summary judgment, the Bank argues Linda's 2016 demand letters are not "claims" in the first instance.  *See* Bank MSJ ¶ 34.  The Bank argues the related claim provision only applies to two lawsuits, not two claims.  Id. ¶ 41. The Bank also argues the demand letters and later lawsuit are not related, because some of the acts alleged in the later suit had not yet occurred.  Id. ¶ 42.  As explained below, each argument ignores the plain language of the policy and fails as a matter of law.

### A. Linda's 2016 Demand Letters Qualify as "Claims"

As all parties agree, the Policy defines a Claim to include not just formal proceedings before a court or regulatory body, but also a "written demand for monetary damages or non-monetary relief."  Policy (Exh. 35), Prof. Liab. § II at 2722; Bank MSJ ¶ 33.  The demand letters sent by Linda on June 3, 2016 and July 25, 2016 clearly fit that definition.  These demand letters were clearly written.  *See* Exh. 1-2.  The demand letters allege that selling Moody Ranches at the price negotiated by the Bank "is a breach of the Bank's fiduciary duty" and that the Bank has a "fiduciary duty to the beneficiaries of the Estate and Trust to make the ranch profitable."  Id.  The demand letters also include an express demand for non-monetary relief that will rectify such breaches.  In her demand letters, Linda "demands" and "again demands" that the Bank not sell Moody Ranches until January 2019 or later and that the Bank make the ranch productive in the interim.  Id.

In its motion for summary judgment, the Bank seeks to now recharacterize these demands as "mere[] requests" for a "voluntary course of action" by the Bank.  Bank MSJ ¶ 36.  In doing so, the Bank relies on an early letter, stating Linda "would like" to have her

input "considered" before any decisions are made regarding Moody Ranches.  Id. (citing Exh. N-1).  But this letter was written in October 2015 – *before* the Bank explained that a sale prior to January 2019 could trigger a built-in gains ("BIG") tax of $13 million and *before* the Bank negotiated a sale price Linda believed was 9 million to 18 million dollars less than fair market value.  After learning this information, and after learning her initial input regarding the negotiated sale (that it was a "low-ball" offer not in the best interests of the beneficiaries) resulted in no change of plans, it is not surprising that Linda's writings took on a far different tone than her first letter eight months earlier.  By June and July of 2016, Linda was no longer asking for an "opportunity" to have input, or "hoping" such input would be "considered."  Linda was expressly *demanding* that the Bank take a specific course of action.  Exh. 1-2.  And by June and July of 2016, Linda was not just suggesting that other actions were unpreferred.  Linda instead stated that moving forward on the terms negotiated was "a breach of the Bank's fiduciary duty."  Exh. 2.  That clear and pointed language cannot now be transformed into a mere request for voluntary action.  Linda's June and July 2016 letters were "written demands for . . . non-monetary relief."

In arguing for a contrary result, the Bank contends that a letter cannot qualify as a written demand for non-monetary relief unless it is also accompanied by a threat of injunctive relief, civil liability, or other consequence for failing to comply with the demand. Bank MSJ ¶¶ 35-36.  But nothing in the Policy requires this additional element, and the Bank cannot insert or read in new requirements that do not appear in the plain language of the Policy.  *See Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) ("Courts strive to honor the parties' agreement and not remake their

contract by reading additional provisions into it."). The Policy does not define a Claim as a *demand plus a threat*.[1] It requires only a *demand* (and deals with threats or knowledge of future claims elsewhere). Here, we have two express demands for action, which clearly satisfy the Policy's definition of "Claim." And Texas courts have held that similar letters qualify as demands for non-monetary relief, without a threat of litigation. *See Drawbridge Energy US Ventures, LLC v. Federal Ins. Co.*, 2022 WL 991989, at *6 (S.D. Tex. 2022); *Spec's Family Partners, Ltd. v. Hanover Ins. Co.*, 739 Fed.Appx. 233, 239 (5th Cir. 2018).

Citing to three cases from the Eastern District, the Bank also appears to suggest that a "Claim" exists only when a demand is made pursuant to a government subpoena that has penalties for non-compliance. *See* <u>Bank MSJ</u> ¶ 35.[2] But as detailed above, neither the plain language of the Policy nor other Texas courts limit a "Claim" to this situation. The Bank would again have to add words to the Policy to accomplish that restriction. Such an

---

[1] To the extent the Bank argues it is significant that Linda did not file suit to enjoin the sale at the time of her demand letter, *see* <u>Bank MSJ</u> ¶ 36, the Bank is conflating multiple definitions of the term Claim. Although filing such a suit would clearly qualify as a Claim in its own right, nothing in the Policy requires a written demand to be accompanied by a contemporaneous civil suit in order for the demand to be a "Claim." To read the Policy in this way would collapse one definition of claim (a written demand) into another (a civil proceeding), and would render the first definition of Claim entirely meaningless.

[2] The Bank also cites *W.R. Starkey Mortgage, LLP v. Chartis Specialty Ins. Co.*, 2013 WL 12138896 (E.D. Tex. 2013) for the proposition that "A naked demand for something due (the dictionary definition of 'relief') without any threat of liability is merely a request that the insured take some action voluntarily." *See* <u>Bank MSJ</u> ¶ 35. But to be clear, that broad language appears nowhere in the text of the court's opinion. The facts of *W.R. Starkey* are also distinguishable. There, the court held there had been no "demand," because the DOJ made a *request* for documents and asked the insured to produce them on a *voluntary basis*. *See id.* at *6. Here, by contrast, Linda made an express "demand" that the Bank make the ranch productive, told the Bank that it had a fiduciary duty to do so, and twice "demanded" that the Bank cease moving forward with a sale that was in breach of its fiduciary duties.

interpretation also makes no sense in the context of the trust coverage at issue.  In a policy designed to cover acts, errors, or breaches of duty in the administration of trusts or estates, it makes no sense to interpret a "Claim" to apply exclusively to law enforcement subpoenas that would rarely, if ever, be received.  The natural meaning of a "demand" in this context is a demand *from a beneficiary* directing the insured to take certain actions in the administration of the estate, such as a demand to make property productive or a demand to cease taking actions in breach of the insured's fiduciary duty.  No reasonable construction of the trust coverage would exclude such demands from the definition of "Claim" or limit the term "Claim" solely to governmental subpoenas.  Under the plain and unaltered language of the Policy, the written demand letters in this case clearly qualify as "Claims."

### B.  The Related Claim Provision Does Not Apply Only to Two Lawsuits

The related claim provision also clearly applies to Linda's demand letters and subsequent lawsuit.  The Policy expressly states that all "Claims" based upon or arising out of interrelated wrongful acts are deemed to be a single claim first made at the time of the earliest claim.  Policy (Exh. 35), Gen. Terms § III.C at 2691.  And the definition of "Claim" plainly includes a "written demand for . . . non-monetary relief."  Policy (Exh. 35), Prof. Liab. § II at 2722.  Thus, by its terms, the related claim provision clearly applies to any two types of Claims, including a demand letter followed by a later civil proceeding.

The Bank's argument that the related claim provision only applies to multiple *lawsuits* or multiple *legal proceedings* finds no support in the language of the Policy.  Although the related claim provision certainly *can* apply where there are multiple lawsuits, that is not the *only* situation in which that provision applies.  The Policy does not say that

only multiple "lawsuits" arising from interrelated wrongful acts will be treated as a single claim.  It says that all "Claims" must be aggregated together.  Policy (Exh. 35), Gen. Terms § III.C at 2691.  And the Court would have to rewrite either the related claim provision or the definition of "Claim" (or both) in order to reach the conclusion urged by the Bank.

Notably, the Court will not be breaking new ground in applying the related claim provision to a demand letter and subsequent lawsuit.  While the Bank suggests that case law has only applied the related claim provision to multiple lawsuits, the Bank neglects to disclose the many Texas cases that have applied the related claim provision to an earlier demand letter.  In *Drawbridge Energy US Ventures, LLC v. Federal Insurance Co.*, 2022 WL 991989 (S.D. Tex. 2022), for example, the Court applied the policy's related claim provision to hold that a demand letter and later lawsuit were deemed to be a single claim "first made" at the time of the demand letter.  *Id.* at *6.  Similarly, in *Clarendon American Insurance Co. v. Molpus Co.*, 2005 WL 8155169 (W.D. Tex. 2005), the Court applied the policy's related claim provision to hold that a current counterclaim and a demand letter received 18 months before the policy were deemed to be a combined claim made prior to policy inception.  *Id.* at *10.  Numerous other Texas cases have likewise found an earlier written demand and a later lawsuit to be related under similar provisions.  *See, e.g.*, *SXSW, LLC v. Federal Ins. Co.*, 2022 WL 1648500, at *6 (W.D. Tex. 2022); *Landing Council of Co-Owners v. Federal Ins. Co.*, 2013 WL 4787954, at *1 (S.D. Tex. 2013); *Regency Title Co., LLC v. Westchester Fire Ins. Co.*, 5 F.Supp.3d 836, 845 (E.D. Tex. 2013).  Accordingly, under both the plain language of the Policy and existing Texas case law, the related claim provision applies to Linda's 2016 demand letters and her subsequent lawsuit.

### C.  *The Claims Need Not Be Identical in Order to Be Related*

Linda's demand letters and later lawsuit are also clearly related.  Under the Policy, claims are deemed related if they are based upon or arise out of the same wrongful act, or if they are based upon or arise out of interrelated wrongful acts, "which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events, or transactions."  Policy (Exh. 35), Gen. Terms § III.C at 2691; § II at 2689.  The claims in this case easily satisfy either or both bases for relatedness.  Among other reasons:

- The demand letters and current Fiduciary Duty Suit are each based upon the same wrongful act of negotiating a sale of Moody Ranches for less than its fair market or appraised value.  *Compare* Exh. 1-2 *with* Petition (Exh. 4) ¶¶ 27-28.

- The demand letters and Fiduciary Duty Suit are each based upon the Bank's actions of allowing Darlene to demand and control the sale of the ranch, over Linda's objections.  *Compare* Exh. 2, at p. 2 *with* Petition (Exh. 4) ¶ 24.

- The demand letters and Fiduciary Duty Suit each arise from the Bank's decision to treat Darlene as a 50 percent owner of Moody Ranches and distribute shares to her pursuant to the MPA.  *Compare* Exh. N-4 at 2 *with* Petition (Exh. 4) ¶ 22.

- The demand letters and Fiduciary Duty Suit are based upon or arise from an ongoing series of events of aligning with and favoring Darlene's interests over Linda's.  *See* Exh. 2; Petition (Exh. 4) ¶ 21; ¶ 24; ¶ 34; ¶ 46.

- The demand letters and Fiduciary Duty Suit also arise from or are based upon acts by the Bank that share a common nexus of at least one *fact* (Mr. Moody's ownership of the ranch and his estate plan), or one *circumstance* (the Bank's service as executor and trustee and/or Linda's status as a beneficiary), or one *situation* (the competing demands and positions of Darlene and Linda), or one *event* (the Bank's distribution of 50 percent of Moody Ranches to Darlene pursuant to the MPA), or one *transaction* (the sale of Moody Ranches).

Any one or more of these reasons is sufficient to deem Linda's demand letters and later Fiduciary Duty Suit "related" under the broad standard of the Policy.

In its motion for summary judgment, the Bank argues the claims are nevertheless unrelated, because the Fiduciary Duty Suit includes additional events (other than the sale of Moody Ranches) that were not stated in Linda's earlier demand letters.  Bank MSJ ¶ 42.  But Texas law is clear that the claims need not be identical in order to be related.  *See Clarendon American Ins. Co. v. Molpus Co.*, 2005 WL 8155169, at *10 (W.D. Tex. 2005).  In fact, Texas courts have specifically held that there need only be *some* wrongful act in common for claims to be related.  In *Nobilis Health Corp. v. Great American Insurance Co.*, 2018 WL 4810840 (S.D. Tex. 2018), the Court found that, despite their differences, three lawsuits were a single claim because all three contained "at least some allegations of the same Wrongful Acts."  *Id.* at 8.  As explained by the Court: "In order to be Related Wrongful Acts, the Policy only requires that the Wrongful Acts be connected by reason of any common fact, circumstance, or situation.  The fact that the complaints contain some of the same Wrongful Acts is enough."  *Id.*  Likewise, in *Turner v. Cincinnati Insurance Co.*, 9 F.4th 300 (5th Cir. 2021), the Fifth Circuit found two lawsuits were related, even though they were brought by different plaintiffs, who were students at different campuses, which coordinated for their own allegedly improper marketing.  *See id.* at 316.  Construing policy provisions identical to the terms of the Wesco Policy, the Court held the insured's argument about how the two lawsuits were different did not prevent them from being related:

> The ATI entities' role in creating and maintaining this "high pressure sales culture," however small that role might have been, is a fact common to both lawsuits and integral to the claims presented in both.  As a result, we conclude that the Bartlett lawsuit and the Nelson lawsuit are based on at least one common "wrongful act" or "interrelated wrongful act" and therefore constitute a single claim under the insurance policy.

*Id.* at 317.

10

The Bank nonetheless insists that "there can be no common nexus of facts" between two claims where the second claim includes allegations of wrongdoing that had not yet occurred at the time of the first claim.  Bank MSJ ¶ 42.  But both the plain language of the Policy and Texas case law refute this argument.  Under the Policy, claims are related if they are based upon or arise out of the *same wrongful acts* **or** if they are based upon or arise out of *interrelated wrongful acts* (that is, acts which share a common nexus of "any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events, or transactions").  Policy (Exh. 35), Gen. Terms § III.C at 2691; § II at 2689.  The Bank's position – that the exact *same* Wrongful Acts must give rise to both claims – would read the second half of this related claim provision out of existence.  It would also ignore the Policy's directive that claims are related if they are connected by a *series* of related events.  The Policy expressly contemplates that there may be a series of events, progressing over time, and directs that such a series be considered a single claim.

In accordance with that understanding, Texas courts have specifically addressed arguments like the one made by the Bank, and held that new acts post-dating the first claim are still related.  In *Reeves County* v. *Houston Casualty Co.*, 356 S.W.3d 664 (Tex. App. – El Paso 2011), for example, the court held that a lawsuit filed in 2001 (alleging that the county sheriff was interfering with plaintiff's ability to operate as a bail bondsman) and a second lawsuit filed four years later (alleging that plaintiff was operating as a bondsman, but that the sheriff was now giving preferential treatment to plaintiff's competitors) were related.  *See id.* at 673-74.  On appeal, the insured specifically argued that it would be "nonsensical" to find the two lawsuits related, because the claimants had "settled all of

their claims related to any conduct . . . alleged in the 2001 suit," and "all the wrongful acts pleaded in the 2005 suit occurred after the 2001 suit was settled in 2002." *See id.* at 670. But the Court rejected that argument, and held the two suits were related, because both suits "involved the same parties and the same or similar alleged wrongful actions." *Id.* at 675. The court in *Clarendon American Insurance Co.*, 2005 WL 8155169, reached the same result. There, the insured argued that a 1999 demand letter and 2003 counterclaim could not be related, because the counterclaim raised issues that were broader than the issues in the 1999 letter, and the counterclaim involved subsequently acquired properties and misrepresentations occurring after the 1999 letter. *Id.* at *10. Despite these facts, the court found the claims related, because "nothing in the Policy . . . requires strict identity between the original Claim and subsequent issues for the subsequent issues to relate back to the original Claim." *Id.* Although there were differences in the scope of the two claims and the timing of their acts, the court determined the demand letter and later counterclaim were based upon a series of related facts, circumstances, situations, transactions, or events (the parties' ongoing relationship involving management of timber properties), and that the demand letter and counterclaim constituted a single related claim. *Id.*

In arguing for a different result, the Bank cites a single case, applying Oklahoma law: *Axis Surplus Ins. Co. v. Johnson*, 2008 WL 4525409 (N.D. Okla. 2008). Bank MSJ ¶ 42. The *Axis* court's application of Oklahoma law obviously is not controlling here. (As the Bank agrees, Texas law governs the interpretation of the Bank's insurance policy. *See* Bank MSJ ¶ 28, n.12). The facts in *Axis* are also easily distinguishable. Unlike the current case, the two claims at issue in *Axis* were premised upon entirely different sets of facts and

12

were brought by two different plaintiffs. *See Axis*, 2008 WL 4525409 at *3-6. As the court in *Axis* repeatedly emphasizes, the petition in the second case contains "no mention" of the first plaintiff, the first lawsuit, or the aircraft loan that was the subject of that first action. *Id.* at *6, 9. The insureds in *Axis* were instead trying to claim the cases were related because both plaintiffs asserted claims for "breach of fiduciary duty." *Id.* at *9. The court rejected that "sweeping interpretation," and held that the mere use of the same legal terminology was not enough to satisfy the policy's definition of interrelated wrongful acts, where the underlying factual allegations were unrelated. *Id.* at *9-10.

The situation here is different. In this case, the exact same allegation that was made in the earlier demand letters is expressly made and repeated in the later Fiduciary Duty Suit. Contrary to the Bank's suggestion, Wesco is not asking the Court to find the two claims related based solely on the appearance of the words "breach of fiduciary duty" in both claims. The claims here are related because they both involve claims of breach of fiduciary duty made by the *same plaintiff* against the *same defendant* arising out of the administration of the *same estate and trusts*, involving the distribution of the *same multi-million dollar asset*, based on the Bank's interpretation of the *same agreements* in favor of the *same competing beneficiary*. The two claims also allege a progressive series of related actions by the Bank, all in its role as administrator of the same estate and trusts, which the claimant alleges are part of a pattern of preferring the interests of Darlene and the Bank over the interests of Linda. Under the broad standard of relatedness set forth in the Wesco policy, that is more than enough for Linda's demand letters and Fiduciary Duty Suit to be considered a single claim that was first made during the coverage of the July 2015 Policy.

13

## II.     The Notice of Potential Claim Provision Applies

The Fiduciary Duty Suit is also deemed to be a claim "first made" during the July 2015 Policy as a result of the Bank's submission of a notice of potential claim in February 2017.  At that time, the Bank wrote to Wesco's claims department, provided notice that the Bank had been named as a party in Linda's MPA Suit, and indicated there was a dispute about whether the MPA relied upon by the Bank was valid.  *See* Exh. 37.  The Bank also provided a copy of Linda's petition, which further described the relevant parties, the Bank's transfer of shares in Moody Ranches to Darlene, the "continuing dispute as to the proper distribution of [the] Estate," and Linda's request to enjoin the Bank from "unlawfully" distributing any further assets pursuant to the MPA.  MPA Petition (Exh. 3) ¶¶ 2-4, 19, 25, 33.  Under the Policy, this notice of "facts or circumstances which may reasonably give rise to a Potential Claim" ensured that "any Claim subsequently made shall be deemed have been first made during the Policy Year in which the notice was first given."  Policy (Exh. 35), Gen. Terms § V.B at 2692.  So when Linda later *did* file suit based on the same facts and circumstances, that suit was deemed to be first made as of the Bank's 2017 notice.

In its motion for summary judgment, the Bank contends the Bank's February 2017 notice cannot be treated as a notice of potential claim under the Policy because the notice did not use the words "Potential Claim."  *See* Bank MSJ ¶ 44.  But it is the substance of the notice, not the label attached to it, that matters.[3]  And regardless of its choice of words,

---

[3]   While the Bank notes that Wesco's corporate representative "conceded that the term 'Potential Claim' does not appear in the February 2017 notice," Bank MSJ ¶ 44, Wesco's representative was clear that the *substance* of this letter was a notice of potential claim.  Ivy Depo. (Exh. 46) pp. 84-86 ("I think that what the insured is doing is putting us on notice

the letter submitted by the Bank provided notice of a "Potential Claim."  Specifically, the Bank's letter and accompanying petition notified Wesco that the Bank was administering an estate and trust, that Linda had started litigation to resolve an ongoing dispute regarding the proper distribution of the estate, that Linda alleged property of the estate was being unlawfully distributed pursuant to the MPA, and that Linda could amend her claim to allege liability.  Stated differently, the Bank provided notice of an act in the rendering of trust services that may subsequently give rise to a Claim.  That is the very definition of a notice of "Potential Claim."  *See* Policy (Exh. 35), Gen. Terms § II at 2690 ("Potential Claim").

In arguing for a different result, the Bank also argues there was no "Wrongful Act" in the MPA Petition for the Bank to give notice of.  Specifically, the Bank asserts that "it is undisputed that the MPA Petition did not include any allegation of a Wrongful Act by MNB," or "any allegation about MNB's conduct at all."  Bank MSJ ¶ 45.  Both assertions are incorrect.  While the Bank correctly cites the definition of a Wrongful Act (any actual or alleged act . . . or neglect by the Insured in the rendering of or failure to render Trust Services), the Bank is wrong that the MPA Petition fails to allege such an act.  In the MPA Petition, Linda clearly alleges that, in its role as executor, "MNB has taken the position" that the MPA converted property owned by Mr. Moody into community property, and that "consistent with this position, Executor transferred certain shares of Moody Ranches Inc. from the Estate to Darlene."  MPA Petition (Exh. 3) ¶ 19.  The MPA Petition then goes on

_____

[for] the purpose of being able to lock in their coverage under the potential claim notice, in case a claim does arise. . . .  I think just the fact that sending this letter is providing potential claim notice; otherwise, why provide us notice of this at that time? . . .  I would say this is a notice of potential claim . . .  It doesn't require specific language.").

to explain that Linda is seeking declaratory relief to clarify this dispute "as to the proper distribution of [the] Estate," and seeks an injunction to prohibit the Bank from "unlawfully" distributing any further assets of the Estate pursuant to the MPA.  Id. ¶¶ 25, 33.  The Bank is therefore wrong in saying that there was no Wrongful Act to give notice of.

The Bank is also wrong that its February 2017 notice cannot qualify as a notice of Potential Claim under Section V.B, because it did not provide "full particulars" of the facts giving rise to a Potential Claim or identify the potential plaintiffs and causes of action. Bank MSJ at ¶46.  As an initial matter, the notice and accompanying petition *do* provide a substantial number of facts.  But even if these details fail to provide "full particulars," that does not change the fact that the Fiduciary Duty Suit is deemed first made at the time of the notice.  Section V.B is broken into two paragraphs.  The first paragraph says if notice is given to the insurer of the reasons for anticipating a Potential Claim, then any subsequent claim "shall be deemed to have been first made" at the time of the notice.  Policy (Exh. 35) § V.B at 2692.  It does not include any further conditions for deeming the claim made at that time.  It is only the second paragraph that requires full particulars, and it requires them only as a condition precedent to *coverage*.  Id.  It does not say such particulars are a condition to deeming the claim first made at the time of notice.  Accordingly, the Bank cannot defeat the effect of its February 2017 notice through its own failure to provide further details.  The notice provided by the Bank identified the facts and reasons that may give rise to a potential claim (the Bank's distribution of assets pursuant to the disputed MPA), and Linda's subsequent Fiduciary Duty Suit repeating those same facts is therefore deemed to have been first made within the coverage (and limits) of the July 2015 Policy.

### III.    The Prior Litigation Endorsement Applies

Even if Linda's Claim is found to have been first made during the July 2018 Policy, coverage for the Fiduciary Duty Suit is still limited to a maximum of $1,000,000 under the Policy's prior litigation endorsement.  That endorsement limits coverage to $1,000,000 for:

> any Claim . . . arising from, based upon, or attributable to "any prior or pending civil . . . proceeding initiated against any Insured prior to 7/17/2018, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or Wrongful Act underlying or alleged in such prior or pending civil . . . proceeding.

Policy (Exh. 35), Endorsement at WIC 2761.  Here, it is undisputed there was a "civil proceeding" against the Bank.  *See* Exh. 32, RFA No. 9 (admitting MPA Suit was a "civil proceeding").  That proceeding was initiated prior to 7/17/2018, on November 9, 2016.  *See* Answer ¶ 140.  The current Fiduciary Duty Suit also clearly arises from, is based upon, or is attributable to that prior MPA Suit.  (The current suit expressly cites to the Bank's actions in the prior MPA Suit as the basis for the present litigation, and raises the Bank's appeal of and refusal to comply with the judgment in the MPA suit as further breaches of fiduciary duty.  Petition (Exh. 4) ¶¶ 30, 33, 34, 38, 41, 43, 45, 46.)  In the alternative, the current Fiduciary Duty Suit arises out of or "in any way involves" the same or substantially same fact, circumstance, situation, or Wrongful Act underlying or alleged in the prior MPA Suit.  (Both suits arise out of the Bank's role as executor of Mr. Moody's estate and trusts, Smith Depo. (Exh. 31) 104-107, involve the Bank's act of distributing Moody Ranches to Darlene pursuant to the MPA, Petition (Exh. 4) ¶ 22; MPA Petition (Exh. 3) ¶ 19, and allege many of the same surrounding facts and situations related to the estate plan.)  The prior litigation endorsement therefore applies, and bars coverage in excess of $1,000,000.

In its cross-motion for summary judgment, the Bank largely avoids any discussion of this portion of the Policy's endorsement.  The Bank argues only that the prior litigation endorsement is not implicated, because "The MPA Lawsuit and the subsequent jury verdict and judgment were limited to the validity and enforceability of the MPA and did *not* involve any Wrongful Trust Services Act by MNB."  Bank MSJ ¶ 53.

The Bank is wrong that the prior MPA Suit did not involve a Wrongful Trust Services Act by MNB.  It plainly did.  As described above, a Wrongful Trust Services Act means any actual or alleged act by the Bank in the rendering of trust services, including service as an executor of an estate.  Policy (Exh. 35), Prof. Liab. § II, at 2724-25 (defining "Wrongful Trust Services Act" and "Trust Services").  And the MPA Suit directly involved and was brought because of the Bank's act of deciding that certain property belonged to Darlene under the MPA, and should be distributed to her as part of the administration of the estate.  *See* MPA Petition (Exh. 3) ¶ 19.  Linda filed the MPA Suit to obtain a binding declaration against the Bank about whether such a distribution was appropriate.  Id. ¶ 25. Linda also sought to enjoin and prevent the Bank from distributing any further property pursuant to the MPA.  Id. ¶¶ 41, 47.  And that same Wrongful Act of distributing property under the MPA is clearly alleged and at issue in the later Fiduciary Duty Suit.  *See* Petition (Exh. 4) ¶¶ 22, 30, 33, 34 (referring to the distribution of assets pursuant to the MPA, failure to investigate the MPA, and refusal to challenge the MPA).

Furthermore, even if the prior MPA Suit did *not* involve a Wrongful Act, that does not mean the prior litigation endorsement does not apply.  In order for the endorsement to apply, there does not need to be a prior civil proceeding "for a Wrongful Act."  Nor does

the prior civil proceeding need to include a demand "for monetary damages" or seek to hold the insured liable.[4]  The endorsement requires only a prior *civil proceeding*, and does not condition its application on any of these other requirements.  Indeed, it is significant that these other requirements *do* appear in other parts of the Policy, such as the definition of "Claim," but are omitted from the endorsement.  To read such requirements into the prior litigation endorsement would thus make the endorsement repetitive of the related claim provision and render the endorsement entirely superfluous.  *See Global ADR, Inc. v. City of Hammond*, 2004 WL 2694902, at *8 (E.D. La. 2004) (explaining prior litigation need not satisfy all of the requirements of the "claim" definition, because the prior litigation provision does not state that it applies to "all claims arising out of all prior and pending *claims* . . . rather, the policy clearly states that [the provision applies to] any claim arising out of all pending and prior *litigation*"); *accord APC Homemaker Serv., Inc. v. Pando*, 511 S.W.3d 736, 741 (Tex. App. – El Paso 2015) (requiring court to "give effect to all the provisions of the contract so that none will be rendered meaningless.").

---

[4]  Cases have frequently applied prior litigation provisions to past proceedings, even where those past proceedings involved only equitable or declaratory relief or did not assert any liability or covered wrongdoing by the insured.  *See Clarendon American Ins. Co.,* 2005 WL 8155169, at *7 (stating that the policy's prior litigation exclusion "has clear application in situations involving pending or prior litigation seek injunctive or declaratory relief"); *accord Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1312-13 (3rd Cir. 1994) (applying provision to prior equitable suit to void appointments); *Acosta Inc. v. National Union Fire Ins. Co.*, 39 So.3d 565, 569 (Fla. App. 1 Dist. 2010) (applying exclusion to prior lawsuit for injunctive relief and turnover of property); *National Waste Associates, LLC v. Travelers Casualty & Surety Co.*, 988 A.2d 402, 410-11 (Conn. Super. 2008) (applying provision to prior unemployment compensation proceeding, even though the policy did not provide coverage for such events, because "the purpose of the prior litigation provision is so that insurance companies can be apprised of events that might blossom into a covered event").

The prior litigation endorsement also provides multiple ways for the prior proceeding to be connected to the current claim – all of which are listed in the disjunctive. For example, the endorsement applies if the current claim arises from the prior proceeding itself, such as where the second claim is based upon actions in that first proceeding or a failure to comply with the judgment in such proceeding. Policy (Exh. 35), Endorsement at 2761. (In its motion, the Bank fails to address this portion of the endorsement.) Or the endorsement applies if the current claim arises out of or "in any involves" the same or substantially same *fact* or *circumstance* or *situation* or *Wrongful Act* as the prior proceeding. Id.; *see also Zunenshine v. Executive Risk Indem.*, Inc., 1998 WL 483475, at *5 (S.D.N.Y. 1998) (emphasizing that a similar provision is "phrased in the disjunctive"). Here, the connection between the MPA Suit and current claim clearly meets at least one of these alternatives for application. The Bank's cursory attempt to avoid the prior litigation endorsement is therefore unavailing, and any coverage must be capped at the $1,000,000 limit in effect at the time of the prior litigation.

## IV.    The Prior Knowledge Endorsement Applies

Coverage for the Fiduciary Duty Suit must also be limited to a maximum of $1,000,000 under the Policy's prior knowledge endorsement. That endorsement expressly precludes the Bank from trying to take advantage of the higher limits it purchased in July 2018 if, prior to that time, it already knew or had reason to know of the basis for a potential claim. As explained in Wesco's initial motion for summary judgment, that endorsement can be satisfied by either subjective knowledge (a fact that "is" regarded as the basis for a potential claim) or objective knowledge (a fact that "reasonably would be" regarded as the

basis for a potential claim).  Here, both alternatives have been met.  Prior to July 2018, Bank executive John Smith *subjectively knew* that "the remainder beneficiaries . . . could litigate in the future for selling the ranch before the favorable tax status year," and specifically identified that "risk or potential liability" to members of the trust committee and board of directors.  *See* Exh. 12.  As detailed below, Smith also knew additional facts prior to July 2018 that *objectively would be regarded* as the basis for a potential claim.

In its cross-motion for summary judgment, the Bank primarily focuses on the Bank's subjective knowledge,[5] and relies on selected portions of Smith's testimony in the current lawsuit to argue that he did not know of any event that could be the basis for a potential claim against by the Bank.  Bank MSJ ¶ 49.  Such conclusory and self-serving statements do not create a genuine dispute of fact sufficient to withstand summary judgment.  *See Savant v. APM Terminals*, 2013 WL 12099874, at *8 (S.D. Tex. 2013); *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997).  These new statements are also directly contradicted by Smith's statements and testimony during the operative time period before the July 2018 Policy began.  For example, the Bank seeks to rely on Smith's testimony that he did not expect any more litigation.  *See* Smith Depo. (Exh. 31) 64.  But in the very next question, Smith admits he previously told the trust committee "the remainder beneficiaries could litigate in the future."  Id.  Likewise, the

---

[5]  To the extent the Bank suggests that the insured's subjective knowledge is "all that matters," Bank MSJ ¶ 52, that is contrary to the plain language of the Policy, which also applies to facts that "reasonably would be" regarded as the basis for a potential claim.  Such an argument is also directly contrary to the case law cited by the Bank.  *See Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka*, 267 F.Supp.2d 601, 608 (E.D. Tex. 2003) (explaining coverage can be excluded under either the subjective prong *or objective prong*).

Bank seeks to rely on Smith's testimony in May 2022 that he did not think Linda was making allegations against the Bank for breach of fiduciary duty or failure to protect assets of the estate in February 2018.  Id. 83-84.  But when Smith was deposed *in February 2018*, he testified to the exact opposite understanding.  *See* Smith MPA Depo. (Exh. 47) 133-34 ("In my opinion, there was – has been a claim of breach of fiduciary duty. . . . according to my counsel, in discovery, we were accused of breach of fiduciary duty and failure to protect the assets.").  Whether the change in testimony four years later is a failure of memory or a self-serving statement to try to obtain higher limits of coverage, the Court need not accept the conclusory testimony relied upon by the Bank.  The Court should look to Smith's understanding at the time in question, and find that prior to July 2018, Smith was aware of facts and circumstances that he subjectively did regard as the basis for a potential claim.

The objective prong of the prior knowledge endorsement provides a second, and alternative, basis for limiting coverage.  In addition to Smith's own subjective beliefs about the possibility of a future claim, the record is clear that he had knowledge of a number of facts and circumstances that would lead an objective insured to know that there was the basis for a potential claim.  Without limitation, it is undisputed that Smith knew that:

- Linda would be unhappy if the ranch was sold in 2016 (Exh. 31 at 35-36);

- Linda refused to consent to the Bank's sale of the ranch and alleged that the sale price was for millions of dollars less than its fair market value (Exh. 1);

- Linda had alleged that a sale on the proposed terms was "not in the best interest of the remainder beneficiaries" and was "a breach of the bank's fiduciary duty" (Exh. 2; Smith Depo. (Exh. 31) at 46);

- Linda had complained about the Bank's failure to disclose the MPA to her (Smith Depo. (Exh. 31) at 88; MPA Petition (Exh. 3) ¶ 17);

- Linda thought the Bank did not conduct an inadequate investigation of the MPA (Smith Depo. (Exh. 31) at 86);

- Linda believed the Bank should be supporting her in questioning the validity of the MPA, not expending estate funds to uphold an agreement adverse to the assets of the estate (Exh. 14; Exh. 33 - RFA No. 27);

- Linda had filed a summary judgment response, alleging that the Bank attempted to extort a release from Linda, that the Bank had failed to properly investigate the validity of the MPA, and that the Bank had filed a motion for summary in support of the MPA "in hopes to avoid a future lawsuit over [the Bank's] failures to protect the estate" (Exh. 40 ¶¶ 87, 89 p. 2; Exh. 33 - RFA No. 32); and

- Linda continued to allege that the Bank failed to protect and defend the assets of the estate, even after the Bank asked her to withdraw that allegation (Exh. 19; Exh. 33 – RFA No. 31).

Because a reasonable person would objectively view these undisputed facts as the basis for a potential claim, it is appropriate to grant summary judgment on this prong as well.

In arguing for a different result, the Bank claims that no reasonable trust department would have expected a potential claim by Linda before July 2018, because Linda never filed an injunction to stop the sale of the ranch, never threatened the Bank with legal action, and never asserted any causes of action against the Bank in the MPA Lawsuit. Bank MSJ ¶ 50. However, the prior knowledge endorsement does not require a claim or lawsuit to already have been filed against the insured. *See Aztec Abstract & Title Ins., Inc. v. Maxum Specialty Group*, 302 F.Supp.3d 1274, 1284 (D. N.M. 2018) (holding that prior knowledge exclusion "should not be interpreted to exclude only coverage for ripened claims that had already been made or were certain to be made as of the time of policy inception"). (Indeed, to interpret the prior knowledge endorsement as applying only when some litigation has previously been filed against the insured would render it superfluous and duplicative of the

Policy's prior *litigation* endorsement.)  Nor does the prior knowledge endorsement require an express threat of litigation against the insured in order to apply.  "Quite the contrary, numerous courts have held that the actual threat of a suit is not necessary to establish the insured's prior knowledge of a potential claim."  *Westport Ins. Corp. v. Albert*, 2005 WL 1308534, at *5 (D. Md. 2005) (finding prior knowledge based on statements in probate action that insured breached fiduciary duties to the estate and beneficiaries, mismanaged estate property, and failed to account for assets of the estate).  All that is required is that a reasonable insured would understand his actions might be the basis of a future claim.  *See Westport Ins. Corp. v. Cotton Schmidt, LLP*, 605 F.Supp.2d 796, 805 (N.D. Tex. 2009).

In its motion for summary judgment, the Bank also relies heavily upon a statement made by Linda's attorney in February 2018 that "we have not asserted *in this litigation* a claim of breach of fiduciary duty."  Bank MSJ ¶ 51.  But the record is clear that neither Linda nor her attorney ever promised not to assert claims against the Bank *in a future suit*. *See* Cavanah Depo. (Exh. 48) p. 61 (Q. "Did Linda Moody or Linda Moody's attorneys ever promise that Linda would not bring claims against the bank in a different lawsuit?  A. No.").  In fact, Linda's counsel expressly referred to a potential lawsuit against the Bank in pleadings post-dating that February 2018 statement. [6] Exh. 40 at 2 (asserting the Bank

---

[6]  Similar statements were also made by Linda's counsel in later court hearings.  *See* 3/7/2018 Hearing on Motions for Summary Judgment (Exh. 49) at 51 (alleging MNB did no investigation of the MPA and stating "that isn't really the issue for today but that's going to be an issue for a different, perhaps, proceeding"); 5/15/2018 Hearing on Motions in Limine (Exh. 50) at 167-68 (arguing Linda can introduce the Bank's failure to investigate the MPA, because the Bank is defending the agreement and "we have a right to challenge their opinions and their concerns . . . now that they're going to get sued.  So, they're . . . working harder to try to find this document [valid].").

had filed a motion for summary judgment seeking to uphold the MPA, "in hopes to avoid a future lawsuit over its failures to protect the Estate"). Linda's counsel also continued to question "whether or not MNB is complying with its fiduciary obligations," claimed that the Bank had "attempted to extort a release for its improper actions as a fiduciary," and alleged that the Bank had failed to properly investigate the validity of the MPA, improperly coordinated its defense with Darlene, and filed a summary judgment motion that would reduce the assets of the estate by approximately $20,000,000. Id. ¶¶ 86, 87, 89. Linda also refused to withdraw her allegation that the Bank "has failed to comply with its duties to protect and defend the assets of the Estate," and continued to assert such allegation throughout the entirety of the MPA Suit. *Compare* Exh. 16 (asking Linda to remove that allegation in February 2018) *with* Exh. 19 p. 5 (reasserting the Bank's failure to protect and defend the assets of the estate at the close of discovery in May 2018). The Bank's argument that it "did not have *any* reason to suspect that Linda would file suit in February 2020" therefore rings hollow. There were an abundance of reasons and more than $20,000,000 in disputed estate funds to think a future suit was likely.[7]

---

[7] Relying on *One Beacon Insurance Co. v. T. Wade Welch & Associates*, 841 F.3d 669 (5th Cir. 2016), the Bank also argues that the prior knowledge endorsement renders coverage illusory. However, coverage is illusory only where it does not provide coverage for *any* claim. *See Balfour Beatty Const., LLC v. Liberty Mutual Fire Ins. Co.*, 968 F.3d 504, 515 (5th Cir. 2020). Here, that is not the case. Different from the provision at issue in *One Beacon*, the Wesco Policy does not exclude coverage for "every single thing the insured does or does not do." In *One Beacon*, coverage was excluded every time the insured "had a reasonable basis to believe it had committed a wrongful act." The court held that such an exclusion was overbroad because it did not require the insured to *also* foresee such act may result in a claim. The Wesco Policy, by contrast, includes this additional requirement. Wesco's prior knowledge endorsement applies only where an Executive of the Bank knows of a fact or circumstance that "reasonably would be regarded as the basis for a Potential

## V.     The Known Loss Doctrine Applies

Coverage is also precluded by the known loss or fortuity doctrine.  As the Bank agrees, that doctrine applies if the insureds "knew at the inception of coverage that they were engaging in activities which might reasonably be expected to expose them to or result in liability." *RLI Ins. Co. v. Maxxon Southwest, Inc.*, 108 Fed.Appx. 194, 199 (5th Cir. 2004).  And here, the Bank knew it was selling the ranch over the express written objection of one of its beneficiaries, who alleged the sale was a breach of fiduciary duty.  Exh. 2. The Bank also knew it was taking positions in the MPA Suit that its beneficiary had alleged were inconsistent with the Bank's fiduciary obligations and duties to protect the assets of the estate.  Exh. 14; Exh. 40 ¶ 86.  Having already engaged in such activities, and having already received allegations that such activities were a breach of duty, the Bank could not "then purchase insurance [to] shift financial responsibility for its conduct." *RLI Ins. Co. v. Maxxon Southwest, Inc.*, 256 F.Supp.2d 727, 730 (N.D. Tex. 2003); *accord Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 208 F.Supp.2d 687, 691 (S.D. Tex. 2001).

In arguing that the fortuity doctrine does not apply, the Bank mostly incorporates its prior arguments regarding the prior knowledge endorsement.  Wesco likewise relies upon the extensive set of facts known to the Bank, described above.  However, it should be noted that the fortuity doctrine is a common law doctrine inherent in every insurance

---

Claim" (that is, a Wrongful Act that may subsequently give rise to a Claim).  By requiring an Executive to know not just of "any act," but of *an act that reasonably would be regarded as the basis for a potential claim*, the Wesco Policy does not run into the same problem created in *One Beacon*.  The Bank's claim of illusory coverage is therefore misplaced, and does not allow the Bank to avoid the prior knowledge endorsement.

policy, and it does not depend upon any particular language in the policy. *See Sentry Ins. V. DFW Alliance Corp.*, 2007 WL 507047, at *8 (N.D. Tex. 2007). The fortuity doctrine also applies not just to those facts about which the insured *actually* knew, but also those that it *should have known*. *See Wesco Ins. Co. v. Layton*, 725 Fed.Appx. 289, 294 (5th Cir. 2018); *BITCO General Ins. Corp. v. Acadia Ins. Co.*, 427 F.Supp.3d 838, 856 (E.D. Tex. 2019). Accordingly, to the extent the Bank contends that one of its Executives did not actually read the contents of documents sent to him, or was not actually informed of facts known by the Bank's representatives, such arguments will not defeat application of the fortuity doctrine. *See Layton*, 725 Fed.Appx. at 293; *In re Vantage Benefit Administrators, Inc.*, 2021 WL 2954819, at *6 (Bkry. N.D. Tex. 2021) (each recognizing that knowledge can be imputed to the insured for purposes of fortuity doctrine). Because the Bank was or *should have been* aware of facts reasonably expected to expose the Bank to liability at the time it requested the July 2018 Policy, the fortuity doctrine bars coverage under that policy.

## VI. Wesco's Internal Claim Notes Are Irrelevant and Inadmissible

At various points, the Bank refers to entries made in Wesco's internal claim notes. For example, the Bank suggests that Wesco's claim notes acknowledge the MPA Suit did not involve any allegations against the Insured. Bank MSJ ¶ 17. The Bank also argues the claim notes acknowledge that the Fiduciary Duty Suit has "no inter-relationship to other claims." Bank MSJ ¶ 3. As described below, however, these internal claim notes are not relevant to the Court's application of unambiguous Policy language to the undisputed written documents at issue in this case. These notes are also taken out of context.

Texas law is clear that the interpretation and construction of an insurance policy is

a question of law for the Court to determine. *See Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 858-59 (5th Cir. 2014). Whether a contract is ambiguous is also a question of law. *Id.* Ambiguity cannot be created by facts extrinsic to the policy language. *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676-77 (Tex. App. Austin 2003). "Ambiguity must be determined by the four corners of the Policy itself without reference to parole evidence." *Saratoga Resources, Inc. v. American Intern. Group, Inc.*, 102 F.Supp.3d 915, 919-20 (S.D. Tex. 2015). And it is the Court – not anyone else – that determines whether the Policy is subject to more than one reasonable interpretation or application. *See Betco Scaffolds Co., Inc. v. Houston United Cas. Ins. Co.*, 29 S.W.3d 341, 344 (Tex. App. - Houston (14 Dist. 2000)) (en banc).

Here, the language of the policy is unambiguous. The pleadings and other written documents to which that language must be applied are also undisputed. The interpretation and application of the Policy is therefore a question of law for the Court to decide, and the parties' subjective beliefs or understandings of how the policy works are not relevant or material to the Court's task in this case. *See, e.g.*, *Lawyers Title Ins. Corp.*, 739 F.3d at 858-59; *Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358, 1364 (5th Cir. 1987). Where application of the policies' language to the claim "does not produce an uncertain or ambiguous, but leads only to one reasonable conclusion," no parol evidence of the parties' intentions is permitted or required. *See National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).

Consistent with the above, Texas courts refuse to consider extrinsic evidence about the interpretation or application of an unambiguous policy provision at summary judgment.

For example, in *Shafaii Children's Trust v. West American Insurance Co.*, 417 S.W.3d 614 (Tex. App. - Hous. (14 Dist.) 2013), the Court rejected the insured's attempt to rely on evidence that the insurer's adjuster agreed with its interpretation of how the limits of the policy applied to a loss, holding that the adjuster's understanding could not be admitted for purposes of creating ambiguity or contradicting the language of the policy. *See id.* at 621. Similarly, in *Mitchell v. State Farm Lloyds*, 2009 WL 596611 (Tex. App. - Dallas 2009), the Court rejected the insured's attempt to rely upon an adjuster's testimony regarding her interpretation of certain policy terms, holding that the testimony was not admissible to create ambiguity. *Id.* at *6. Other decisions have likewise excluded testimony, affidavits, and opinions about how the policy should be interpreted or applied, where the policy language was not ambiguous. *See Tolar v. Allstate Texas Lloyd's Co.*, 772 F.Supp.2d 825, 831-32 (N.D. Tex. 2011); *RSI Intern., Inc. v. CTC Transp., Inc.*, 291 S.W.3d 104, 110 (Tex. App. Fort Worth 2009); *Sustainable Modular Mgmt. v. Travelers Lloyds Ins. Co.*, 2022 WL 2133870, at *1-2 (N.D. Tex. 2022). Accordingly, Wesco's claim notes are not relevant or material to the Court's decision on summary judgment, and the Court should not consider such documents in applying the clear terms of the Policy.

The claim notes also do not provide the type of evidence suggested by the Bank. A reading of those notes shows that they were not intended as any sort of unequivocal or final decision about any of the coverage issues in this case. The February 2017 notes addressed the preliminary question of whether there was a claim of liability for which the insured was seeking coverage, or whether the Bank was simply providing notice of a potential claim. *See* Bank <u>Ex. E</u>, at 6516. And the claim notes related to the Fiduciary Duty Suit addressed

the question of whether that suit should be *handled under the same claim number* as the prior notice of circumstance or one other claim involving the Bank. *See* Bank Ex. L at 12155-56. The May 28, 2020 note also reflected the adjuster's preliminary opinion, prior to receipt of documents from the insured (including Linda's demand letters), and prior to the engagement of coverage counsel. *See* Ivy Depo. (Exh. 46) 181-82, 225-227. And the August 3, 2020 note was focused on relatedness to one specific other claim (claim number 3235145) that involved a different claimant and different defendants. [8] *See* Bank Ex. L at 12155. These notes were not some final or exhaustive statement on all possible claims to which Linda's fiduciary Duty Suit might be interrelated within the meaning of the Policy. In applying the clear language of the Policy to the undisputed facts in this case, the Court should therefore disregard the internal claim notes relied upon by the Bank.

## CONCLUSION

For the reasons stated herein, and in Wesco's own motion for summary judgment, the Court should deny the Bank's motion for summary judgment and dismiss the Bank's counterclaim for breach of contract. The Court should instead grant Wesco's motion for summary judgment and declare that coverage for the current Fiduciary Duty Suit is limited to a maximum of $1,000,000 under either the July 2015 Policy or July 2018 Policy.

---

[8] While the August 3, 2020 note mistakenly states that claim number 3235145 involved the same trusts, this is not accurate. Claim number 3235145 involved a claim by Robert Moody Jr. against Buddy Herz for breaches of fiduciary duty in his role as trustee of the "Three R Trusts," set up by Robert Moody Sr. *See* Exh. 45 pp. 4, 7. It did not involve the Living Trust or the marital trusts set up by W.L. Moody IV, for which the Bank served as trustee. Nor does claim number 3235145 involve any claims or allegations by Linda Moody or against the Bank as a defendant. *See* Exh. 44.

Respectfully submitted,

Dated:  October 28, 2022

By:  _/s/ Daniel A. Ellerbrock_____
Daniel A. Ellerbrock, Esq. attorney-in-charge
MN Bar No. 0392039 (admitted *pro hac vice*)
GREGERSON, ROSOW, JOHNSON & NILAN
100 Washington Square, Suite 1550
Minneapolis, MN 55401
Phone: (612) 338-0755
Fax: (612) 349-6718
dellerbrock@grjn.com

In association with:

Alissa K. Christopher, Esq. Counsel
State Bar No. 11531020
Southern District of Texas Bar No. 16201
COZEN O'CONNOR
1717 Main Street, Suite 3100
Dallas, TX 75201
Phone: (214) 462-3036
Fax: (214) 462-3299
akchristopher@cozen.com

*Attorneys for Wesco Insurance Company*

## **CERTIFICATE OF SERVICE**

This certifies that, on October 28, 2022, a true copy of the foregoing was served on all counsel of record who are registered ECF users pursuant to the Federal Rules of Civil Procedure.

/s/ *Daniel A. Ellerbrock*
Daniel A. Ellerbrock